**LOWENSTEIN SANDLER LLP**
Kenneth A. Rosen, Esq.
Bruce Buechler, Esq.
Gerald C. Bender, Esq.
Wojciech F. Jung, Esq.
Shirley Dai, Esq.
65 Livingston Avenue
Roseland, New Jersey 07068
(973) 597-2500 (Telephone)
(973) 597-2400 (Facsimile)

*Proposed Counsel to the Debtors and*
*Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| Dots, LLC, *et al.*,[1] | Case No. 14-11016 (___) |
| Debtors. | (Joint Administration Requested) |

**DECLARATION OF LISA RHODES, CHIEF EXECUTIVE OFFICER**
**OF DOTS, LLC, IN SUPPORT OF DEBTORS' CHAPTER 11**
**PETITION AND FIRST DAY MOTIONS**

---

[1]     The Debtors in these chapter 11 cases are Dots, LLC, IPC/Dots LLC, and Dots Gift LLC.  The last four digits of Dots, LLC's and IPC/Dots LLC's tax identification numbers are (3957) and (8282), respectively.

I, Lisa Rhodes, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I am the Chief Executive Officer of Dots, LLC ("**Dots**") and Dots Gift LLC, and a Director of IPC/Dots LLC, the above-captioned debtors and debtors-in-possession (together the "**Debtors**," or the "**Company**").

2.      I have been employed by Dots since August 2012.  Prior to joining the Company, I served as the Senior Vice President of Wal-Mart's U.S. apparel merchandising division and Executive Vice President and Chief Merchandising Officer of Maurice's, a specialty retailer of women's clothing.  Prior to that, I worked at Charming Shoppes, Marshall's and Macy's.  I have over 30 years of experience in the retail industry.

3.      As a result of my work for and on behalf of the Company, I am familiar with the Company's business and financial affairs.  I am responsible, together with the other members of the Company's senior management team, for, among other things, devising and implementing strategies for the Company, including, *inter alia*, (i) understanding and shaping the business and financial affairs of the Company; (ii) developing a cash flow analysis and assessing the current liquidity position of the Company; (iii) exploring and implementing various restructuring strategies for the Company; and (iv) serving as a principal contact with the Company's creditors and vendors.  I am familiar with the Company's books and records, and I have acquired extensive knowledge of the Company and its day-to-day operations and business affairs, including its assets, liabilities, historical operations, and future plans.

4.      I submit this declaration (the "**Declaration**") pursuant to section B(3) of the *Guidelines Governing First Day Matters*, set forth in Appendix A to rule 6003-1 of the Local Rules of the United States Bankruptcy Court for the District of New Jersey (the "**Local**

**Bankruptcy Rules**") in support of the voluntary petitions for relief for the Debtors' cases (together, the "**Chapter 11 Cases**") under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") and the motions and applications for related relief filed as of the date hereof (the "**Petition Date**") or concurrently herewith (collectively, the "**First Day Pleadings**").

      5.     I have reviewed the First Day Pleadings or have otherwise had their contents explained to me and, to the best of my knowledge and insofar as I have been able to ascertain after reasonable inquiry, I believe that approval of the relief requested therein is necessary to minimize disruption to the Debtors' business operations, permit an effective transition into chapter 11, and preserve and maximize the value of the Debtors' estates.  I also believe that absent immediate access to financing and authority to make certain essential payments and otherwise continue conducting ordinary course business operations as described in greater detail in the First Day Pleadings, the Debtors would suffer immediate and irreparable harm to the detriment of their estates, creditors, and other stakeholders.

      6.     Except as otherwise indicated, the facts set forth in this Declaration are based upon my personal knowledge of the Debtors' business operations, my review of relevant documents, information provided to me or verified by other managers, employees or the Debtors' professional advisors, including Lowenstein Sandler LLP ("**Lowenstein Sandler**") and PricewaterhouseCoopers LLC ("**PwC**"), and/or my opinion based upon my experience, and/or knowledge and information concerning the Debtors' financial records and the retail industry generally.  Unless otherwise indicated, the financial information contained in this Declaration is unaudited and subject to change.

7.      I am authorized to submit this Declaration on behalf of the Debtors and, if called upon, I would testify competently to the facts set forth herein.

## PRELIMINARY STATEMENT

8.      Dots is a leading retailer of fashionable clothing, accessories, and footwear for price-conscious women.  The Company's growth and success was founded on a passion for delivering value to the customer.  With over 25 years of experience offering distinct fashion at everyday low prices, Dots provides missy and plus size choices to fashion savvy 25 to 35 year old women.

9.      Beginning in the fourth quarter of 2011, prior management instituted a number of new merchandising strategies and operational tactics that resulted in a downturn in store traffic and overall financial performance.  Dots' financial difficulties have been exacerbated by adverse economic conditions and a number of largely unsuccessful changes in product pricing and marketing, as well as a burdensome lease portfolio.

10.      Beginning with the hiring of a new, highly-experienced management team in the second half of 2012, Dots instituted a repositioning strategy to address its operating challenges and recapture its core customer base by focusing on new brand positioning, pricing, product merchandising and marketing initiatives, as well as rationalizing the Company's lease portfolio.

11.      While the Company's turnaround strategy has begun to improve trends in comparable store sales growth, the overall business continues to be under financial pressure with sales below projections.  Simultaneously, the Company's cash needs are significant and liquidity

continues to be strained.  Although IPC/Dots L.P. ("**IPC**"), which acquired the Company in early
2011 has, through related parties, devoted significant resources to fund the Company's
operations and cash needs, the Company continues to face hurdles in terms of its ability to meet
cash and non-cash obligations.

12.    The Company's liquidity has been strained in large part due to third-party
payment pressures.  Beginning in approximately October 2013, certain of the Company's
vendors and factors contracted credit terms and/or began demanding that the Debtors pay for
goods on significantly shortened timeframe or upon delivery.  In fact, certain creditors received
payment from Dots premised on the release of new goods but failed to deliver, thereby causing
significant liquidity challenges.  Consequently, in December 2013, the Company retained PwC
and Lowenstein Sandler to assist the Debtors in evaluating strategic alternatives and, in January
2014, initiated a broad marketing campaign in an effort to sell the Company's assets.

13.    The Company filed the Chapter 11 Cases in order to gain access to
necessary operating liquidity and enable it to swiftly and effectively move toward a sale of some
or all its businesses while minimizing administrative expenses.  Furthermore, the chapter 11
process will create the opportunity to right-size the Company's store footprint through lease
rejections, a process which is intended to enable the Company to emerge from the Chapter 11
Cases as a going concern and a financially stable company, albeit under new ownership.

14.    To familiarize the Court with the Company's businesses and the first day
relief sought by the Debtors, this Declaration is organized into three sections.  **Part I** provides
background information with respect to the Debtors' business operations and corporate history,
as well as a summary of the Company's pre-petition capital structure.  **Part II** describes the

circumstances leading to the commencement of the Chapter 11 Cases.  **Part III** summarizes the

relief requested in and the facts supporting each of the First Day Pleadings.

## PART I
## BACKGROUND

A.      **Company History, Organization And Structure**

15.      Founded in 1987 in a small suburb of Cleveland, Ohio, Dots is widely

known for its broad assortment of hip, fun, and trendy apparel and accessories offered at

exceptional values.  Dots is one of the leading value-priced fashion retailers in the United States

and a pioneer in bringing a mall-inspired, fast-fashion women's specialty retail concept for the

value-conscious consumer to regional and community off-mall properties.  The Dots brand has

become synonymous with affordable fashion, proving that looking good does not have to be

expensive.

16.      In 2008, Dots began launching products under its own label.  A year later,

Dots upgraded its headquarters to a 193,000 square foot corporate office campus and distribution

facility in Glenwillow, Ohio.  In 2011, the Company was acquired by IPC, a leading middle-

market private equity firm with significant experience investing in specialty retail and apparel

companies.  In the second half of 2012, the Company hired new management and seasoned

executives to develop and implement new merchandise and marketing strategies to fit the

multiple lifestyle needs of fashionable women.

17.     The Debtors' current organizational chart and a description of each entity

are set forth below:

**IPC/DOTS LLC
POST-CLOSING ORGANIZATIONAL CHART**



- <u>IPC/Dots LLC</u>: a Delaware limited liability company.

- <u>Dots, LLC</u>: a Delaware limited liability company that is wholly owned by IPC/Dots LLC.
  Dots, LLC is the lessee of the Debtors' approximately 400 retail stores and the operating
  company for the Debtors' business.

- <u>Dots Gift, LLC</u>: an Ohio limited liability company that issues the Company's gift cards.
  Dots Gift LLC is wholly owned by Dots, LLC.

**B.**       **Current Businesses and Operations**

18.       As part of the Company's recent initiatives, the new management team has developed an action plan to address the decline in sales and to reverse disappointing trends.  The Company has realigned its product offering, increased its plus-size offering, and improved the quality of its product.

19.       As a result of these measures, in-store conversion is at historical highs and the Company has experienced increased customer loyalty.  Between August 2012 and November 2013, Dots showed improvements in customer satisfaction, receiving "good/excellent" ratings in customer-satisfaction surveys for fit, quality, fashion, and availability of items.  In addition, Dots' survey rating for price has stabilized.

20.       The Company has also invested in technology at both its Glenwillow, Ohio headquarters and New York City merchandising center.  Dots' new management has launched several initiatives in e-commerce, private label credit cards, and customer relationship management, and created new platforms for dialogue with the Company's customers through Facebook, Twitter, Instagram, Pinterest, and blogs.

21.       In addition to selling value-priced fashion apparel, shoes, and accessories for the missy and plus-size markets at approximately 400 retail stores throughout the Midwest, East, and South United States, Dots also sells merchandise online and maintains an e-commerce website at www.dots.com.  For the fiscal year ended January 31, 2013, Dots generated approximately $338.8 million in sales, as compared to sales for the fiscal year ended January 31, 2012 of $346.2 million, respectively.  The Company currently estimates sales of $293.7 million for the fiscal year ending January 31, 2014.

22.     Despite signs of business improvement, Dots has decided to file for chapter 11 with the goal of disposing of its underperforming stores, restructuring its balance sheet, and attracting new investors who will continue to operate the Company as a going concern.   Management is confident that the chapter 11 process will provide the Company sufficient time to see positive changes in the year-old marketing strategy and increased consumer recognition of new merchandise.

**(i)     Dots' Retail Stores**

23.     The Company currently operates approximately 400 retail stores located in vibrant off-mall real estate throughout 28 states.   Dots' retail stores are in attractive, high-traffic retail centers that are well suited for destination consumers and frequent shoppers.   Dots' national retail store footprint is set forth on the following map:



**(ii)     Workforce**

24.     The Debtors' workforce includes approximately 3,500 individuals in their stores, distribution center, and corporate headquarters, including approximately 1,250 full-time employees and approximately 2,250 part-time employees.   The Company also periodically employs temporary employees through various temporary employee agencies, and utilizes the services of independent contractors in the areas of marketing, finance, information technology, merchandising, and human resources.

**(iii)     Business Operations And Product Flow**

25.     After conducting extensive market research, the Company's new management team reshaped Dots' offering and selection to appeal to 25-35 year old women, one of the fastest growing and highest-spending demographic groups in retail.

26.     The Company currently offers a broad assortment of styles, colors and sizes that target this group and promotes its products through the customer-friendly service of its employees, who serve as "personalized shoppers."   The broad assortment of merchandise also allows the Company to purchase in limited quantities and continually refresh merchandise throughout selling seasons based on customer buying trends.

27.     Dots' sourcing arrangements from both domestic vendors and domestic importers maximize short cycle times to further reduce inventory risk.   This model optimizes costs, quality, and efficiency.

C.      **The Debtors' Prepetition Debt Structure**

      (i)      **Prepetition Senior Credit Documents**

      28.      As of the Petition Date, the Debtors have outstanding secured debt owed to Salus Capital Partners, LLC ("**Salus**" or the "**Prepetition Senior Lender**"), which includes a (i) a revolving component in the original principal amount of up to $35 million (the "**Revolving Facility**"), and (ii) a term loan facility in the original principal amount of $16 million ("**Term Facility**").  As of the Petition Date, $14.5 million remains outstanding under the Revolving Facility and $16.1 million remains outstanding under the Term Facility (collectively, together with any amounts incurred or accrued, but unpaid prior to the Petition Date, the "**Prepetition Senior Obligations**").  To secure the Prepetition Senior Obligations, except for certain permitted encumbrances (the "**Permitted Liens**"), the Debtors granted the Prepetition Senior Lender first-priority security interests in and liens on substantially all their personal and real property (collectively, the "**Prepetition Collateral**").

      (ii)      **Prepetition Subordinated Credit Documents**

      29.      As of the Petition Date, the Debtors have outstanding secured debt owed to IPC-related parties (the "**Prepetition Subordinated Lenders**" and together with the Prepetition Senior Lender, the "**Prepetition Secured Creditors**") that is junior and subordinate to the Prepetition Senior Obligations (the "**Prepetition Subordinated Obligations**").  To secure the Prepetition Subordinated Obligations, the Debtors granted the Prepetition Subordinated Lenders second-priority security interests and liens on the Prepetition Collateral.  IPC is also an equity holder of the Debtors.

(iii)     **Prepetition Subordination Agreement**

30.     Prior to the commencement of the Chapter 11 Cases, the Debtors

consented to and agreed to be bound by a subordination agreement by and among the Prepetition

Senior Lender and Prepetition Subordinated Lenders (the "**Prepetition Subordination**

**Agreement**"), which governs the relationship and relative rights by and among the Debtors and

the Prepetition Secured Creditors.

(iv)     **Trade Debt**

31.     As of the Petition Date, the Debtors have aggregate unsecured debts

totaling approximately $47.0 million, which include amounts owing for merchandise, utilities,

rents, professional fees, and employee-related expenses.  Of that amount, approximately $13.8

million constitutes trade vendor payables.

32.     As discussed in detail in **Part III** below, Dots seeks authority to pay a

limited number of critical vendors who provide crucial seasonal inventory that cannot be re-

sourced.  Dots also seeks authority to pay pre-petition amounts owed to certain freight

forwarders, carriers, and other logistics providers that transport Dots' merchandise and who may

assert a possessory lien over Dots' goods in their possession.

**PART II**
**EVENTS LEADING TO THE DEBTORS' CHAPTER 11 CASES**

A.     **Adverse Economic Conditions, Strategic Setbacks, And Restructuring Efforts**

33.     For most of its operating history, the Company has operated profitably.

However, the economic downturn that occurred in the past few years created a difficult operating

environment for Dots' businesses and for apparel retailers in general.  Moreover, all aspects of

the women's apparel, accessories, and shoe businesses are highly competitive.  Many of Dots'

competitors are other specialty retailers and large national chains that have substantially greater resources than the Company and are better known to shoppers, including Target and Wal-Mart, and are normally located in strip malls or shopping centers in very close proximity to Dots' stores.  As a result of increased competition, Dots has faced greater pressure to maintain market share, which has directly and negatively affected its sales, margins, and, thus, its profitability.

34.     Traffic to retail stores began to drop in 2011 due to macro-economic challenges and the Company's aging customer base.  To combat the declining sales, in 2012, prior management initiated programs that ultimately resulted in the quality of the Company's merchandise offering being compromised and its core customer base disappointed.  For example, the Company initiated programs that (a) introduced product lines that were too young for its customer base; (b) lacked versatility in merchandise offered in its stores; (c) limited selection of larger-sized products, (d) decreased overall product quality, and (e) communicated pricing that confused the customer.

35.     I joined Dots as Chief Executive Officer in the second half of 2012, along with a new highly-experienced management team, to develop and implement a repositioning strategy for the Company.  Together with the new management team, I assessed Dots' business performance (including product, pricing, processes, and merchandising) and the Company's real estate portfolio.  My team and I proactively began implementing new strategies to update Dots' merchandise, target underperforming stores, streamline the Company's business, and operate a core group of profitable stores under favorable or market lease obligations.

36.     The fruits of new management's labor and hard work have not materialized as quickly as expected.  Despite the Company's path towards profitability, general

macro-economic factors and unfavorable store leases have continued to hamper the Debtors'
businesses, placing a significant strain on Dots' liquidity, and ultimately leading to the
commencement of the Chapter 11 Cases.

37.    Dots, however, is optimistic.  The Company has a history of positive cash
flow, and it now has a seasoned management team and an efficient sourcing infrastructure model
in place.  Dots believes that the combination of fresh merchandise, coupled with other
repositioning strategies and a streamlined lease portfolio, will enable it to thrive as a profitable
player in the retail market.  Seeing such initiatives to completion requires commencing the
Chapter 11 Cases, which will allow Dots to address unfavorable legacy leases and obtain
additional financing to meet its liquidity needs.

**B.     Unfavorable Lease Agreements**

38.    Dots does not own the real property for its approximately 400 retail
locations.  Instead, Dots leases its stores, headquarters, and distribution center from numerous
lessors.  Many of Dots' stores are subject to real property leases with unfavorable terms that have
negatively impacted the Company's overall operating performance, contributing to Dots'
financial deterioration.  In connection with its 2012 turnaround initiative, Dots carefully assessed
its real estate portfolio and reviewed the quality of its existing store base by trade area, location
type, and competitive landscape.  Through this real estate assessment, Dots determined that
certain stores are not strategic to its business and should be closed so the Company can right-size
its store footprint.

39.    Specifically, Dots has determined that 36 of its leased stores are
chronically underperforming due to either the location and competitive landscape of the store, or

-14-

because such stores are currently subject to unfavorable lease terms.  These leases include above-market rent or restrictions that limit Dots' flexibility to adjust its lease portfolio as the market changes.  The Debtors intend to use the tools available in chapter 11 to reject leases that are burdensome to their estates and/or secure meaningful economic concessions from landlords to rationalize their lease portfolio.

40.    As part of this goal, and as more fully described in **Part III** below, the Debtors will transfer inventory from 36 underperforming retail stores for sale at their other retail locations, and will seek to reject the leases for those stores as of January 31, 2014.  This will ensure that the Company does not continue to incur burdensome administrative costs related to these chronically underperforming stores as it undergoes its restructuring.

### C.    Need for Post-Petition Financing

41.    The Debtors require additional liquidity as a bridge to a sale or other restructuring initiative, and have sought post-petition debtor-in-possession financing (the "**DIP Financing Facility**").  In a motion filed concurrently herewith, and as more fully described in **Part III** below, the Debtors seek authority to enter into a $36 million DIP Financing Facility with Salus, their Prepetition Senior Lender.  Dots believes the proposed DIP Financing Facility presents the best and only option available.  The DIP Financing Facility will enable the Company to continue to maximize the value of the Debtors' businesses and properties, and operate their businesses through a going-concern sale.

### D.    Pre-Petition Sale Efforts

42.    In December 2013, Dots retained Lowenstein Sandler and PwC to assist the Company's board of directors and management team in evaluating strategic alternatives

regarding the sale of the Dots business.  Dots has filed the Chapter 11 Cases to gain access to

necessary liquidity and evaluate its options, including sale of some or all of its business and

reorganization under a smaller store footprint.

## PART III
## FIRST DAY MATTERS

### A.      Relief Sought In The First Day Pleadings

43.      It is critically important for the Debtors to maintain the loyalty and

goodwill of, among other constituencies, their vendors, employees, and customers.  Achieving

this goal is likely to be particularly challenging while conducting a marketing campaign for the

ultimate section 363 sale of the Company.  To that end, the Debtors have filed the First Day

Pleadings seeking relief intended to allow the Debtors to effectively transition into chapter 11

and minimize disruption to the Debtors' business operations, thereby preserving and maximizing

the value of the Debtors' estates.  Unless this "first day" relief is granted, I believe the Debtors'

business operations will suffer significant adverse, immediate, and irreparable consequences.

44.      Several of the First Day Pleadings request authority to pay certain pre-

petition claims.  I am told by my advisors that rule 6003 of the Federal Rules of Bankruptcy

Procedures (the "**Bankruptcy Rules**") provides, in relevant part, that the Court shall not

consider motions to pay pre-petition claims during the first 21 days following the filing of a

chapter 11 petition "except to the extent relief is necessary to avoid immediate and irreparable

harm."  In light of this requirement, and as set forth below, the Debtors have narrowly tailored

their requests for immediate authority to pay certain pre-petition claims to only those

circumstances where the failure to pay such claims would cause immediate and irreparable harm

to the Debtors and their estates.   Accordingly, certain requests for relief will be deferred for consideration at a later hearing.

45.      I have reviewed each of the First Day Pleadings or had their contents explained to me.  The facts stated therein and described below are true and correct to the best of my information and belief, and I believe that the relief sought in each of the First Day Pleadings is necessary to enable the Debtors to operate in chapter 11 with minimal disruption to their business operations, and constitutes a critical element in successfully restructuring the Debtors' business.  A brief summary of the relief sought in each of the First Day Pleadings is as follows:[2]

**B.      Administrative Motions**

(i)      **Application for Designation as Complex Chapter 11 Cases (the "Complex Chapter 11 Application")**

46.      By the Complex Chapter 11 Application, the Debtors request entry of an order designating the Debtors' Chapter 11 Cases as a complex chapter 11 case pursuant to Exhibit F to the Court's *General Order Governing Procedures for Complex Chapter 11 Cases*, and rule 6003-1 of the Local Bankruptcy Rules.

47.      I believe that the relief requested in the Complex Chapter 11 Application is in the best interest of the Debtors' estates, their creditors, and all parties-in-interest, and will enable the Debtors to continue to operate their businesses in a streamlined fashion and allow the U.S. Trustee and other parties-in-interest to monitor the Chapter 11 Cases with greater ease and efficiency.   Accordingly, on behalf of the Debtors, I respectfully submit that the Complex Chapter 11 Application should be approved.

---

[2]      This section is intended only as a summary of the key provisions of the First Day Pleadings and the relief sought therein.  To the extent that this Declaration is inconsistent with any provisions of any of the First Day Pleadings, the terms of the First Day Pleadings shall control.  The Court is respectfully referred to the First Day Pleadings for the full details thereof.

      **(ii)**       **Application For Expedited Consideration Of First Day Matters (the "<u>Expedited</u> <u>First</u> <u>Day</u> <u>Application</u>")**

48.      The Debtors request entry of an order designating their First Day Pleadings as requiring expedited consideration before this Court.  I believe that the relief requested in the Expedited First Day Application is essential to avoid the potentially disruptive impact the commencement of the Chapter 11 Cases might have on the Debtors and will facilitate the Debtors' orderly transition into Chapter 11 and increase going concern value.  Accordingly, on behalf of the Debtors, I respectfully submit that the Expedited First Day Application should be approved.

      **(iii)**     **Motion for an Order Directing Joint Administration of the Debtors' Chapter 11 Cases (the "<u>Joint</u> <u>Administration</u> <u>Motion</u>")**

49.      The Debtors request entry of an order pursuant to section 105(a) of the Bankruptcy Code and Bankruptcy Rule 1015(b) directing joint administration of the Chapter 11 Cases for procedural purposes only.  Specifically, the Debtors request that this Court maintain one file and one docket for each of the Chapter 11 Cases under the lead case, Dots, LLC. Further, the Debtors request that an entry be made on the docket of each of the Chapter 11 Cases to indicate the joint administration of the Chapter 11 Cases.

50.      The Debtors also seek authority to file the monthly operating reports required by the U.S. Trustee's Operating Guidelines on a consolidated basis, but intend to track and break out disbursements on a Debtor-by-Debtor basis.

51.      Given the integrated nature of the Debtors' businesses, joint administration of the Chapter 11 Cases will provide significant administrative convenience without harming the substantive rights of any party-in-interest.  Many of the motions, hearings, and orders that will be filed in the Chapter 11 Cases will almost certainly affect each of the

Debtors.  The entry of an order directing joint administration of the Chapter 11 Cases will reduce

fees and costs by avoiding duplicative filings and objections and will allow the U.S. Trustee and

all parties-in-interest to monitor the Chapter 11 Cases with greater ease and efficiency.

52.     I believe that the relief requested in the Joint Administration Motion is in

the best interests of the Debtors' estates, their creditors, and all parties-in-interest and will enable

the Debtors to continue to operate their businesses in chapter 11 without disruption.

Accordingly, on behalf of the Debtors, I respectfully submit that the Joint Administration Motion

should be granted.

> **(iv)   Debtors' Application for Entry of an Order Authorizing the Retention of Donlin Recano & Company, Inc. as Claims and Noticing Agent Effective as of the Petition Date (the "Donlin Recano Application")**

53.     Pursuant to the Donlin Recano Application, the Debtors seek to retain

Donlin Recano & Company, Inc. ("**Donlin Recano**") as claims and noticing agent in the Chapter

11 Cases.  I believe that by retaining Donlin Recano, the Debtors' estates, and particularly their

creditors, will benefit from Donlin Recano's services.  Donlin Recano specializes in noticing,

claims processing, and other administrative tasks necessary to operate chapter 11 cases

effectively.  It is my understanding that Donlin Recano is fully equipped to manage claims issues

and provide notice to creditors and other interested parties in the Chapter 11 Cases.  Therefore,

on behalf of the Debtors, I respectfully submit that the Donlin Recano Application should be

approved.

> **(v)    Debtors' Motion for an Order Extending the Time to File Schedules of Assets and Liabilities, Schedules of Executory Contracts and Unexpired Leases and Statements of Financial Affairs (the "Schedules and Statements Motion")**

54.     The Debtors request entry of an order granting a 30-day extension of the

time to file their schedules of assets and liabilities and statements of financial affairs

(collectively, the "**Schedules and Statements**") for a total of 44 days after the Petition Date. The Debtors have thousands of potential creditors, and the breadth of the Debtors' business operations require the Debtors to maintain voluminous books and records, and complex accounting systems.   Given the size, complexity, and geographic scope of the Debtors' operations, as well as the number of creditors, I submit that the large amount of information that must be assembled to prepare the Schedules and Statements, and the hundreds of employee and advisor hours required to complete them, would be unnecessarily burdensome to the Debtors during the first 14 days following the Petition Date.   The Debtors are sensitive to the need to complete the Schedules and Statements as soon as possible, and they intend to complete the Schedules and Statements before the proposed 44-day deadline, if possible.

55.     I believe that the relief requested in the Schedules and Statements Motion is in the best interests of the Debtors' estates, creditors, and all parties-in-interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Schedules and Statements Motion should be granted.

**(vi)     Debtors' Motion for Entry of an Order (I) Granting the Debtors an Extension of Time to File Their List of Creditors and (II) Authorizing the Debtors and/or Their Agent to (A) Prepare Consolidated Lists of Creditors and Interest Holders in Lieu of a Mailing Matrix, (B) File a Consolidated List of the Debtors' Thirty (30) Largest Unsecured Creditors, and (C) Mail Initial Notices (the "Creditor Matrix Motion")**

56.     Pursuant to the Creditor Matrix Motion, the Debtors request entry of an order granting them an extension of time to file their list of creditors for 30 days after the Petition Date.   The Debtors also propose to prepare a consolidated list of creditors and interest holders available to all parties-in-interest in lieu of submitting a mailing matrix.   Additionally, the

Case 14-11016-DHS    Doc 19    Filed 01/20/14    Entered 01/20/14 22:27:23    Desc Main
Document    Page 21 of 43

Debtors seek authority to file a consolidated list of the Debtors' creditors holding the 30 largest unsecured claims.  Finally, the Debtors request that Donlin Recano, their proposed notice and claims agent, undertake all mailings directed by this Court, the U.S. Trustee, or as required by the Bankruptcy Code, including the notice of commencement of the Chapter 11 Cases.

57.    As previously stated, the Debtors have thousands of potential creditors, and the breadth of the Debtors' business operations require the Debtors to maintain voluminous books and records, and complex accounting systems.  Given the size and scope of the Debtors' operations and the number of creditors, I submit that the large amount of information that must be assembled to prepare the list of creditors, and the hundreds of employee and advisor hours required to complete it, would be unnecessarily burdensome to the Debtors at the beginning of the Chapter 11 Cases, which is a critical time for the Debtors.  The Debtors are sensitive to the need to complete the list of creditors as soon as possible, and they intend to complete the list of creditors before the proposed 30-day deadline, if possible.

58.    I believe that the relief requested in the Creditor Matrix Motion is in the best interests of the Debtors' estates, creditors, and all parties-in-interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Creditor Matrix Motion should be granted.

C.    **Operational Motions**

59.    The Debtors intend to ask for relief with respect to the following First Day Pleadings that directly impact the Debtors' ability to operate their businesses and manage their properties as a going concern.

(i)    **Debtors' Motion For Entry of Interim And Final Orders (I) Authorizing the Debtors to Obtain Post-petition Financing on a Senior Secured And Superpriority Basis; (II) Authorizing the Use of Cash Collateral; (III) Granting Adequate Protection; (IV) Scheduling Final Hearing Thereon; and (V) Granting Related Relief ("Financing Motion")**

60.    Subject to Court approval, the Debtors have negotiated and reached an agreement to enter into the DIP Financing Facility that consists of a senior secured, superpriority post-petition credit facility in the aggregate amount of up to $36,000,000, consisting of (i) a revolving loan in the maximum principal amount of $20,000,000 and (ii) a term loan in the amount of $16,000,000 (the "**DIP Term Loan**").  Upon entry of the order approving the DIP Financing Facility on a final basis, the Debtors' existing obligations under the Prepetition Senior Credit Agreement will be rolled-up and replaced by the DIP Financing Facility.

61.    In addition, certain affiliates of IPC (the "**Sponsor Participants**") have agreed to participate in the DIP Financing Facility pursuant to a separate participation agreement among the Sponsor Participants, the DIP Agent (as defined in the Financing Motion), and the DIP Lenders (as defined in the Financing Motion), pursuant to which the Sponsor Participants will hold a participation interest in the DIP Term Loan.  Absent the agreement of the Sponsor Participants to participate in the DIP Financing Facility, the DIP Agent and DIP Lenders would have been unwilling to provide the DIP Financing Facility to the Debtors.

62.    In the ordinary course of business, the Debtors use cash on hand and cash flow from operations to fund working capital, inventory purchases, capital expenditures, and other general corporate purposes.  An inability to use these funds during the Chapter 11 Cases could cripple the Debtors' business operations.  Indeed, the Debtors must use their cash to, among other things, continue operating their businesses in an orderly manner, maintain business

relationships with vendors, suppliers, and customers, pay employees, and satisfy other working capital and operational needs - all of which are necessary to preserve and maintain the Debtors' going concern value and, ultimately, effectuate a successful reorganization. As set forth in more detail in the Financing Motion, access to the DIP Financing Facility, the participation of the Sponsor Participants, and use of Cash Collateral (as defined in the Financing Motion) are critical to the Debtors' ability to continue to operate through an orderly sale process and to permit the Debtors' to maximize value for the benefit of their stakeholders. After pursuing other avenues for funding their continuing operations, the Debtors have determined that the DIP Financing Facility is the best financing option available to them.

63.     If the Financing Motion is granted, the DIP Financing Facility will provide the Debtors the liquidity they need to continue to operate through a plan of reorganization or sale process pursuant to section 363 of the Bankruptcy Code. The ability to operate will enable the Debtors to conduct a competitive bidding process for the sale of their business as a going concern, rather than a piecemeal liquidation of their assets and, therefore, will maximize value for the Debtors' estates. Most significantly, the ability to pursue a sale as a going concern will provide the Debtors with an opportunity to save the jobs of approximately 3,500 employees. In short, approving the DIP Financing Facility will permit the Debtors to continue to operate their business, support the proposed sale process, and satisfy critical financing obligations during the Chapter 11 Cases.

64.     As set forth in the Financing Motion, the Debtors' execution of the DIP Financing Facility agreements is an exercise of their sound business judgment that warrants approval by the Court. Prior to the Petition Date, the Debtors and their advisors undertook an analysis of the Debtors' projected financing needs during the pendency of the Chapter 11 Cases.

Based on such analysis, the Debtors determined that post-petition financing was necessary to support their operational and restructuring activities. Accordingly, the Debtors began negotiating with the Prepetition Senior Lender regarding the terms of a post-petition DIP Financing Facility.

65.     After a series of good faith, arms'-length negotiations, the Debtors and the DIP Lender entered into the DIP Financing Credit Agreement (as defined in the Financing Motion), whereby the parties reached agreement on the material terms of the DIP Financing Facility. Based on the advice of counsel and other professionals, and the Debtors' own analysis, the Debtors have determined in their sound business judgment that the DIP Financing Credit Agreement provides a greater amount of financing on more favorable terms than any other reasonably available alternative. Without post-petition financing, the Debtors would be unable to continue operations without interruption or pursue an orderly sale of their assets under section 363 of the Bankruptcy Code.

66.     The Debtors and their advisors have canvassed the market to find parties interested in extending debtor-in-possession financing. The Debtors' advisors have assisted the Debtors in negotiations to obtain the best terms available to ensure that the DIP Financing Facility was fully subscribed. For a number of reasons, however, including but not limited to, the existence of liens granted to the Prepetition Senior Lender and the Prepetition Subordinated Lenders, none of the institutions contacted were willing or available to provide financing to the Debtors in the time frame required to address the Debtors' urgent liquidity needs.

67.     Moreover, as noted, virtually all of the Debtors' assets are encumbered by pre-petition liens. Thus, even if alternative debtor-in-possession financing was available on

more favorable terms and conditions, and could be consummated in a timely fashion, such financing would result in a protracted priming contest with the Prepetition Secured Creditors, the results of which could not be predicted with certainty. Any protracted litigation would jeopardize the Chapter 11 Cases from the outset. Although the DIP Lender will be granted priming liens as set forth in the proposed DIP Orders (as defined in the Financing Motion), the DIP Lender will be priming itself and the Prepetition Subordinated Lenders in accordance with their rights under an existing inter-creditor agreement.

68.     As a condition to extending the DIP Financing Facility, the DIP Lender required the Sponsor Participants to participate in the DIP Financing Facility. Absent the Sponsor Participants' participation, the Debtors would not have been able to obtain the DIP Financing Facility.

69.     The Debtors' ability to finance their operations and the availability of sufficient working capital and liquidity are vital to preserve and maintain the Debtors' going-concern value and maximize the value of the Debtors' estates for the benefit of all creditors. As discussed in detail in the Financing Motion, the Debtors require immediate access to Cash Collateral in order to meet their liquidity needs in connection with the Chapter 11 Cases. While the Interim DIP Order (as defined in the Financing Motion) approves the Debtors' authorization to enter into a DIP Financing Credit Agreement, the Debtors submit that such relief is inseparable from the relief relating to the use of Cash Collateral. The Prepetition Senior Lender is unwilling to consent to the Debtors' use of Cash Collateral absent the Debtors' entry into the DIP Financing Facility in its entirety. As more fully described in the Financing Motion, the Prepetition Subordinated Lenders have consented (or are deemed to have consented by virtue of the terms of the Prepetition Subordination Agreement) to the entry of the Interim DIP Order.

70.     For the foregoing reasons, I believe that the terms and conditions of the DIP Financing Facility (including the fees and charges paid thereunder) and the use of Cash Collateral are fair, reasonable, and negotiated in good faith and at arms' length after extensive efforts to obtain the most advantageous post-petition financing.  The Debtors and their advisors have determined, in their reasonable business judgment, that the DIP Financing Facility is the best financing option available under the present circumstances.  I further believe that the relief requested in the Financing Motion is in the best interests of the Debtors' estates, their creditors, and all other parties-in-interest, and will enable to the Debtors to operate their businesses in chapter 11 without disruption.  On behalf of the Debtors, I respectfully submit that the Court should (a) approve immediate access to the DIP Financing Facility and use of Cash Collateral on an interim basis pursuant to the Interim DIP Order and (b) enter the Final DIP Order at the Final Hearing (as those terms are defined in the Financing Motion).

> **(ii)     Debtors' Motion for an Order (I) Authorizing the Debtors to Continue and Maintain Their Existing Cash Management System, Bank Accounts and Business Forms, (II) Modifying the Investment Guidelines, (III) Providing the United States Trustee With a 60-Day Objection Period and (IV) Granting Related Relief (the "<u>Cash Management Motion</u>")**

71.     The Debtors request entry of an order authorizing them to (a) continue using their existing cash management system, bank accounts and business forms, (b) modifying the investment guidelines, (c) providing the U.S. Trustee with a 60-day objection period, and (d) granting related relief.  In addition, the Debtors further request that this Court authorize and direct the Debtors' Banks to (a) continue to maintain, service, and administer the Bank Accounts (as defined in the Cash Management Motion), and (b) debit the Bank Accounts in the ordinary course of business.

72.     In the ordinary course of their business, the Debtors utilize an integrated,

centralized cash management system to collect, transfer and disburse funds generated by their operations. The Cash Management System (as defined in the Cash Management Motion) is specifically tailored to meet the Debtors' current operating needs, enabling the Debtors to centrally control and monitor corporate funds and available cash, as well as to keep accurate account balances and presentment information.

73.    If the Debtors are required to open separate accounts as debtors-in-possession and modify the Cash Management System in accordance with the U.S. Trustee Guidelines, such process would necessitate opening new accounts for collections, cash concentration, and disbursements. In fact, the Debtors would need to open dozens of new bank accounts. Thus, the Debtors' treasury, accounting, and bookkeeping employees would be forced to focus exclusively on immediately opening new bank accounts, instead of on their daily responsibilities during this critical juncture of the Chapter 11 Cases. The opening of new bank accounts would certainly increase operating costs, thereby negatively impacting the Debtors' cash flow. Most importantly, delays that would result from opening new accounts, revising cash management procedures, instructing customers to redirect payments, and implementing new information technology protocols would negatively impact the Debtors' ability to operate their businesses while pursuing these arrangements. Additionally, the Debtors would be subject to significant administrative burdens and expenses because they would need to execute new signatory cards and depository agreements, and create an entirely new manual system for issuing checks and paying post-petition obligations.

74.    I believe the Debtors' continued use of the Cash Management System will greatly facilitate their transition into the Chapter 11 Cases by, among other things, avoiding administrative inefficiencies and expenses, minimizing delays in payment of post-petition debts,

and providing important internal controls.  I believe that parties-in-interest will not be harmed by the Debtors' maintenance of the existing Cash Management System, including their Bank Accounts, because the Debtors have implemented appropriate mechanisms to ensure that unauthorized payments will not be made on account of obligations incurred before the Petition Date.  Specifically, the Debtors and their advisors have implemented internal protocols that prohibit payments on account of pre-petition debts without the prior approval of appropriate managers.  In light of such protective measures, the Debtors submit that maintaining the Cash Management System is in the best interests of their estates and creditors.

75.    Given the substantial economic scale and geographic reach of the Debtors' business operations, I believe that any disruption to the Cash Management System could impede a successful restructuring of the Debtors' businesses.  Accordingly, I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates and will enable the Debtors to operate their businesses in chapter 11 without disruption.  Therefore, on behalf of the Debtors, I respectfully submit that the Cash Management Motion should be granted.

(iii)    **Debtors' Motion for an Order (I) Authorizing, But Not Directing, the Debtors To Pay Pre-Petition Wages, Salaries And Related Obligations and Taxes, and (II) Directing All Banks to Honor Checks and Transfers for Payment of Pre-Petition Employee Obligations (the "Wages Motion")**

76.    By the Wages Motion, the Debtors seek entry of an order authorizing, but not directing, the Debtors to (a) pay all pre-petition claims of employees for wages, salaries, commissions, sick pay, personal day pay, vacation pay, holiday pay, severance pay, and other accrued compensation; (b) make all payments for which employee payroll deductions were withheld pre-petition; (c) reimburse all pre-petition employee business expenses; (d) make pre-petition contributions and pay benefits under certain employee benefit plans; (e) honor workers'

compensation programs; (f) pay other miscellaneous employee-related costs including, but not limited, to processing costs and fees; (g) continue employee programs with respect to vacation, sick, personal, and holiday leave; and (h) continue certain health, welfare, savings, and other benefit programs (collectively, the "**Employee Obligations**").

77.     In the ordinary course of business, the Debtors employ approximately 3,500 individuals (collectively, the "**Employees**") in their stores, distribution center, and corporate headquarters, including approximately 1,250 full-time employees and approximately 2,250 part-time employees, all of whom are paid in arrears every 2 weeks.  Subject to fluctuating needs, the Debtors currently employ approximately 18 temporary employees (the "**Temporary Employees**") through various temporary agencies that generally invoice the Debtors and are paid on a monthly term.  The Debtors also utilize the services of approximately 3 independent contractors (the "**Independent Contractors**"), who submit invoices for their services and are paid weekly.

78.     The Debtors seek authority to pay accrued pre-petition Employee Obligations in the ordinary course of business in the following approximate amounts:

| Category | Accrued Pre-Petition Amount |
|---|---|
| Employee Wages and Salaries | $2,550,000[3] |
| Bonuses, Supervision Pay, Other Incentive Compensation | $36,000 |
| Temporary Agencies | $35,000 |
| Independent Contractors | $17,500 |
| Employee Payroll Deductions (401(k), Garnishments, Health Premiums, FSA Contributions, etc.) | $94,000 |
| Payroll Taxes and Tax Withholding | $420,000 |
| Health and Welfare Benefits | $500,000 |

---

[3] The Debtors do not believe that any Employee or Independent Contractor is owed more than the $12,475 priority claim amount established pursuant to sections 507(a)(4) and (5) of the Bankruptcy Code.

| Category | Accrued Pre-Petition Amount |
|---|---|
| 401(k) Plan Match | $5,000 |
| Severance Pay | $185,000 |
| Reimbursable Business Expenses | $6,000 |
| Business Expense Card Charges | $50,000 |

79.     In addition, the Debtors request authority to pay severance pay to terminated employees pursuant to existing agreements and the Debtors' policies and procedures. The Debtors presently owe approximately $430,000 of severance pay to 36 employees, and seek authority to pay Severance Pay entitled to priority under section 507(a)(4) of the Bankruptcy Code, totaling $185,000 to 34 employees who were terminated within 180 days before the Petition Date (the "**Priority Severance Pay Claims**").  By the Wages Motion, the Debtors do not seek authority to pay any Priority Severance Pay Claim exceeding $12,475 in amount.

80.     The Debtors provide continued health insurance coverage to certain former Employees who pay underlying premiums.  For example, the Debtors' former Chief Executive Officer pays a reduced health insurance continuation premium as part of his separation agreement.  The Debtors are also contractually obligated to provide health insurance coverage to their former owner and his spouse (who pay premiums to the Debtors for such coverage) until approximately December 2018.  The Debtors request authority to continue to honor these arrangements post-petition.

81.     In addition, the Debtors' policies and procedures provide for the provision of outplacement services to certain terminated Employees based upon their position and tenure at the time of termination.  I believe that offering outplacement services to Employees who may be terminated (due, for instance, to the closure of underperforming stores) may be beneficial in providing such Employees an incentive to remain with the Debtors for so long as their services

-30-

are needed (for instance, through the closure of an underperforming store). Accordingly, I respectfully submit that the Debtors should be authorized, but not required, to continue to provide outplacement services on terms equivalent to their pre-petition policies, in the Debtors' discretion.

82.     The continued, uninterrupted service of the Employees is essential to the Debtors' reorganization efforts. I believe that the success of the Debtors' restructuring efforts is dependent upon the continued dedication, goodwill, and support of their Employees and Independent Contractors and the willingness of temporary agencies to continue to provide Temporary Employees. I further believe that any delay in paying the Employee Obligations outstanding as of the Petition Date, a failure by the Debtors to continue their practices, programs, and policies with respect to Employee benefits, or a failure by the Debtors to pay the amounts due and owing to Independent Contractors and temporary agencies could severely disrupt the Debtors' relationship with their workforce, impair morale at this critical juncture, and disrupt the Debtors' business operations. Absent payment of all accrued Employee Obligations and continuation of the Debtors' benefits programs, I believe that Employees may quickly seek alternative employment (including with the Debtors' competitors), which would hinder the Debtors' ability to serve their customers while simultaneously requiring the Debtors to incur the cost and distraction of seeking replacement Employees instead of focusing on their reorganization efforts. I believe that the relief requested in the Wages Motion is in the best interests of the Debtors, their estates and creditors, and all other parties-in-interest in the Chapter 11 Cases, and will enable the Debtors to continue to operate their business during the Chapter 11 Cases uninterrupted. Accordingly, on behalf of the Debtors, I respectfully submit that the Wages Motion should be granted.

       **(iv)**    **Debtors' Motion For An Order Authorizing, But Not Directing, Payment Of Certain Pre-Petition Shipping And Warehousing Charges, And Related Possessory Liens (the "Shipper Motion")**

83.    The Debtors contract with various domestic freight forwarders, common carriers, rail carriers, and truckers (collectively, the "**Shippers**") and warehousemen (the "**Warehousemen**") who, as of the Petition Date, are in possession of the Debtors' property. The Debtors rely on the Shippers to ship and transport goods and merchandise to and from the Debtors' distribution center in Glenwillow, Ohio through established distribution networks. In many circumstances, the Shippers and Warehouseman will have a statutory lien on the goods in their possession securing the charges or expenses incurred in connection with the transportation and storage of the Debtors' goods, and if their claims are not satisfied, the Shippers and Warehouseman may refuse to release the Debtors' property, severely disrupting product flow and operations.

84.    The Debtors' monthly Shipping and Warehousing Charges are roughly $615,000 per month, and average $7,380,000 per year. The Debtors estimate they owe approximately $453,000 for unpaid pre-petition Shipping and Warehousing Charges and approximately $411,000 to Innotrac Corporation ("**Innotrac**"), and approximately $120,000 to Independence Business Supply ("**IBS**"). The Debtors seek authorization to pay, in their sole discretion, unpaid pre-petition Shipping and Warehousing Charges, including Innotrac and IBS, in an amount not to exceed $1,000,000.

85.    I believe that the relief requested in the Shipper Motion is in the best interests of the Debtors' estates, their creditors, and all parties-in-interest and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Shipper Motion should be granted.

> **(v)**  **Debtors' Motion For An Order Authorizing, But Not Directing, the Debtors to Pay Certain Pre-Petition Sales, Use, Income, Property and Other Miscellaneous Taxes and Fees, and Granting Related Relief (the "Tax Motion")**

86.    In the Tax Motion, the Debtors request entry of an order authorizing them to pay taxes and governmental fees (including sales, use, income, margin, business activity, personal property, franchise, and other miscellaneous taxes and business license, permit, annual report, and other miscellaneous fees) that accrued or arose in the ordinary course of business before the Petition Date.  The Debtors estimate that the following approximate amounts of taxes and fees in each category, totaling approximately $1,400,000 in the aggregate, have accrued and remain owing as of the Petition Date:

| Category | Approximate Amount |
|---|---|
| Sales Taxes | $500,000 |
| Use Taxes | $10,000 |
| Income, Margin, and Business Activity Taxes | $100,000 |
| Personal Property Taxes | $250,000 accrued, due early 2014<br>$470,000 accrued, due later 2014-early 2015 |
| Business License/Permit Fees, Annual Report Fees, Franchise Taxes, and Other Miscellaneous Taxes and Fees | $50,000 |

87.    The Debtors must continue to pay all taxes and governmental fees when due to continue operating in certain jurisdictions.  Failure to pay all taxes and governmental fees (including taxes and fees that arose pre-petition) when due could result in taxing authorities suspending the Debtors' ability to operate, filing liens, and/or seeking relief from the automatic stay to take action against the Debtors.  In many jurisdictions, certain taxes, such as sales taxes, are collected in trust for the applicable taxing authorities.  Moreover, many jurisdictions may seek to impose liability on the Debtors' directors and officers for unpaid taxes, distracting the Debtors' key management personnel from the Debtors' reorganization efforts at a time when their commitment to the Debtors is most critical.

88.     The relief the Debtors seek in the Tax Motion will enable the Debtors to continue to operate their business during the Chapter 11 Cases uninterrupted.  Accordingly, to prevent immediate, irreparable harm to the Debtors' business, I believe that the relief requested in the Tax Motion is in the best interests of the Debtors and their estates and creditors and all other parties-in-interest in the Chapter 11 Cases and, therefore, should be granted.

**(vi)     Debtors' Motion for an Order (I) Authorizing, But Not Directing, the Debtors to Honor Certain Pre-Petition Obligations to Customers and Continue, Renew, Replace, Modify, Implement or Terminate Customer Programs In the Ordinary Course of Business, and (II) Authorizing and Directing Financial Institutions to Honor All Related Checks And Electronic Payment Requests (the "Customer Programs Motion")**

89.     In the ordinary course of their business, the Debtors engage in certain marketing and sales practices that are, among other things, (i) targeted to develop and sustain positive reputations for their stores and merchandise in the marketplace, and (ii) designed to attract new customers to the Debtors' stores and to enhance store loyalty and sales among the Debtors' existing customer base (collectively, the "**Customer Programs**").

90.     By the Customer Programs Motion, the Debtors seek entry of an order (i) authorizing, but not directing, the Debtors to honor certain pre-petition obligations to customers, and continue, renew, replace, modify, implement new, and/or terminate their Customer Programs in the ordinary course of business without further application to the Court, and (ii) authorizing and directing financial institutions to receive, process, honor, and pay all checks presented for payment and electronic payment requests relating to the foregoing.

**(a)     Gift Cards**

91.     The Debtors' retail stores issue gift cards in a variety of denominations (collectively, the "**Gift Cards**"), which Gift Cards are redeemable by purchasers or recipients in

exchange for the Debtors' merchandise (with certain restrictions). The Debtors estimate that their retail stores issued approximately $1.9 million in Gift Cards during the calendar year ending December 31, 2013. As of the Petition Date, the aggregate amount of Gift Cards outstanding is approximately $1.4 million. The outstanding Gift Cards constitute potential non-cash obligations of the Debtors.

**(b)     Store Credits**

92.     The Debtors' retail stores issue store credits for returns that were usable for merchandise or applied against the purchase price of merchandise (the "**Store Credits**"). As of the Petition Date, the aggregate amount of Store Credits outstanding is approximately $650,000. The unredeemed Store Credits constitute potential non-cash obligations of the Debtors.

**(c)     Return Policies**

93.     Consistent with industry practices, the Debtors have traditionally maintained merchandise return and exchange policies for their customers (collectively, the "**Return Policies**"). The Debtors' Return Policies are customer friendly and are referred to as "No Questions Asked – Hassle-Free" return policies. On average, the Debtors receive $28.4 million in returns from customers on an annual basis. The Debtors seek authority to continue their Return Policies post-petition in the ordinary course of business.

**(d)     Card Reward Program**

94.     As part of their efforts to build customer, store and brand loyalty, the Debtors offer private label credit cards to qualifying customers through a private label credit card plan with World Financial Network Bank (now Comenity Bank). Credit card holders are entitled to, *inter alia,* a 15% discount off of their first credit card purchase, as well as other special offers.

The private label credit cards provide the Debtors' customers with financing for the purchase of goods at the Debtors' stores and online.  Under this program, the Debtors pay Alliance Data Systems, the credit card program administrator ("**ADS**") certain costs related to a low score credit program.

95.     The Debtors estimate that during the calendar year ended December 31, 2013, approximately $30.6 million worth of goods were sold through the use of the Debtors' private label credit cards, and the Debtors seek authority to honor any outstanding pre-petition obligations to ADS in relation thereto.

### (e)      Charitable Programs

96.     From time to time the Debtors participate in various charitable activities, including, but not limited to, donations tied to sales of specific merchandise and donation of samples.   As of the Petition Date, the Debtors estimate that that there are no pre-petition obligations that have not yet been paid pursuant to any of their charitable programs.

### (f)      Other Customer Programs

97.     In the ordinary course of business, the Debtors engage in various other customer programs, including offering coupons and discounts to the public and their employees, and offering a "daily deal" coupon.   Although the Debtors do not believe they have any outstanding pre-petition obligations in connection with these Customer Programs, the Debtors, out of an abundance of caution, request authority to continue to honor any obligations related to these programs post-petition in the ordinary course of business, regardless of when they may be deemed to arise.

98.     The Debtors participate in a Dream Reward Program, which enables participating customers to receive a reward of $10.00 towards the next purchase if the customer

spends at least $10.00 on 15 occasions.

99.     The Debtors also honor vouchers issued by non-profit or governmental organizations to prospective customers of the Debtors.   Each non-profit or governmental organization is billed for the amount of any redeemed voucher.  On annual basis, the Debtors accept approximately $100,000 in such vouchers.

100.    I believe that the continuance of the Customer Programs in the ordinary course of business and the authority to satisfy pre-petition obligations relating thereto are essential to facilitate the Debtors' transition into chapter 11, maintain customer confidence and trust, and enable the Debtors' to successfully undergo the chapter 11 reorganization process. Accordingly, on behalf of the Debtors, I respectfully submit that the Customer Programs Motion should be granted.

**(vii)    Debtors' Motion For Entry of Interim and Final Orders (I) Prohibiting Utility Companies From Discontinuing, Altering or Refusing Service on Account of Pre-Petition Invoices, (II) Approving The Debtors' Proposed Form of Adequate Assurance of Future Payment, (III) Establishing Procedures For Resolving Requests For Additional Adequate Assurance and (IV) Scheduling A Final Hearing (the "<u>Utilities Motion</u>")**

101.    As of the Petition Date, the Debtors operate approximately 400 retail stores located throughout 28 states and offices located in New York and Ohio (collectively, the "<u>**Locations**</u>").  Prior to the Petition Date, in the ordinary course of the Debtors' business, the Debtors spent approximately $6,900,000 annually to provide various Utility Services for the Locations, with an average monthly cost of approximately $575,000.

102.    By this motion, the Debtors request entry of an order (a) determining that their Utility Providers have been provided with adequate assurance of payment within the

meaning of section 366 of the Bankruptcy Code, (b) approving the Debtors' proposed offer of adequate assurance (including an adequate assurance deposit of $266,200) and procedures whereby Utility Providers may request additional or different adequate assurance, (c) prohibiting the Utility Providers from altering, refusing or discontinuing services on account of pre-petition amounts outstanding and on account of any perceived inadequacy of the Debtors' proposed adequate assurance, (d) establishing procedures for the Utility Providers to object to the Debtors' proposed adequate assurance procedures, and (e) determining that the Debtors are not required to provide any additional adequate assurance.

103.    I believe that uninterrupted Utility Services for the Locations are essential to the Debtors' ongoing operations.  Additionally, any interruption of Utility Services, even for a brief period of time, likely would negatively affect the Debtors' restructuring efforts.  I believe, and I am, advised that the proposed Adequate Assurance Procedures and the proposed Adequate Assurance Deposit of $266,200 are necessary in the Chapter 11 Cases because if such measures are not approved, the Debtors could be forced to address numerous requests by the Utility Providers for adequate security in a disorganized manner during the critical first weeks of the Chapter 11 Cases.  Moreover, absent the relief sought in the Utilities Motions, a Utility Provider could severely disrupt the Debtors' operations at a particular Location by unilaterally deciding, on or after the 30th day following the Petition Date, that it is not adequately protected and threaten to discontinue service or make an exorbitant demand for payment to continue service.  Discontinuation of utility service could essentially shut down business at a Location; any significant disruption of operations could put the Chapter 11 Cases in jeopardy.

104.    I believe that the relief requested in the Utilities Motion is in the best interests of the Debtors' estates, their creditors, and all parties-in-interest and will enable the

Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Utilities Motion should be granted.

> **(viii)  Debtors' Motion For Entry Of Interim And Final Orders Authorizing, But Not Directing, The Debtors To Pay Certain Pre-Petition Claims Of Certain Critical Vendors (the "Critical Vendor Motion")**

105.    The Debtors, with the assistance of their advisors, have spent significant time reviewing and analyzing their books and records and consulting operations management and purchasing personnel to identify certain critical business relationships and/or suppliers of goods and services (the "**Critical Vendors**"),[4] the loss of which could immediately and irreparably harm their businesses, shrink their market share, reduce their enterprise value, and/or significantly impair their going-concern viability.

106.    The Critical Vendors constitute a small portion of the Debtors' trade vendors by both number and dollar amount owed.  Specifically, the Critical Vendors total 16 vendors and the pre-petition trade amount owed to Critical Vendors represents approximately 40.8% of the Debtors' total pre-petition trade obligations of approximately $13.9 million. Moreover, the Debtors estimate that, as of the Petition Date, they owe Critical Vendors approximately $1.8 million in aggregate for goods received by the Debtors within 20 days of the Petition Date (approximately 31.5% of the pre-petition Critical Vendor claims), which amounts may be entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code.

107.    The Debtors propose to condition the payment of Critical Vendor Claims on the agreement of the individual Critical Vendor to continue supplying goods and services to

---

[4] The Debtor will provide the list of Critical Vendors to the DIP Lender and counsel to the Official Committee of Unsecured Creditors (if any) appointed in these cases upon agreement from such parties that such information will be treated as confidential.

the Debtors on terms that are as or more favorable to the Debtors as the most favorable trade

terms, practices, and programs in effect between the Critical Vendor and the Debtors in the six

months prior to the Petition Date (the "**Customary Trade Terms**"), or such other trade terms as

are agreed to by the Debtors and each Critical Vendor.  The Debtors reserve the right to negotiate

new trade terms with any Critical Vendor as a condition to payment of any Critical Vendor

Claim.

108.    I believe that the authority to pay Critical Vendors and the continued

availability of trade credit as requested in the Critical Vendor Motion will enable the Debtors to

maximize the value of their businesses, and avoid the termination of business by the Critical

Vendors and the resulting need for increased funding that would ultimately impede the Debtors'

ability to operate.  The authority to pay the Critical Vendor Claims on the terms set forth in the

Critical Vendor Motion is therefore in the best interests of the Debtors, their estates, customers,

and creditors.    Accordingly, on behalf of the Debtors, I respectfully request that the relief

requested in the Critical Vendor Motion be granted.

> **(ix)      Debtors' Motion For Entry Of An Order Authorizing (I) Rejection Of Certain Unexpired Leases Of Non-Residential Real Property As Of The Surrender Date, (II) Abandonment Of Related Property, And (III) Related Relief (the "Rejection Motion")**

109.    The Debtors operate a chain of approximately 400 stores in twenty-eight

states located throughout the Midwest, East, and Southeast (the "**Retail Stores**").  Prior to the

commencement of the Chapter 11 Cases, the Debtors determined that 36 of these Retail Stores

(the "**Closing Stores**") were underperforming and diminishing the value of their estates.  The

estimated January 2014 rent roll for the Closing Stores, including amounts for "extras" (such as

common area maintenance), is $333,708.  Accordingly, the Debtors are removing inventory and

other property from these locations and intend to surrender possession of the Closing Stores to

their respective landlords as soon as possible, but by no later than January 31, 2014. The

Debtors have also determined that certain *de minimis* personal property consisting of inventory,

furniture, fixtures, and equipment, if any, that remain after the Debtors exit the Closing Stores

(the "**Related Property**") will be burdensome and will have no value for their estates.

Accordingly, the Debtors believe that it is in the best interests of their estates and creditors to

abandon the Related Property at the time they surrender the Closing Stores' leases.

110. I believe that Rejection Motion is essential to maintaining the value of the

Debtors' estates and will enable the Debtors' to undergo a successful chapter 11 reorganization

process. Accordingly, on behalf of the Debtors, I respectfully submit that the Rejection Motion

should be granted.

> **(x)** **Debtors' Motion For An Order Authorizing The Debtors To (I) Pay Installments Under Pre-Petition Insurance Premium Finance Arrangements, (II) Continue Pre-Petition Insurance Programs And (III) Pay All Pre-Petition Obligations In Respect Thereof ("Insurance Motion")**

111. By the Insurance Motion, the Debtors seek entry of an order to continue

various pre-petition insurance programs covering a variety of matters such as general liability,

automobile liability, umbrella liability, excess liability, directors' and officers' liability, and

property (the "**Insurance Programs**"), and pay all pre-petition and post-petition obligations in

respect thereof in the ordinary course of their businesses.

112. In connection with the day-to-day operations of their business, the Debtors

maintain various Insurance Programs and related insurance policies as set forth on a non-

exhaustive list attached to the Insurance Motion through several different insurance providers

(the "**Insurance Providers**").

113.    The Debtors are required to pay premiums under the Insurance Programs based on a fixed amount established and billed by each Insurance Provider.  Depending on the particular Insurance Policy, premiums are either (i) paid in installments over the term of the policy or (ii) pre-paid at a policy's inception or renewal.  As of the Petition Date, the Debtors are not current on all of their Insurance Programs and owe approximately $120,000 in monthly insurance premiums.

114.    Accordingly, on behalf of the Debtors, I respectfully request that the relief requested in the Insurance Motion be granted to prevent any disruption of the Debtors' Insurance Policies and Insurance Programs and any attendant harm to the Debtors' businesses that such disruption would cause.

**D.      Conclusion**

115.    The relief sought in each of the First Day Pleadings will minimize the adverse effects of the Chapter 11 Cases on the Debtors and result in maximum creditor recoveries.  I believe that the relief sought in each First Day Pleading is necessary to enable the Debtors to operate effectively as debtors-in-possession.

116.    Accordingly, for the reasons stated herein and in each of the First Day Pleadings, I respectfully request that each First Day Pleading be granted in its entirety, together with such other and further relief as this Court deems just and proper.

*[Signature Page To Follow]*

I certify under penalty of perjury that, to the best of my knowledge, information and belief, the statements set forth in this Declaration are true and correct.

**DOTS, LLC,** *et al.*
*Chapter 11 Debtors and Debtors in Possession*

Dated: January 20, 2014

By: _____
Lisa Rhodes
Chief Executive Officer of Dots, LLC,
Chief Executive Officer of Dots Gift LLC,
and Authorized Person for IPC/Dots LLC

29066/2
01/20/2014 28273586.9