**LOWENSTEIN SANDLER LLP**
Kenneth A. Rosen, Esq.
Gerald C. Bender, Esq.
Wojciech F. Jung, Esq.
Richard Corbi, Esq.
Andrew Behlmann, Esq.
65 Livingston Avenue
Roseland, New Jersey 07068
(973) 597-2500 (Telephone)
(973) 597-2400 (Facsimile)

*Proposed Counsel to the Debtors and
Debtors-in-Possession*

<div align="center">

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**

</div>

| | |
|---|---|
| In re: | Chapter 11 |
| Dots, LLC, *et al.*, [1] | Case No. 14-11016 (___) |
| Debtors. | (Joint Administration Requested) |

<div align="center">

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I)
AUTHORIZING THE DEBTORS TO OBTAIN POST-PETITION FINANCING ON A
SENIOR SECURED AND SUPERPRIORITY BASIS; (II) AUTHORIZING THE USE OF
CASH COLLATERAL; (III) GRANTING ADEQUATE PROTECTION; (IV)
SCHEDULING FINAL HEARING THEREON; AND (V) GRANTING
RELATED RELIEF**

</div>

The above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**"), by

and through their proposed counsel, submit this motion (the "**Motion**") pursuant to sections 105,

361, 362, 363, 364, and 507 of title 11 of United States Code (the "**Bankruptcy Code**"), rules

2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy**

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Dots, LLC (3957); IPC/Dots LLC (8282), and Dots Gift LLC (collectively, the "**Company**" or the "**Debtors**").  The location of the Debtors' headquarters is 745 Fifth Avenue, New York, NY 10151.

**Rules**"), and rule 4001-4 of the District of New Jersey Local Bankruptcy Rules ("**Local Bankruptcy Rules**"), for entry of an interim order (the "**Interim DIP Order**"), substantially in the form attached hereto as **Exhibit A**, and after a final hearing on the Motion (the "**Final Hearing**"), a final order (the "**Final DIP Order**," and together with the Interim DIP Order, collectively, the "**DIP Orders**") (a) authorizing the Debtors to obtain postpetition financing (the "**DIP Facility**") on a senior secured and superpriority basis in accordance with the terms of a postpetition DIP financing agreement (the "**DIP Credit Agreement**") between the Debtors and Salus Capital Partners, LLC ("**Salus**"), as administrative and collateral agent (in such capacity, the "**DIP Agent**") and the other lenders from time to time party to the DIP Credit Agreement (collectively, the "**DIP Lenders**" and, together with the DIP Agent, the "**DIP Secured Parties**"), (b) authorizing the Debtors to use Cash Collateral (as defined herein), (c) granting adequate protection to the Prepetition Secured Parties (as defined herein) with respect to, inter alia, such use of Cash Collateral and any diminution in the value of the Prepetition Secured Parties' interests in the Prepetition Collateral (as defined herein), including Cash Collateral (as defined herein), (d) prescribing the form and manner of notice of and setting the time for the Final Hearing, and (e) granting certain related relief.  In support of this Motion, the Debtors submit the *Declaration of Lisa Rhodes, Chief Executive Officer of Dots, LLC, in Support of Chapter 11 Petitions and First Day Pleadings* (the "**Rhodes Declaration**").   In further support of the Motion, the Debtors respectfully state as follows:

## JURISDICTION

1.      This Court has jurisdiction over this Motion under 28 U.S.C. **§§** 157 and 1334 and the *Standing Order of Reference to the Bankruptcy Court Under Title 11* dated as of September 18, 2012.  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2.      The statutory bases for the relief requested herein are sections 105(a), 361, 362, 363, 364, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, and 9014, and Local Bankruptcy Rule 4001-4.

## GENERAL BACKGROUND

3.      On the date hereof (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "**Chapter 11 Cases**").

4.      The Debtors are operating their businesses and managing their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  As of the filing of this Motion, no trustee or examiner has been requested in the Chapter 11 Cases and no committee has been appointed in the Chapter 11 Cases.

5.      Additional background facts surrounding the commencement of the Chapter 11 Cases are more fully described in the Rhodes Declaration, which is being filed concurrently herewith.

## SPECIFIC BACKGROUND

**A.      The Prepetition Capital Structure**

*(i)      Prepetition Senior Credit Documents*

6.      As of the Petition Date, the Debtors have outstanding secured debt to Salus, as the sole lender (in such capacity, the "**Prepetition Senior Agent**") under that certain Amended and Restated Credit Agreement dated as of September 12, 2013 (as amended from time to time, and together will all related documents and agreements, the "**Prepetition Senior Credit Documents**") by and between Dots, LLC, as borrower, IPC/DOTS, LLC and Dots Gifts LLC as guarantors, and the Prepetition Senior Agent as administrative agent, term loan agent, and collateral agent for the other lender parties thereto (collectively, the Prepetition Senior Agent and such lenders are referred to herein as the "**Prepetition Senior Secured Parties**").

7.      The Prepetition Senior Credit Documents provide for (i) a revolving credit

facility in the original maximum principal amount of $35 million (the "**Prepetition Revolving Facility**") and (ii) a term loan facility in the original principal amount of $16 million ("**Prepetition Term Facility**").

8.       As of the Petition Date, there is $14,505,558.91 of outstanding principal amount owing by the Debtors under the Revolving Facility and $16,092,888.89 of outstanding principal amount owing by the Debtors under the Term Facility (collectively, together with any amounts paid, incurred or accrued but unpaid prior to the Petition Date in accordance with the Prepetition Senior Credit Documents, including all "Indebtedness" as described in the Prepetition Senior Credit Documents, the "**Prepetition Senior Secured Obligations**").  As more fully set forth in the Prepetition Senior Credit Documents, except for certain permitted encumbrances (the "**Permitted Liens**"), prior to the Petition Date, the Debtors granted first-priority security interests in and liens on (collectively, the "**Prepetition Senior Liens**") substantially all personal and real property of the Debtors, including owned real estate, accounts receivable, inventory, equipment, and general intangibles (collectively, the "**Prepetition Collateral**") to the Prepetition Senior Agent on behalf of the Prepetition Senior Secured Parties to secure repayment of the Prepetition Senior Secured Obligations.  The Prepetition Senior Secured Obligations mature on or before September 12, 2017.

   *(ii)    Prepetition Junior Credit Documents*

9.       As of the Petition Date, the Debtors have outstanding secured debt owed pursuant to a Subordinated Term Loan Agreement dated as of September 12, 2013 by and between the Debtors and Irving Place Capital Partners III L.P., Irving Place Capital III Feeder Fund, L.P., Irving Place Capital Partners III Coinvestors L.P., (collectively, "**IPC**" or the "**Prepetition Junior Secured Parties**" and together with the Prepetition Senior Secured Parties, the "**Prepetition Secured Parties**") (as such may have been amended, supplemented, restated or otherwise modified prior to the Petition Date, the "**Prepetition Subordinated Credit Agreement**").  Pursuant to the Prepetition Subordination Agreement (as defined below),

obligations owing under the Prepetition Subordinated Credit Agreement are junior and subordinate to the Prepetition Senior Secured Obligations. As of the Petition Date, the outstanding principal amount owed by the Debtors on account of the Prepetition Subordinated Credit Agreement was not less than $10.35 million.

10.     Furthermore, as of the Petition Date, the Debtors have outstanding secured debt owed pursuant to that certain Amended and Restated Subordinated Term Loan Agreement dated as of September 12, 2013 by and between the Debtors and IPC (as such may have been amended, the "**Amended and Restated Prepetition Subordinated Credit Agreement**", together with the Prepetition Subordinated Credit Agreement and together with all other loan and security agreements executed in connection therewith, the "**Prepetition Junior Credit Documents**" and together with the Prepetition Senior Credit Documents, the "**Prepetition Credit Documents**"). Pursuant to the Prepetition Subordination Agreement (as defined below), obligations owing under the Amended and Restated Prepetition Subordinated Credit Agreement are also junior and subordinate to the Prepetition Senior Secured Obligations. As of the Petition Date, the outstanding principal amount owed by the Debtors on account of the Amended and Restated Prepetition Subordinated Credit Agreement was not less than $6.68 million.

11.     Accordingly, as of the Petition Date, the outstanding principal amount owed by the Debtors under the Prepetition Junior Credit Documents was not less than $17.0 million in the aggregate (the "**Prepetition Junior Secured Obligations**" and together with the Prepetition Senior Secured Obligations, the "**Prepetition Secured Obligations**"). As set forth more fully in the Prepetition Junior Credit Documents, prior to the Petition Date, the Debtors granted second-priority security interests in and liens on the Prepetition Collateral to the Prepetition Junior Secured Parties, (collectively, the "**Prepetition Junior Liens**" and together with the Prepetition Senior Liens, the "**Prepetition Liens**"). IPC is also an equity holder of the Debtors.[2]

---

[2] IPC and/or affiliates of IPC own the majority of the equity interests in the Debtors. Accordingly, IPC and its affiliates are "insiders" of the Debtors as that term is defined in the Bankruptcy Code.

*(iii) Prepetition Subordination Agreement*

12.     Prior to the commencement of the Chapter 11 Cases, the Prepetition Senior Agent and the Prepetition Junior Secured Parties entered into, and the Debtors consented to and agreed to be bound by, that certain Subordination Agreement dated September 12, 2013 (the "**Prepetition Subordination Agreement**"), which governs the relationship among and relative rights of the Debtors and the Prepetition Secured Parties.    Pursuant to the Prepetition Subordination Agreement, the Prepetition Junior Secured Obligations are junior and subordinate to the Prepetition Senior Secured Obligations.

**B.      Debtors' Need for Postpetition Financing and Use of Cash Collateral**

13.     In the ordinary course of business, the Debtors use cash on hand and cash generated by their operations to fund working capital, inventory purchases, and capital expenditures and for other general corporate purposes.    An inability to access and use cash in the ordinary course of business during the Chapter 11 Cases could cripple the Debtors' business.    Indeed, the Debtors must use their cash to, among other things, continue to operate their business in an orderly manner, maintain business relationships with vendors, suppliers, and customers, pay employees, and satisfy other working capital and operation needs, all of which are necessary to preserve and maintain the Debtors' going-concern value and, ultimately, effectuate a successful sale of some or all of the Debtors' businesses.    Access to the DIP Facility and use of Cash Collateral will allow the Debtors to continue operating their business while working to right-size their store footprint and pursue a sale of some or all of its businesses.    After pursuing other avenues for funding their continuing operations, the Debtors have determined that the DIP Facility is the best financing option available to them.

14.     Leading up to the Petition Date, the Debtors worked with their advisors to formulate a plan that would provide the Debtors with sufficient liquidity to continue their operations.    The Debtors, however, have been unable to devise such a plan and, as of the Petition Date, anticipate lacking sufficient liquidity to continue operating their businessess

without the DIP Facility.  Accordingly, without the relief requested in the Motion, the Debtors would be required to commence an immediate shutdown of their operations and piecemeal liquidation of their assets to the detriment of their creditors, vendors, employees, and other stakeholders.

15.     If the Motion is approved, the DIP Facility will provide the Debtors the liquidity that they need to continue to operate through a plan of reorganization or sale process pursuant to section 363 of the Bankruptcy Code.  Providing the Debtors with the ability to continue their operations through a going-concern sale with a competitive bidding process, rather than a piecemeal liquidation, will maximize value for the Debtors' creditors, vendors, employees, and other stakeholders.  Most significantly, the ability to pursue a going-concern sale will provide the Debtors with an opportunity to preserve the jobs of approximately 3,500 employees.

## C.     **The DIP Credit Agreement**

16.     Prior to the Petition Date, the Debtors and their advisors undertook an analysis of the Debtors' projected financing needs during the pendency of the Chapter 11 Cases.  Based on such analysis, the Debtors determined that they could potentially continue to operate solely on the use of "cash collateral," as that term is defined in section 363(a) of the Bankruptcy Code ("**Cash Collateral**"), for a limited amount of time.  Thereafter, however, the Debtors believe that they will need post-petition financing to support their operational and restructuring activities.  Accordingly, the Debtors, with the assistance of their advisors, canvassed the market to find interested parties to participate in a debtor-in-possession financing arrangement.  Based on such efforts, the Debtors determined that Salus was willing to provide post-petition financing and consent to the use of Cash Collateral on more favorable terms than any other reasonably available alternative.

17.     Accordingly, the Debtors began negotiating with Salus regarding the terms of a postpetition DIP facility. After a series of good faith, arms'-length negotiations, the Debtors

entered into the DIP Credit Agreement[3] with the DIP Agent and DIP Lenders.[4]  Pursuant to the DIP Credit Agreement, the DIP Secured Parties have agreed to, inter alia, provide the Debtors with the DIP Facility, subject to the DIP Financing Conditions (as defined below), and the Prepetition Secured Parties have agreed to permit the Debtors to use the Cash Collateral in accordance with the terms of an approved budget (the "**Budget**")[5] during the pendency of the Chapter 11 Cases.  The DIP Facility is a $36 million postpetition senior secured credit facility, consisting of a $20 million revolving facility (the "**DIP Revolver**") and a $16 million term loan (the "**DIP Term Loan**").

18.     As a condition to entering into the DIP Facility, the DIP Agent has required that IPC provide, and IPC has agreed to provide, credit support for the DIP Facility in the form of a participation interest in the term loan portion of the DIP Facility (the "**Participation**"), the terms of which are under discussion between IPC and the DIP Secured Parties. Without the Participation, the DIP Secured Parties indicated that they would not have been willing to enter into the DIP Facility.

19.     The Debtors request that the Court, among other things, (i) approve the terms of the DIP Credit Agreement (including the consensual use of Cash Collateral in accordance with the Budget); (ii) authorize the Debtors to execute and deliver the DIP Credit Agreement and all agreements, documents, and instruments contemplated by the DIP Credit Agreement and DIP Orders (collectively with the DIP Credit Agreement and DIP Orders, the "**DIP Documents**"), which shall be subject to the Court's approval at the Final Hearing; (iii) approve the Participation, and (iv) grant adequate protection to the Prepetition Secured Parties as set forth in the Interim DIP Order.

**D.     Summary of DIP Credit Agreement**

20.     In accordance with the disclosure requirements of Bankruptcy Rule 4001(b), (c),

---

[3] A copy of the DIP Credit Agreement is annexed hereto as **Exhibit B**.
[4] The DIP Agent, Salus, is also the Prepetition Senior Agent.
[5] A copy of the Budget is annexed to the DIP Credit Agreement.

and (d) and Local Bankruptcy Rule 4001-4, the material terms of the DIP Credit Agreement are

as follows:[6]

| **Material Terms**<br>Location in DIP Credit Agreement | **Summary of DIP Credit Agreement** |
|---|---|
| Borrower<br>*Preamble* | Dots, LLC, as debtor and debtor-in-possession, as lead borrower. |
| Guarantors<br>*Preamble* | IPC/Dots LLC, as parent, and Dots Gift LLC, each as a debtor and debtor-in-possession, as guarantors. |
| Agent and Lender(s)<br>*Preamble* | Salus Capital Partners, LLC as agent for the lenders from time to time party to the DIP Credit Agreement[7] |
| Amount and Type of Facility<br>*Recitals, Page 1* | A senior secured, superpriority postpetition credit facility in an aggregate amount of up to $36,000,000, consisting of (i) a revolving facility in the maximum principal amount of $20,000,000 and (ii) a $16,000,000 term loan.  Upon the entry of the Final DIP Order, the existing Prepetition Senior Secured Obligations will be repaid and replaced by the DIP Facility. |
| Use of Proceeds<br>*Article 6.11* | Borrowings under the DIP Facility may be used (a) on the Closing Date, to pay Transaction Expenses, and (b) after the Closing Date, to fund the Chapter 11 Cases in accordance with the Budget and for financing the working capital needs of the Borrowers and their Subsidiaries and for general corporate purposes of the Borrowers and their Subsidiaries in accordance with the Budget. |
| Borrowing Base<br>*Definitions, Article 1.01* | The Revolving Loans will be governed by a Borrowing Base. The Borrowing Base will be calculated as follows:<br><br>    (a)    the face amount of Eligible Credit Card Receivables <u>multiplied by</u> the Credit Card Advance Rate;<br><br>    <u>plus</u><br><br>    (b)    the product of (i) the product of (x) the Cost of Eligible Inventory, <u>multiplied by</u> (y) the Appraised Value, <u>multiplied by</u> (ii) the Inventory Advance Rate;<br><br>    <u>minus</u><br><br>    (c)    the then amount of the Seasonal Ineligible. |

---

[6] This summary is qualified in its entirety by the provisions of the DIP Credit Agreement. Capitalized terms used in this summary but not otherwise defined in the Motion shall have the meanings set forth in the DIP Credit Agreement. To the extent there are any conflicts between this summary and the DIP Credit Agreement, the terms of the DIP Credit Agreement shall govern. Additionally, capitalized terms not otherwise defined in this summary shall have the meanings given to them in the DIP Credit Agreement.

[7] Salus is the initial lender under the DIP Facility.

| | |
|---|---|
| | Borrowing Base Collateral reporting will be provided to Lender each Wednesday and upon every advance on the DIP Facility. |
| Security<br>*Article 2.14* | The priority of Agent's Liens on the Collateral shall be set forth in the Interim Financing Order and the Final Financing Order (when applicable). |
| | All Obligations shall constitute administrative expenses of the Loan Parties in the Chapter 11 Cases, with administrative priority and senior secured status under Sections 364(c) and 364(d) of the Bankruptcy Code.  Subject only to the Carve-Out up to the Carve-Out Amount, such administrative claim shall have priority over any and all administrative expense claims, unsecured claims and costs and expenses against the Loan Parties or their estates in the Chapter 11 Cases (or any subsequent proceeding or case under the Bankruptcy Code), at any time existing or arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provision of the Bankruptcy Code or otherwise and shall at all times be senior to the rights of the Loan Parties, the Loan Parties' estates and any successor trustee or estate representative in the Chapter 11 Cases or any subsequent proceeding or case under the Bankruptcy Code subject to the priorities set forth in the Interim Financing Order or Final Financing Order (when applicable). The Liens granted to the Agent on the Collateral owned by the Loan Parties, and the priorities accorded to the Obligations shall have the priority and senior secured status afforded by Sections 364(c) and 364(d) of the Bankruptcy Code (all as more fully set forth in the Interim Financing Order or the Final Financing Order (when applicable)) senior to all claims and interests other than the Carve-Out up to the Carve-Out Amount and the Prepetition Perfected Liens. |
| | No other Lien having a priority superior to or pari passu with that granted to the Agent on behalf of itself and the Lenders shall be granted or approved while any Obligations under the DIP Credit Agreement or any Prepetition Obligations under the Prepetition Credit Agreement remain outstanding. |
| | Except for the Carve-Out up to the Carve-Out Amount, as set forth in the Interim Financing Order and the Final Financing Order (when applicable), no costs or expenses of administration shall be imposed against the Agent or the Lenders or any of the Collateral under Sections 105, 506(c) or 552 of the Bankruptcy Code, or otherwise, and the Borrowers hereby waives for themselves and on behalf of their estates in bankruptcy, any and all rights under Sections 105, 506(c) or 552 of the Bankruptcy Code, or otherwise, to assert or impose or seek to assert or |

| | |
|---|---|
| | impose, any such costs or expenses of administration against the Agent or the Lenders or the Prepetition Agent or the Prepetition Lenders. |
| Carve-Out<br>*Definitions, Article 1.01* | $350,000 with respect to counsel for the Debtors<br>$50,000 with respect to Allowed Professional Fees of the Committee's Case Professionals |
| Interest Pricing<br>*Definitions, Article 1.01*<br>*Article 2.07* | DIP Revolver – LIBO Rate + 8.50%<br><br>DIP Term Loan – LIBO Rate + 9.25%<br><br>Interest will be due and payable monthly in arrears. All interest and fees shall be based on a 360-day year and actual days elapsed. |
| Bankruptcy Milestones | As set forth more fully in Schedule 6.23 of the DIP Credit Agreement, the debtors are subject to certain bankruptcy milestone covenants (subject to modification by agreement of the Debtors and the DIP Secured Parties):<br><br>• January 27, 2014: Distribute to all interest informational packages and solicitations for bids in connection with a going concern sale or a Remainder Chain Liquidation, with due diligence materials<br><br>• February 14, 2014: Receive a stalking horse bid for a going concern sale or Remainder Chain Liquidation that is reasonably acceptable to Agent, or file a motion seeking approval of bidding procedures (including bid protections for one or more stalking-horse bids) for a going concern sale or remainder chain liquidation,<br><br>• February 21, 2014: Obtain an order of the Court extending the time to assume or reject leases to a date not less than 210 days after the Petition Date<br><br>• February 21, 2014: Obtain approval of the bid procedures and stalking horse bids<br><br>• March 3, 2014: Obtain approval of a Sale Transaction in an amount sufficient to repay the DIP Obligations and Prepetition Obligations in full, including Cash Collateralization of all L/C Obligations and funding of the Indemnity Account<br><br>• March 4, 2014: If the approved Sale Transaction is a Full Chain Liquidation, execute agency documents or other documents to effect the sale; if the approved Sale Transaction includes a going concern sale, execute all sale documents for such transaction and all documents |

| | |
|---|---|
| | necessary to effect the Remainder Chain Liquidation, if any. |
| Default Rates<br>*Definitions, Article 1.01*<br>*Article 2.07* | Upon the occurrence and during the continuance of an Event of Default, the Non-Default Interest Rate and the Letter of Credit Fees shall be increased to 4% above the amounts otherwise applicable. |
| Fees<br>*Article 2.08* | <u>Origination Fees</u>:   0.50% of the Revolving Credit Facility ($95,000) and 0.50% of the Term Loan Facility ($80,000), fully earned and due and payable in cash on the Closing Date<br><br><u>Collateral Monitoring Fee</u>:  $60,000 per annum, payable to the Agent for its own account, fully earned on the Closing Date and payable monthly in advance with the first such payment on the Closing Date and thereafter on the first day of each month immediately following the Closing Date<br><br><u>Unused Line Fee</u>:  0.75% per annum on the actual daily unused portions of the Aggregate Revolving Commitments, payable to the Agent for the account of the Revolver Lenders monthly in arrears, commencing on the first monthly payment date to occur after the Closing Date<br><br><u>DIP Maintenance Fee</u>: $35,000 fully earned on the Closing Date and payable to the Agent for its own account on each ninety (90) day anniversary of the Closing Date<br><br><u>Exit Fee</u>:  On the earlier to occur of (i) a Change of Control, (ii) Borrower's emergence from the Chapter 11 Cases through a plan of reorganization or a liquidation, (iii) the Termination Date pursuant to clause (ii) or (iii) of the definition of such term (whether in connection with a refinancing of the Obligations or otherwise) or (iv) a sale of all or substantially all of the assets of the Borrower (whether in one or a series of transactions), the Borrower shall pay to the Agent, for its own account, a fee in the approximate amount of $160,000.<br><br><u>Letter of Credit Fees</u>:  In addition to any other amounts paid or payable under the Credit Agreement in respect of Letters of Credit, the Borrower shall pay to the issuer of a Letter of Credit under the Senior Credit Facility a customary fronting fee computed on the face amount available to be drawn under such Letter of Credit and customary issuance, presentation, amendment and other processing fees, and other standard costs and charges associated therewith. |
| Termination Date<br>*Definitions, Article 1.01* | All obligations under the DIP Facility, accrued or otherwise, would be due and payable in full on the Termination Date which would be the earliest of (i) January 21, 2015 (the "<u>Maturity Date</u>"), assuming the Final Financing Order has been entered; (ii) |

| | |
|---|---|
| | the date on which the maturity of the Obligations is accelerated (or deemed accelerated) and the Revolving Commitments are irrevocably terminated or deemed terminated in accordance with Article VIII of the DIP Credit Agreement; or (iii) the termination of the Revolving Commitments in accordance with the provisions of the DIP Credit Agreement (the "Termination Date"). |
| Events of Default<br>*Article VIII* | Notwithstanding the provisions of Section 362 of the Bankruptcy Code and without notice, application or motion to, hearing before, or order of the Bankruptcy Court or any notice to any Loan Party, any of the following shall constitute an Event of Default:<br><br>Non-Payment.  The Borrowers or any other Loan Party fails to pay when and as required to be paid herein, (i) any amount of principal of any Loan or any L/C Obligation, or deposit any funds as Cash Collateral in respect of L/C Obligations, or (ii) any interest on any Loan or on any L/C Obligation, or any fee due hereunder, or (iii) any other amount payable hereunder or under any other Loan Document; or<br><br>Specific Covenants.  (i) Any Loan Party fails to perform or observe any term, covenant or agreement contained in any of Section 6.01, 6.02, 6.03, 6.05, 6.07, 6.10, 6.11, 6.13, 6.14, 6.15, 6.18, 6.20, 6.22, 6.23 (including failure to meet the sale milestones set forth on Schedule 6.23), 6.24 or Article VII; or (ii) any of the Loan Parties fails to perform or observe any term, covenant or agreement contained in the Facility Guaranty or Security Agreement to which it is a party; or<br><br>Other Defaults.  Any Loan Party fails to perform or observe any other covenant or agreement (not specified in clauses (a) or (b) above) contained in any Loan Document on its part to be performed or observed and such failure continues for fifteen (15) days after the earlier of (i) the date upon which an officer of any Loan Party becomes aware of such failure and (ii) receipt by the Lead Borrower of written notice from the Agent of such failure; or<br><br>Representations and Warranties.  (i) Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of any Borrower or any other Loan Party herein, in any other Loan Document, or in any document delivered in connection herewith or therewith shall be incorrect or misleading in any material respect when made or deemed made or (ii) any information contained in any Borrowing Base Certificate is untrue or incorrect in any respect; or<br><br>Cross-Default.  As defined in the DIP Credit Agreement; or<br><br>Chapter 11 Cases.  The occurrence of any of the following in the |

Chapter 11 Cases:

(i)     any Loan Party, without the Agent's written consent, files a motion with the Bankruptcy Court seeking the authority to liquidate all or substantially all of the Loan Parties' assets or capital stock unless the transactions that are the subject of the motion will result in payment in full in cash of the Obligations and all of the Prepetition Obligations;

(ii)     other than in connection with the payment in full or refinancing of the Obligations hereunder and all of the Prepetition Obligations, the bringing of a motion, taking of any action or the filing of any plan of reorganization or disclosure statement attendant thereto by or on behalf of the Borrowers in the Chapter 11 Cases: (A) to obtain additional financing under Section 364(c) or (d) of the Bankruptcy Code not otherwise permitted pursuant to the DIP Credit Agreement; (B) to grant any Lien other than Permitted Encumbrances upon or affecting any Collateral; (C) except as provided in the Interim Financing Order or Final Financing Order, when applicable, to use cash collateral under Section 363(c) of the Bankruptcy Code without the written consent of the Agent; (D) that seeks to prohibit the Agent from credit bidding on any or all of the Loan Parties' assets during the pendency of the Chapter 11 Cases; or (E) any other action or actions materially adverse to the Agent and the Lenders, the Prepetition Agent and the Prepetition Lenders or their rights and remedies hereunder, under the Prepetition Loan Documents or their interest in the Collateral;

(iii)     other than in connection with the payment in full or refinancing of the Obligations hereunder and the Prepetition Obligations, (A) the filing of any plan of reorganization or disclosure statement attendant thereto, or any direct or indirect amendment to such plan or disclosure statement, by any Loan Party or any other Person to which the Agent or the Lenders do not consent or otherwise agree to the treatment of its claims, (B) the entry of any order terminating the Loan Parties' exclusive right to file a plan of reorganization, or (C) the expiration of the Loan Parties' exclusive right to file a plan of reorganization;

(iv)     the entry of an order in the Chapter 11 Cases confirming a plan of reorganization that (A) is not acceptable to the Agent in its sole discretion or (B) does not contain a provision for termination of the commitments and repayment in full in cash of all of the

Obligations under the DIP Credit Agreement and all of the Prepetition Obligations under the Prepetition Credit Agreement on or before the effective date of such plan or plans;

(v)      the entry of an order amending, supplementing, staying, vacating or otherwise modifying the Loan Documents, the Prepetition Loan Documents, the Interim Financing Order, the Final Financing Order or the Cash Management Order without the written consent of the Agent or the filing of a motion for reconsideration with respect to the Interim Financing Order or the Final Financing Order or the Interim Financing Order, the Final Financing Order or the Cash Management Order are otherwise not in full force and effect;

(vi)      except as set forth in the "first day" motions which have been reviewed by the Agent, the payment of, or application for authority to pay, any Prepetition Indebtedness or Prepetition claim without the Agent's prior written consent unless otherwise permitted under the DIP Credit Agreement or as requested in the "first day" motions;

(vii)      the allowance of any claim or claims under Section 506(c) of the Bankruptcy Code or otherwise against the Agent, the Lenders or any of the Collateral;

(viii)      the appointment of an interim or permanent trustee in the Chapter 11 Cases or the appointment of a receiver or an examiner in the Chapter 11 Cases with expanded powers to operate or manage the financial affairs, the business, or reorganization of the Loan Parties; or the sale without Agent's consent, of all or substantially all of the Loan Parties' assets either through a sale under Section 363 of the Bankruptcy Code, through a confirmed plan of reorganization in the Chapter 11 Cases, or otherwise that does not provide for payment in full in cash of the Obligations, the Prepetition Obligations and termination of Lenders' commitment to make Loans;

(ix)      the dismissal of the Chapter 11 Cases, or the conversion of the Chapter 11 Cases from Chapter 11 to Chapter 7 of the Bankruptcy Code, or any Loan Party files a motion or other pleading seeking the dismissal of the Chapter 11 Cases under Section 1112 of the Bankruptcy Code or otherwise;

(x)      the entry of an order by the Bankruptcy Court granting relief from or modifying the automatic stay of

Section 362 of the Bankruptcy Code (1) to allow any creditor to execute upon or enforce a Lien on any Collateral having a value of $100,000 or more, or (2) with respect to any Lien of or the granting of any Lien on any Collateral to any state or local environmental or regulatory agency or authority;

(xi)   the commencement of a suit or action against the Agent and any Lender or the Prepetition Agent or the Prepetition Lenders, by or on behalf of any Loan Party, or their bankruptcy estates;

(xii)   the entry of an order in the Chapter 11 Case avoiding or permitting recovery of any portion of the payments made on account of (x) the Obligations owing under the DIP Credit Agreement or the other Loan Documents or (y) the Prepetition Obligations owing under the Prepetition Credit Agreement or the Prepetition Loan Documents;

(xiii)   the failure of any Loan Party to perform any of its obligations under the Interim Financing Order, the Final Financing Order (when applicable) or the Cash Management Order or any of its material obligations under the any other order of the Bankruptcy Court, which is not cured within two (2) Business Days of written notice to the Lead Borrower of same;

(xiv)   (1) the failure of the Borrowers to have obtained an order, pursuant to the Bankruptcy Milestones, extending the time period of the Loan Parties to assume or reject unexpired leases of real property to a date that is 210 days from the Petition Date, or, (2) if such date has been extended by order of the Bankruptcy Court, the failure of the Borrowers to have obtained an order, pursuant to the Bankruptcy Milestones, further extending the time period of the Loan Parties to assume or reject leases;

(xv)   the entry of an order in the Chapter 11 Cases granting any other superpriority administrative claim or Lien equal or superior to that granted to the Agent on behalf of itself and the Lenders; or

(xvi)   the Final Financing Order is not entered prior to the expiration of the Interim Financing Order, and in any event within 45 days of the Petition Date.

Judgments.   There is entered against any Loan Party or any Subsidiary thereof (i) one or more judgments or orders for the payment of money in an aggregate amount (as to all such

judgments and orders) exceeding $250,000 (to the extent not subject to the automatic stay or otherwise enjoined from enforcement pursuant to the Bankruptcy Code or covered by independent third-party insurance as to which the insurer is rated at least "A" by A.M. Best Company, has been notified of the potential claim and does not dispute coverage), or (ii) any one or more non-monetary judgments that have, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and, in either case, (A) enforcement proceedings are commenced by any creditor upon such judgment or order, or (B) there is a period of 30 consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, is not in effect and such judgment has not been satisfied; or

ERISA.  (i) An ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan which has resulted or could reasonably be expected to result in liability of any Loan Party or any ERISA Affiliate under Title IV of ERISA to the Pension Plan, Multiemployer Plan or the PBGC in an aggregate amount in excess of $250,000 or an amount related to such liability that is consistent with the Budget or which would be reasonably likely to result in a Material Adverse Effect, or (ii) a Loan Party or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan in an aggregate amount in excess of $250,000 or an amount related to such liability that is consistent with the Budget or which would be reasonably likely to result in a Material Adverse Effect; or

Invalidity of Loan Documents.  (i) Any provision of any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder or satisfaction in full of all the Obligations, ceases to be in full force and effect; or any Loan Party or any other Person contests in any manner the validity or enforceability of any provision of any Loan Document; or any Loan Party denies that it has any or further liability or obligation under any provision of any Loan Document, or purports to revoke, terminate or rescind any provision of any Loan Document or seeks to avoid, limit or otherwise adversely affect any Lien purported to be created under any Security Document; or (ii) any Lien purported to be created under any Security Document shall cease to be, or shall be asserted by any Loan Party or any other Person not to be, a valid and perfected Lien on any Collateral, with the priority required by the applicable Security Document; or

Change of Control.  There occurs any Change of Control; or

Cessation of Business.  Except as otherwise expressly permitted

hereunder, any Loan Party shall take any action to suspend the operation of its business or, liquidate all or a substantially all of its assets or Store locations (other than sales of inventory in the ordinary course), or employ an agent or other third party to conduct a program of closings, liquidations or "Going-Out-Of-Business" sales of all or substantially all of its business; or

Loss of Collateral.  There occurs any uninsured loss to any material portion of the Collateral; or

Breach of Contractual Obligation.  Any Loan Party or any Subsidiary thereof fails to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any Material Contract or fails to observe or perform any other agreement or condition relating to any such Material Contract or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs, the effect of which default or other event is to cause a Material Adverse Effect or to permit the counterparty to such Material Contract to terminate such Material Contract, in either case as to which the applicable cure period has expired; or

Indictment.  The indictment or institution of any legal process or proceeding against, any Loan Party or any Subsidiary thereof, under any federal, state, municipal, and other criminal statute, rule, regulation, order, or other requirement having the force of law for a felony;

Guaranty.  The termination or attempted termination of any Facility Guaranty except as expressly permitted hereunder or under any other Loan Document;

Subordination.  (i)  The subordination provisions of the documents evidencing or governing any Subordinated Indebtedness (the "Subordination Provisions") shall, in whole or in part, terminate, cease to be effective or cease to be legally valid, binding and enforceable against any holder of the applicable Subordinated Indebtedness; or (ii) any Borrower or any other Loan Party shall, directly or indirectly, disavow or contest in any manner (A) the effectiveness, validity or enforceability of any of the Subordination Provisions, (B) that the Subordination Provisions exist in favor of the Agent for the benefit of the Credit Parties, or (C) that all payments of principal of or premium and interest on the applicable Subordinated Indebtedness, or realized from the liquidation of any property of any Loan Party, shall be subject to any of the Subordination Provisions.

| | |
|---|---|
| Conditions Precedent to Credit Extensions<br>*Article IV* | *Any commitment of the DIP Lender to provide the DIP Facility, or to provide the initial loans thereunder, shall be conditioned upon reasonably satisfactory completion of the following* |

*conditions precedent and subsequent, as well as other conditions customary of transactions of this type:*

The Agent's receipt of the following, each of which shall be originals, telecopies or other electronic image scan transmission (e.g., "pdf" or "tif" via e-mail) followed promptly by originals, unless otherwise specified, each properly executed by a Responsible Officer of the signing Loan Party or the Lenders, as applicable, each dated the Closing Date (or, in the case of certificates of governmental officials, a recent date before the Closing Date) and each in form and substance satisfactory to the Agent:

- executed counterparts of the DIP Credit Agreement sufficient in number for distribution to the Agent, each Lender and the Lead Borrower;

- a Note executed by the Borrowers in favor of each Lender requesting a Note;

- such certificates of resolutions or other action, incumbency certificates and/or other certificates of Responsible Officers of each Loan Party as the Agent may require evidencing (A) the authority of each Loan Party to enter into the DIP Credit Agreement and the other Loan Documents to which such Loan Party is a party or is to become a party and (B) the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with the DIP Credit Agreement and the other Loan Documents to which such Loan Party is a party or is to become a party;

- copies of each Loan Party's Organization Documents and such other documents and certifications as the Agent may reasonably require to evidence that each Loan Party is duly organized or formed, and that each Loan Party is validly existing, in good standing and qualified to engage in business in each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification, except to the extent that failure to so qualify in such jurisdiction could not reasonably be expected to have a Material Adverse Effect;

- a favorable opinion of Lowenstein Sandler LLP, counsel to the Loan Parties, addressed to the Agent and each Lender, as to such matters concerning the Loan Parties and the Loan Documents as the Agent may reasonably

request;

- a certificate signed by a Responsible Officer of the Lead Borrower certifying (A) that the conditions specified in Sections 4.02(a) and 4.02(b) have been satisfied, (B) that there has been no event or circumstance since the Petition Date that has had or could be reasonably expected to have, either individually or in the aggregate, a Material Adverse Effect, and (C) that in connection with the filing of the Chapter 11 Cases and the execution, delivery and performance by such Loan Party and the validity against such Loan Party of the Loan Documents to which it is a party, either that (1) no consents, licenses or approvals are required to be obtained by the Loan Parties from any Persons including any Governmental Authority, or (2) that all such consents, licenses and approvals have been obtained and are in full force and effect on the Closing Date;

- evidence that all insurance required to be maintained pursuant to the Loan Documents and all endorsements in favor of the Agent required under the Loan Documents have been obtained and are in effect, including, without limitation, that the Agent is named as "loss payee" and "additional insured" on all applicable insurance policies;

- the Security Documents and certificates evidencing any stock being pledged thereunder, together with undated stock powers executed in blank, each duly executed by the applicable Loan Parties;

- all other Loan Documents, each duly executed by the applicable Loan Parties;

- results of searches or other evidence reasonably satisfactory to the Agent (in each case dated as of a date reasonably satisfactory to the Agent) indicating the absence of Liens on the assets of the Loan Parties, except for Permitted Encumbrances and Liens for which termination statements and releases, satisfactions and discharges of any mortgages, and releases or subordination agreements satisfactory to the Agent are being tendered concurrently with such extension of credit or other arrangements satisfactory to the Agent for the delivery of such termination statements and releases, satisfactions and discharges have been made;

- (A)    all documents and instruments, including Uniform Commercial Code financing statements, required by law or reasonably requested by the Agent to

be filed, registered or recorded to create or perfect the first priority Liens intended to be created under the Loan Documents and all such documents and instruments shall have been so filed, registered or recorded to the satisfaction of the Agent, (B) the DDA Notifications, Credit Card Notifications, and Blocked Account Agreements required pursuant, and subject, to <u>Section 6.13</u> hereof, (C) control agreements with respect to the Loan Parties' securities and investment accounts, and (D) Collateral Access Agreements, subject to the terms of the Agreement and as required by the Agent, if any; and

- such other assurances, certificates, documents, consents or opinions as the Agent or its counsel reasonably may require.

The Agent shall have received a Borrowing Base Certificate dated as of the Closing Date, relating to the week ended on January [_], 2014, and executed by a Responsible Officer of the Lead Borrower.

There shall not be pending any litigation or other proceeding, the result of which, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

There shall not have occurred and be continuing any default or event of default under any Material Contract of any Loan Party.

The consummation of the transactions contemplated hereby shall not violate any applicable Law or any Organization Document.

All fees and expenses required to be paid to the Agent shall have been paid in full.

The Borrowers shall have paid all fees, charges and disbursements of counsel to the Agent to the extent invoiced prior to or on the Closing Date, plus such additional amounts of such fees, charges and disbursements as shall constitute its reasonable estimate of such fees, charges and disbursements incurred or to be incurred by it through the Closing Date (provided that such estimate shall not thereafter preclude a final settling of accounts between the Borrowers and the Agent).

The Agent and the Lenders shall have received all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the USA PATRIOT Act.

The Bankruptcy Court shall have entered the Interim Financing

Order.

The Borrowers shall not be in default under or with respect to the Interim Financing Order or the Cash Management Order and each such order is in full force and effect.

The Agent shall have received and approved the initial Budget, and such other information (financial or otherwise) reasonably requested by the Agent.

The "first day" orders described on Schedule 4.01(m) in form and substance satisfactory to the Agent shall have been entered in the Chapter 11 Cases.

The Agent shall have received all documents and agreements in connection with the proposed Sale Transactions, and each shall be in form and substance satisfactory to the Agent in its sole discretion.

The Agent shall have reviewed and shall be reasonably satisfied with all available contemplated arrangements and agreements among the Borrowers and their trade creditors and landlords.

*The obligation of each Lender to honor any Request for Credit Extension is subject to the following conditions precedent:*

The representations and warranties of each Loan Party contained in Article V or in any other Loan Document, or which are contained in any document furnished at any time under or in connection herewith or therewith, shall be true and correct in all material respects on and as of the date of such Credit Extension, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct as of such earlier date, in the case of any representation and warranty qualified by materiality, they shall be true and correct in all respects;

No Default or Event of Default shall exist, or would result from giving effect to such proposed Credit Extension or from the application of the proceeds thereof;

The Agent and, if applicable, the applicable L/C Issuer shall have received a Request for Credit Extension in accordance with the requirements hereof;

No Overadvance shall result from such Credit Extension;

The Committed Revolving Loan or L/C Obligation requested would not cause the aggregate outstanding amount of the Committed Revolving Loans and/or L/C Obligations plus the Prepetition Revolving Loan then outstanding to exceed the

| | |
|---|---|
| | amount then authorized by the Interim Financing Order or the Final Financing Order, when applicable, or any order modifying, reversing, staying or vacating such order shall have been entered. |
| Indemnification<br>*Article 9.14* | The Loan Parties shall indemnify the Agent (and any sub-agent thereof), each other Credit Party, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless (on an after tax basis) from, any and all losses, claims, causes of action, damages, liabilities, settlement payments, costs, and related documented expenses (but limited, in the case of legal fees and expenses, to the reasonable fees, disbursements and other charges of one counsel to the Indemnitees, taken as a whole, and, if reasonably necessary, one legal counsel in any relevant jurisdiction and one regulatory counsel to all affected Indemnitees taken as a whole (and, in the case of an actual or perceived conflict of interest, one additional legal counsel (and one additional local counsel in each relevant jurisdiction and one additional regulatory counsel) to each affected Indemnitee)), incurred by any Indemnitee or asserted against any Indemnitee by any third party or by any Borrower or any other Loan Party arising out of, in connection with, or as a result of (i) the execution or delivery of the DIP Credit Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, or, in the case of the Agent (and any sub-agents thereof) and their Related Parties only, the administration of the DIP Credit Agreement and the other Loan Documents, (ii) any Loan or Letter of Credit or the use or proposed use of the proceeds therefrom (including any refusal by any L/C Issuer to honor a demand for payment under a Letter of Credit if the documents presented in connection with such demand do not strictly comply with the terms of such Letter of Credit, any bank advising or confirming a Letter of Credit or any other nominated person with respect to a Letter of Credit seeking to be reimbursed or indemnified or compensated, and any third party seeking to enforce the rights of a Borrower, beneficiary, nominated person, transferee, assignee of Letter of Credit proceeds, or holder of an instrument or document related to any Letter of Credit), (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by any Loan Party or any of its Subsidiaries, or any Environmental Liability related in any way to any Loan Party or any of its Subsidiaries, (iv) any claims of, or amounts paid by any Credit Party to, a Blocked Account Bank or other Person which has entered into a control agreement with any Credit Party hereunder, or (v) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by any |

| | |
|---|---|
| | Borrower or any other Loan Party or any of the Loan Parties' directors, shareholders or creditors, and regardless of whether any Indemnitee is a party thereto, in all cases, whether or not caused by or arising, in whole or in part, out of the comparative, contributory or sole negligence of the Indemnitee; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (x) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence, bad faith or willful misconduct of such Indemnitee (or such Indemnitees' Affiliates or Related Persons), (y) result from a claim brought by a Borrower or any other Loan Party against an Indemnitee for material breach of such Indemnitee's (or such Indemnitees' Affiliates or Related Persons) obligations hereunder or under any other Loan Document, if the Borrowers or such Loan Party has obtained a final and nonappealable judgment in its favor on such claim as determined by a court of competent jurisdiction or (z) arise from any disputes solely among Indemnitees (other than any claims against an Indemnitee in its capacity or in fulfilling its role as Agent or any similar role under the DIP Credit Agreement or the other Loan Documents) and not arising out of any act or omission of any Loan Party or any of its respective Affiliates, in each case, whether or not the Closing Date occurs. |
| Agent and Lender Fees and Expenses<br>*Definitions, Article 1.01* | In connection with the request for this arrangement, (a) all reasonable and documented out-of-pocket expenses incurred by the Agent and its Affiliates and each of their respective other representatives and each of their respective successors in connection with the DIP Credit Agreement and the other Loan Documents, (b) all reasonable and documented out-of-pocket expenses incurred by the Lenders and the other Credit Parties and each of their respective Affiliates and each of their respective other representatives (including counsel and outside consultants), and their respective successors, in connection with the enforcement or protection of the rights of the Lenders and the other Credit Parties in connection with the DIP Credit Agreement or the other Loan Documents or efforts to monitor, preserve, protect, collect, or enforce the Collateral, provided that reimbursement of legal fees and expenses of the Lenders shall be limited to the reasonable legal fees and expenses of one counsel to the Lenders taken as a whole and of one local counsel to the Lenders taken as a whole in any relevant jurisdiction (absent a conflict of interest, in which case, the applicable Lenders may engage and be reimbursed for additional counsel), (c) with respect to any L/C Issuer and its Affiliates, all reasonable and documented out-of-pocket expenses incurred in connection with the issuance, amendment, renewal or extension of any Letter of Credit or any demand for payment thereunder, and (d) all customary fees and charges (as adjusted from time to time) of the Agent with respect to access to online Loan information, the disbursement of funds (or the receipt of funds) to or for the |

|  | account of Loan Parties (whether by wire transfer or otherwise), together with any reasonable out-of-pocket costs and expenses incurred in connection therewith; and in each case of clauses (a) through (d) hereof, whether or not the transactions contemplated hereby shall be consummated.   In addition, the Borrowers agree to pay all fees of the Agent as specified in the Fee Letter. |
|---|---|

### E.    <u>Additional Provisions to Be Highlighted Under Local Bankruptcy Rule 4001-4</u>

21.     In addition to the material terms discussed above, the Debtors have identified the below provisions of the Interim DIP Order that are required to be highlighted pursuant to Local Bankruptcy Rule 4001-4:

- *Rollup*.  The DIP Credit Agreement contemplates the roll-up of the Prepetition Senior Obligations under the Prepetition Revolving Facility and the Prepetition Term Facility into the DIP Revolver and the DIP Term Loan, respectively.  *See* Interim DIP Order at ¶ 11.

- *Waivers and Concessions as to Validity of Prepetition Debt*.  Per the Interim DIP Order, the Debtors stipulate to the amount, nature and extent of the Prepetition Secured Parties' liens and security interests with respect thereto.  *See* Interim DIP Order at ¶ E.

- *Committee Challenge Period*.  Per the Interim DIP Order, any committee shall have 60 days (or, if no committee is formed, parties-in-interest with appropriate standing shall have 75 days) from the entry of a Final DIP Order to challenge the Prepetition Secured Parties' liens and security interests under the Prepetition Credit Documents.  *See* Interim DIP Order at ¶ 31.

- *Bankruptcy Code Section 506(c) Waiver*.  The Interim DIP Order provides for a waiver of claims under section 506(c) of the Bankruptcy Code upon the entry of the Final Order.  *See* Interim DIP Order at ¶ 34.

- *Liens on Avoidance Actions*.  The definition of the DIP Collateral under the Interim DIP Order includes all causes of action or proceeds thereof, including avoidance actions, upon entry of the Final Order.  *See* Interim DIP Order at ¶ 7(a)(xiii).

- *Termination; Default; Remedies*.  Per the Interim DIP Order, a termination event occurs upon the occurrence of an event of default under the DIP Credit Agreement.  *See* Interim DIP Order at ¶ 23.

### <u>Relief Requested</u>

22.     By this Motion, the Debtors seek the entry of the DIP Orders granting the following relief:

(a)     authorizing the Debtors to enter into the DIP Credit Agreement and obtain, subject to (x) the entry of a Final DIP Order satisfactory to the DIP Agent, (y) the execution and delivery of a  DIP Documents in form and substance satisfactory to the DIP Agent, and (z) the satisfaction of the terms and conditions set forth in the DIP Documents (collectively, the "**DIP** **Financing** **Conditions**"), senior secured, superpriority post-petition financing consisting of (i) a $20,000,000 senior secured, superpriority revolving credit facility consisting of the roll-up, upon entry of the Final DIP Order, of the existing obligations under the Prepetition Revolving Facility and (ii) a $16,000,000 senior secured, superpriority term loan consisting solely of the roll-up, upon entry of the Final DIP Order, of the existing obligations under the Prepetition Term Facility;

(b)     authorizing the Debtors to execute and deliver the DIP Credit Agreement and the other DIP Documents and to perform such other acts as may be necessary or desirable in connection with the DIP Documents, all of which shall be subject to the Court's approval at the Final Hearing;

(c)     subject to the satisfaction of the DIP Financing Conditions, authorizing the Debtors to enter into the DIP Facility and incur any and all obligations owing thereunder and under the DIP Documents from time to time (collectively, the "**DIP** **Obligations**") and to grant to the DIP Agent allowed superpriority administrative expense claim status in the Chapter 11 Cases and any Successor Case (as defined herein) and authorizing the Debtors to grant to the DIP Agent automatically perfected security interests in and liens on all of the DIP Collateral (as defined in the Interim DIP Order), in each case subject to the priorities set forth in the Final DIP Order;

(d)     authorizing the Borrowers' use of Cash Collateral of the Prepetition Secured Parties;

(e)     providing adequate protection to the Prepetition Secured Parties as set forth in the Interim DIP Order;

(f)     vacating and modifying the automatic stay imposed by Section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the Interim DIP Order and, subject to the satisfaction of the DIP Financing Conditions, the DIP Documents;

(g)     scheduling a Final Hearing to consider the relief requested in the Motion and approving the form of notice with respect to the Final Hearing;

(h)     after the Final Hearing, approving the Participation; and

(i)     granting related relief.

## BASIS FOR RELIEF REQUESTED

**A.    The Debtors Should Be Authorized to Obtain Postpetition Financing**

**(i.)    Entering into the DIP Credit Agreement and the DIP Documents Is an Exercise of the Debtors' Sound Business Judgment**

23.    Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances as described in greater detail below. Provided that an agreement to obtain secured credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in acting in accordance with its sound business judgment in obtaining such credit. *See, e.g.*, *Trans World Airlines, Inc. v. Travellers Intl AG (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment."); *In re Barbara K. Enters., Inc.,* Case No. 08-11474, 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a Debtors' business judgment "so long as a request for financing does not `leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[c]ases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a Debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."); *In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (noting that approval of postpetition financing requires, inter alia, an exercise of "sound and reasonable business judgment."); *see also Bray v. Shenandoah Fed. Say. & Loan Assoc. (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) (stating that "[t]he statute imposes no duty to seek from every possible lender before concluding that such credit is unavailable").

24.    Specifically, to determine whether the business judgment standard is met, a court is "required to examine whether a reasonable business person would make a similar decision

under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513-14 (Bankr. D. Utah 1981) (noting that courts should not second guess a Debtors' business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the Debtors'] authority under the [Bankruptcy] Code.") (citation omitted).

25.     Moreover, where few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom.*, *Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Garland Corp.*, 6 B.R. 456, 461 (B.A.P. 1st Cir. 1980) (secured credit under section 364(c)(2) authorized, after notice and a hearing, upon showing that unsecured credit unobtainable); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *Ames*, 115 B.R. at 37-39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

26.     The Debtors' execution of the DIP Documents is an exercise of their sound business judgment that warrants approval by the Court.  Prior to the Petition Date, the Debtors and their advisors undertook an analysis of the Debtors' projected financing needs during the pendency of the Chapter 11 Cases.  Based on that analysis, the Debtors determined that they need postpetition DIP financing to support their operations during these Chapter 11 Cases. Accordingly, the Debtors began negotiating with the Prepetition Senior Secured Parties regarding the terms of a postpetition DIP facility.  After a series of good faith, arms'-length negotiations, the Debtors and the DIP Secured Parties entered into the DIP Credit Agreement, thereby reaching agreement on the material terms of the DIP Facility (subject to the DIP Financing Conditions).  Based on the advice of counsel and other professionals, and the Debtors' own analysis, the Debtors have determined in their sound business judgment that the

DIP Facility provides a greater amount of financing on more favorable terms than any other reasonably available alternative.  Without postpetition financing, the Debtors would not be able to continue operations without interruption or pursue a going-concern sale of their assets pursuant to section 363 of the Bankruptcy Code.   The Debtors and their advisors have canvassed the market to find interested parties to participate in the debtors-in-possession financing and their advisors have assisted the Debtors in negotiations to obtain the best terms available.  However, for a number of reasons, including but not limited to the existence of liens granted to the Prepetition Senior Secured Parties and the Prepetition Junior Secured Parties, none of the institutions contacted were willing or available to provide financing to the Debtors in the time frame required to address the Debtors' urgent liquidity needs.  Moreover, as noted, virtually all of the Debtors' assets are encumbered by Prepetition Liens.   Thus, even if alternative debtor-in-possession financing were available on favorable terms and conditions and could be consummated in the time required to address the Debtors' immediate liquidity needs, such a financing would result in a protracted priming contest with the Prepetition Secured Parties, the results of which could not be predicted with certainty.  Such potential protracted litigation would jeopardize the Chapter 11 Cases from the outset.  By contrast, under the proposed DIP Facility, the DIP Agent will be granted priming liens pursuant to the terms of the DIP Orders, but the DIP Agent will be priming itself on a fully consensual basis and the Prepetition Junior Secured Parties in accordance with their rights under the Prepetition Subordination Agreement.

27.     Therefore, pursuant to the terms of the DIP Credit Agreement, the DIP Facility will provide the Debtors with funds which the Debtors and their advisors have determined should be sufficient to solidify their credit-worthiness to their vendors and support the Debtors' ongoing operations during the Chapter 11 Cases.

**(ii.)     The Debtors Should Be Authorized to Obtain Postpetition Financing on a Senior Secured and Superpriority Basis**

28.     Section 364 of the Bankruptcy Code authorizes a debtor to obtain, in certain

circumstances, postpetition financing on a secured or superpriority basis, or both. Specifically, section 364(c) of the Bankruptcy Code provides, in pertinent part, that the Court, after notice and a hearing, may authorize a debtor that is unable to obtain credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code to obtain credit or incur debt:

> (1)    with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code];
>
> (2)    secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> (3)    secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

29.    To satisfy the requirements of section 364(c) of the Bankruptcy Code, a debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor on an unsecured or administrative expense basis. *Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986). "The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Id.; see also Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.,* 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense). When few lenders are likely to be able and willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.,* 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom., Anchor Savs. Bank FSB v. Sky Valley, Inc.,* 99 B.R. 117, 120 n. 4 (N.D. Ga. 1989); *see also Ames Dep't Stores,* 115 B.R. at 40 (approving financing facility and holding that the debtor made reasonable efforts to satisfy the standards of section 364(c) where it approached four lending institutions, was rejected by two, and selected the most favorable of the two offers it received).

30.    The Debtors' and their advisors' discussions with various potential sources of

debtor-in-possession financing revealed that such financing on a junior or unsecured basis was not available. The Court should (a) authorize the Debtors to grant to the DIP Agent senior liens on the Debtors' unencumbered property, pursuant to section 364(c)(2) of the Bankruptcy Code, and junior liens on the Debtors' property that is subject to valid, perfected, and unavoidable liens in existence immediately prior to the Petition Date (other than prior permitted encumbrances under the Prepetition Senior Credit Documents and/or the Prepetition Junior Credit Documents) or to valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code, pursuant to section 364(c)(2) of the Bankruptcy Code, and (b) grant the DIP Obligations superpriority administrative expense status as provided for in section 364(c)(1) of the Bankruptcy Code, subject, in each instance, to the Carve Out (as defined in the Interim DIP Order).

31.     Because the DIP Facility also contemplates the granting of priming liens to the DIP Agent (subject to the Carve-Out and other Permitted Liens), the DIP Facility also is subject to approval under the requirements of Section 364(d) Bankruptcy Code.  Section 364(d)(1) provides:

> The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if-
>
> (A)     the trustee is unable to obtain such credit otherwise; and
>
> (B)     there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1). The Debtors submit that this Court should grant the DIP Agent senior liens and security interests as provided in the Interim DIP Order.

32.     First, as discussed above, Section 364(d)(1)(A) of the Bankruptcy Code is satisfied because the Debtors are unable to obtain credit sufficient to sustain their day-to-day business operations or to maintain the going concern value of their assets other than by the

granting to the DIP Agent a first priority lien and security interest in the Debtors' assets as provided in the Interim DIP Order.   Moreover, the Debtors negotiated the DIP Credit Agreement at arm's length and have determined, in the exercise of their business judgment and in consultation with their professional advisors, that such financing is the best and only viable financing available under the circumstances. Bankruptcy Courts grant a debtor considerable deference in acting in accordance with its business judgment. *See, e.g.*, *Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest").

33.   Second, Section 364(d)(1)(B) of the Bankruptcy Code is satisfied because the Debtors propose to provide adequate protection to the Prepetition Secured Parties in the manner set forth above.   As also discussed above, the Debtors have been informed that the Prepetition Secured Parties support and consent to the proposed DIP Facility in its entirety.   Moreover, the Prepetition Junior Secured Parties have already consented (or are deemed to consent) to the proposed financing and cash collateral arrangements pursuant to the terms of the Prepetition Subordination Agreement.

34.   Thus, for all of the reasons set forth above, the Debtors submit that the circumstances of these Chapter 11 Cases require the Debtors to obtain financing pursuant to Sections 364(c) and 364(d) of the Bankruptcy Code. The Debtors further submit that the terms of the DIP Facility and the DIP Orders are fair, reasonable, and necessary under the circumstances, and should be approved in their entirety.

B.    **The Debtors' Request To Use the Prepetition Senior Secured Parties' and Prepetition Junior Secured Parties' Cash Collateral, Pursuant to the Terms of the DIP Orders, Should Be Approved**

35.    The Debtors' use of property of their estates is governed by section 363 of the Bankruptcy Code, which provides in pertinent part that:

> If the business of the debtor is authorized to be operated under section . . . 1108 . . of this title and unless the court orders otherwise, the [debtor] may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).

36.    Section 363(c)(2)(A) of the Bankruptcy Code permits a debtor-in-possession to use cash collateral with the consent of the secured party.  Section 363(e) of the Bankruptcy Code requires a debtor to adequately protect its secured creditors' interest in property to be used by the debtor against any diminution in value of such creditors' interest resulting from the debtor's use of the property.

37.    What constitutes adequate protection is decided on a case-by-case basis. *See In re Columbia Gas Sys., Inc.*, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *see also In re Martin*, 761 F.2d 472 (8th Cir. 1985); *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996); *In re Sw.Assocs.*, 140 B.R. 360 (Bankr. S.D.N.Y. 1992).  The purpose of adequate protection is to shield a secured creditor from diminution in the value of its interest in the particular collateral during the period of use.  *See In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986); *In re Hubbard Power & Light*, 202 B.R. 680 (Bankr. E.D.N.Y. 1996). Adequate protection can come in various forms, including payment of adequate protection fees, payment of interest, and granting of replacement liens and administrative claims.

38.    As discussed above and as set forth in detail in the Interim DIP Order, the Debtors propose to provide the Prepetition Secured Parties, with three primary forms of adequate protection to the extent of any diminution in value of their respective interests in the

Prepetition Collateral (including the Cash Collateral) resulting from the Debtors' use, sale, or lease of the Prepetition Collateral (including the Cash Collateral) during the Chapter 11 Cases and the imposition of the automatic stay.

39.     First, the Debtors will provide the Prepetition Secured Parties with adequate protection replacement liens in all Prepetition Collateral (subject to certain Permitted Liens and the Carve-Out), which includes, without limitation, any and all property of the Debtors, to the extent of and diminution in the value of the Prepetition Collateral.  Second, (subject to certain Permitted Liens and the Carve-Out), as further protection against any diminution in the value of the Prepetition Secured Parties' interest in the Prepetition Collateral, the Prepetition Secured Parties shall be granted the superpriority claims against the Debtors to the extent provided by sections 503(b) and 507(b) of the Bankruptcy Code.  Third, the Debtors will provide the Prepetition Secured Parties with payment of reasonable professional fees and and expenses, subject to the limitations set forth in the DIP Documents and Budget.

40.     In light of the foregoing, the Debtors submit, and the Prepetition Secured Parties agree, that the foregoing forms of proposed adequate protection for the benefit of the Prepetition Secured Parties are necessary and appropriate under the circumstances of the Chapter 11 Cases to ensure that the Debtors are able to continue using Cash Collateral.  Accordingly, the adequate protection proposed herein and in the DIP Orders is fair and reasonable and sufficient to satisfy the requirements of sections 363(c)(2) and (e) of the Bankruptcy Code. Moreover, courts in this Circuit have granted similar relief in other recent chapter 11 cases. *See, e.g.*, *In re 155 Route 10 Assocs., Inc., et al.*, No. 12-24414 (NLW) (Bankr. D. N.J. June 5, 2012); *In re Marcal Paper Mills, Inc.*, No. 06-21886 (MS) (Bankr. D. N.J. Dec. 4, 2006); *In re Neb. Book Co.*, No. 11-12005 (PJW) (Bankr. D. Del. June 28, 2011) (interim order); *In re Barnes Bay Development, Ltd.*, No. 11-10792 (PJW) (Bankr. D. Del. Mar. 21, 2011) (interim order); *In re Appleseed's Intermediate Holdings LLC*, No. 11-10160 (KG) (Bankr. D. Del. Jan. 20, 2011) (interim order); *In re Local Insight Media Holdings, Inc.*, No. 10-13677 (KG) (Bankr. D. Del. Nov. 19, 2010) (interim order); *In re Masonite Corp.*, No. 09-10844 (PJW) (Bankr. D. Del, Mar. 17, 2009)

(interim order); *In re Monaco Coach Corp.*, No. 09-10750 (KJC) (Bankr. D. Del. Mar. 10, 2009) (interim order); *In re Spansion Inc.*, No. 09-10690 (KJC) (Bankr. D. Del. Mar. 4, 2009) (interim order); *In re Muzak Holdings LLC*, No. 09-10422 (KJC) (Bankr. D. Del. Feb. 12, 2009) (interim order); *In re Hawaiian Telcom Commc'ns, Inc.*, No. 08-13086 (PJW) (Bankr. D. Del. Dec. 3, 2008).

41.     In addition, the Prepetition Junior Secured Parties have consented to the use of Cash Collateral and consent to the entry of the DIP Orders (or are deemed to have consented by virtue of the terms of the Prepetition Subordination Agreement).     Accordingly, the Debtors respectfully submit that they should be authorized to use Cash Collateral of the Prepetition Secured Parties in accordance with the Budget.

## C.     Request for Entry of Interim DIP Order

42.     Bankruptcy Rule 4001(b) and (c) provides that a final hearing on a motion to use Cash Collateral or obtain credit may not be commenced earlier than 14 days after service of such motion. However, the Court is authorized to conduct an expedited hearing prior to the expiration of such 14-day period and to authorize the obtaining of credit or use of cash collateral where, as here, such relief is necessary to avoid immediate and irreparable harm to the Debtors' estates.

43.     The Debtors' ability to finance their operations and the availability of sufficient working capital and liquidity are vital to the confidence of the Debtors' employees, vendors, and customers and to the preservation and maintenance of the value of the Debtors' estates.  As discussed above, the Debtors require immediate access to Cash Collateral in order to meet their liquidity needs in connection with these Chapter 11 Cases. While the Interim DIP Order also approves the Debtors' authorization to enter into the DIP Credit Agreement, the Debtors submit that such relief is inseparable from the relief relating to the use of Cash Collateral.   The Prepetition Senior Secured Parties were unwilling to consent to the Debtors' use of Cash Collateral absent the Debtors' agreement to and the Court's approval of the DIP Credit Agreement in its entirety.   As stated above, the Prepetition Junior Secured Parties have

consented (or are deemed to have consented by virtue of the terms of the Prepetition Subordination Agreement) to the entry of the Interim DIP Order.  Accordingly, the Debtors seek immediate entry of the Interim DIP Order to prevent immediate and irreparable harm to the Debtors' estates pending the Final Hearing pursuant to Bankruptcy Rule 4001(b).

### D.      Mofication of the Automatic Stay

44.      The DIP Facility contemplates a modification of the automatic stay to the extent applicable and necessary, to permit the parties to implement the terms of the DIP Orders. Provisions of this kind are standard in debtor-in-possession financings and are reasonable under the circumstances.

### E.      Payment of the Prepetition Senior Secured Obligations Should Be Approved

45.      The Debtors submit that the DIP Facility represents the best postpetition financing available to the Debtors under the circumstances and that entry into the DIP Credit Agreement is in the best interests of the Debtors and their estates. Substantially all of the Debtors' assets are encumbered by the liens and security interests securing the Debtors' Prepetition Senior Secured Obligations.  None of the potential lenders approached by the Debtors were willing to extend credit on a junior priority or unsecured basis.  Thus, absent payment in full of the Prepetition Senior Secured Obligations, the Debtors would be required to attempt to prime the liens of the Prepetition Senior Secured Parties.  Even if the Debtors had been able to locate a debtor-in-possession lender willing to provide a priming facility, the Debtors would have risked further harm to their business if they had chosen to engage in that sort of expensive, time-consuming, and uncertain litigation.

46.      Moreover, as set forth above, the Debtors engaged in good-faith negotiations with the DIP Agent prior to determining to enter into the DIP Credit Agreement. Given the Debtors' immediate liquidity needs, the DIP Agent's ability to act quickly was a significant factor in the Debtors' determination.

47.     Finally, repayment of the debt owed to the Prepetition Secured Parties (but only upon entry of the Final DIP Order) will not prejudice other creditors because the Interim DIP Order provides that the approval of the DIP Facility is without prejudice to the right of any official committee appointed in the Chapter 11 Cases (or, if none, parties in interest) to contest or challenge the validity of the Prepetition Senior Secured Parties' liens. Interim DIP Order, ¶ 31. For the foregoing reasons, the Debtors respectfully submit that the repayment of the Prepetition Senior Secured Obligations is appropriate in light of the circumstances of the Chapter 11 Cases.

48.     Courts have approved debtor-in-possession financing facilities that provided for the repayment of pre-petition indebtedness owed pursuant to secured pre-petition revolving and/or term loan credit facilities. *See, e.g.*, *In re Mantara, LLC*, Case No. 13-13370 (Bankr. S.D.N.Y. Oct. 24, 2013) (interim order); *In re NE Opco, Inc.*, Case No. 13-11483 (Bankr. D. Del. Jun. 11, 2013) (interim order); *In re Big M, Inc.*, Case No. 13-10233 (DHS) (Bankr. D.N.J. Jan. 8, 2013) (interim order); *In re SSI Group Holding, Inc.*, Case No. 11-12917 (MFW) (Bankr. D. Del. Sept. 15, 2011) (interim order); *In re Goody's Family Clothing, Inc.*, Case No. 08-11133 (CSS) (Bankr. D. Del. June 11, 2008) (interim order); *In re Sharper Image Corporation*, Case No. 08-10322 (KG) (Bankr. D. Del. Feb. 20, 2008) (interim order).

## REQUEST FOR FINAL HEARING

49.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, but in no event later than 30 days following the entry of the Interim DIP Order, and fix the time and date prior to the Final Hearing for parties to file objections to the Motion.

## WAIVER OF BANKRUPTCY RULE 6004(a) AND 6004(h)

50.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period

under Bankruptcy Rule 6004(h).

## WAIVER OF MEMORANDUM OF LAW

51.     Because the legal points and authorities upon which this Motion relies are incorporated herein and do not raise any novel issues of law, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law pursuant to Local Bankruptcy Rule 9013-2 be deemed waived.

## NOTICE

52.     Notice of this Motion has been given to (i) the Office of the United States Trustee for the District of New Jersey; (ii) the Debtors' consolidated thirty largest unsecured creditors; (iii) counsel for the Prepetition Senior Secured Parties and DIP Secured Parties, c/o Morgan, Lewis & Bockius, LLP, Attn:  Sandra Vrejan, Esq., 225 Franklin Street, 16th Floor, Boston, Massachusetts 02110 and Morgan, Lewis & Bockius LLP, Attn: Wendy S. Walker, Esq., 101 Park Avenue, 46th Floor, New York, New York 10178; (iv) counsel for the Prepetition Subordinated Lenders, c/o Okin Hollander & DeLuca, LLP, Attn:  Paul S. Hollander, Esq., One Parker Plaza, Fort Lee, New Jersey 07024; (v) those parties listed on the Debtors' Core Service List; and (vi) those parties who have filed a notice of appearance and request for service of pleadings in these Chapter 11 Cases pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

## NO PRIOR REQUEST

53.     No previous motion for the relief sought herein has been made to this or to any other court.

**WHEREFORE,** the Debtors respectfully request that this Court: (i) enter the Interim DIP Order, (ii) schedule a hearing to consider entry of the Final DIP Order, and (iii) grant the Debtors such other and further relief as the Court may deem proper.

Dated:  January 20, 2014

<div style="margin-left:40%">

Respectfully submitted,

**LOWENSTEIN SANDLER LLP**

*/s/ Kenneth A. Rosen* _____
Kenneth A. Rosen, Esq.
Gerald C. Bender, Esq.
Wojciech F. Jung, Esq.
Richard Corbi, Esq.
Andrew Behlmann, Esq.
65 Livingston Avenue
Roseland, New Jersey 07068
(973) 597-2500 (Telephone)
(973) 597-2400 (Facsimile)

*Proposed Counsel to the Debtors and Debtors-in-Possession*

</div>