**MORGAN, LEWIS & BOCKIUS LLP**
Wendy S. Walker (admitted *pro hac vice*)
Rachel Jaffe Mauceri
Patrick D. Fleming (admitted *pro hac vice*)
101 Park Avenue
New York, New York 10178-0600
Telephone: (212) 309-6000
Facsimile: (212) 309-6001

-and-

**MORGAN, LEWIS & BOCKIUS LLP**
Sandra J. Vrejan (admitted *pro hac vice*)
225 Franklin Street, 16th Floor
Boston, Massachusetts 02110
Telephone: (617) 341-7700
Facsimile: (617) 341-7701

*Counsel to Salus Capital Partners, LLC*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **Dots, LLC, *et al.*,**[1] | **Case No. 14-11016 (DHS)** |
| **Debtors.** | **(Jointly Administered)** |

**REPLY OF SALUS CAPITAL PARTNERS, LLC IN**
**SUPPORT OF THE DIP MOTION AND SALE PROCEDURES MOTION**

Salus Capital Partners, LLC ("**Salus**"), as administrative and collateral agent pursuant to the DIP Credit Agreement,[2] and as administrative agent, term loan agent and collateral agent pursuant to the Prepetition Senior Credit Agreement, by its undersigned attorneys, hereby submits this reply in further support of the Sale Procedures Motion and the DIP Motion and in

---

[1] The Debtors in these chapter 11 cases are Dots, LLC, IPC/Dots LLC, and Dots Gift LLC. The last four digits of Dots, LLC's and IPC/Dots LLC's tax identification numbers are (3957) and (8282), respectively.

[2] All capitalized terms used herein but not otherwise defined have the meanings ascribed to them in the Sale Procedures Motion or DIP Motion, as applicable.

DB1/ 77918210.2

response to the objections filed to the DIP Motion (the "**Committee DIP Objection**") and the Sale Procedures Motion (the "**Committee Sale Objection**" and collectively with the Committee DIP Objection, the "**Committee Objections**") filed by the Official Committee of Unsecured Creditors (the "**Committee**") and respectfully states as follows:

### PRELIMINARY STATEMENT

1. Leading up to the Petition Date, the Debtors, with the assistance of their advisors, recognized an inevitable, imminent liquidity shortage, even with the availability of the Prepetition Revolving Facility. As a result, the Debtors determined, in the exercise of their sound business judgment, to commence these Chapter 11 Cases and to accept the additional financing offered by Salus under the DIP Facility. Specifically, the DIP Facility would provide the Debtors with almost $6 million dollars of increased availability—enough, in the Debtors' business judgment, to fund a value maximizing, orderly sale of their assets. In exchange, the Debtors have agreed to the economic and other terms of the DIP Facility.

2. The Committee does not challenge these fundamental facts. Rather, the Committee, with nothing to lose, has launched a classic out-of-the-money creditor strategy—threatening scorched earth litigation in an attempt to extract a settlement from secured creditors. The Committee DIP Objection, in which the Committee asks the Court to rewrite the terms of the DIP Credit Agreement as the Committee would have them, is the first assault in its strategy. Yet the Committee offers no basis for substituting its business judgment for that of the Debtors and certainly offers no basis for forcing Salus to lend on terms to which it has not agreed.

3. In response to the Committee's objections, Salus has already agreed to several substantial concessions, including increases in the Budget for Committee professional fees, funding for a Committee investigation of the liens and obligations under the Prepetition Credit

Documents, information sharing and consultation rights for the Committee, and an extension of the Challenge Period if the Committee seeks standing to bring a Challenge. The Committee remains unsatisfied, but Salus has reached its limit.

4. In short, to the extent that the Committee successfully prosecutes the Committee Objections, the Debtors and Salus do not have an agreement on postpetition financing, which would immediately end the Debtors' attempt to conduct a value maximizing, orderly sale—a result that only the Committee is willing to accept. Accordingly, Salus respectfully submits that the Court should overrule the Committee Objections, grant the DIP Motion on a final basis, and grant the Sale Procedures Motion.

## REPLY

**I.    The Terms of the Dip Credit Agreement are Fair and Reasonable**

5. "In determining whether to approve a debtor's request under Section 364, a Court must examine whether the relief requested is an appropriate exercise of the debtor's business judgment." *In re AMR Corp.*, 485 B.R. 279 (Bankr. S.D.N.Y. 2013); *see also In re Barbara K. Enterprises, Inc.*, 2008 WL 2439649 (Bankr. S.D.N.Y. 2008) (*quoting In re Ames Dept. Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990)); *see also In re Metaldyne Corp.*, 2009 WL 2883045 (Bankr. S.D.N.Y. 2009); *In re Adelphia Commc'ns Corp.*, 2004 WL 1634538, at *2 (Bankr. S.D.N.Y. 2004). "Courts are loath to interfere with corporate decisions absent a showing of bad faith, self-interest, or gross negligence. Courts will uphold the board's decisions as long as they are attributable to any rational business purpose. Parties opposing the proposed exercise of a debtor's business judgment have the burden of rebutting the presumption of validity." *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (internal citations and quotations omitted).

6. The record before the Court is extensive and unquestionably establishes that the

Debtors' decision to borrow under the DIP Credit Agreement is a proper exercise of their business judgment. The Committee has not offered a single shred of contrary evidence. Specifically, the Committee has not—and cannot—refute the findings contained in the Interim Order that: (i) absent the DIP Facility, the Debtors would be immediately and irreparably harmed; (ii) the Debtors had an immediate and critical need to enter the DIP Credit Agreement and access the DIP Facility in order to enable the Debtors to continue operations and to administer and preserve the value of their estates; (iii) the Debtors were unable to obtain postpetition financing on an unsecured or subordinated basis; (iv) the Debtors and Salus negotiated at arms' length and in good faith; (v) the terms of the DIP Credit Agreement are the best available to the Debtors; and (vi) absent the DIP Facility and the authorized use of Cash Collateral, the Debtors would not have available sources of working capital and financing to operate their businesses, to maintain their properties in the ordinary course of business, or to conduct a value maximizing, orderly sale of their assets.

7. Moreover, the terms of the DIP Credit Agreement are fair and reasonable and do not "leverage the bankruptcy process" or "unfairly cede control of the reorganization to one party in interest." In arguing to the contrary, the Committee ignores the benefits of the DIP Facility to the Debtors and all stakeholders, the risks taken by Salus in lending to the Debtors, and relevant case law. The Court in *Farmland Industries*, for example, considered extensively whether a postpetition financing arrangement was fair and reasonable. *See In re Farmland Industries, Inc.*, 294 B.R. 855 (Bankr. W.D.Mo. 2003). Overruling the committee's objection to an amendment to the debtor's postpetition financing agreement, the Court recognized that: "Hard bargains are often the lot of Chapter 11 debtors. Chapter 11 post-petition financing is 'fraught with dangers for creditors,' and debtors may have to enter into hard bargains to acquire (or continue to

receive) the funds needed for reorganization. *Id*. at 885-86. (*citing In re Ellingsen MacLean Oil Co., Inc.*, 65 B.R. 358, 365 (W.D.Mich. 1986)). The Court further held that individual provisions in a postpetition financing agreement should not be considered in isolation, even when those provisions are "extreme or even unreasonable." *Id*. The Court also admonished the committee's failure to consider the benefits gained by the debtors under the amendment, including the ability of the debtor to continue financing its chapter 11 goals. *Id*. at 889.

8.  Like the committee in *Farmland Industries*, the Committee here fails to consider that the DIP Facility represents the best deal the Debtors could achieve *under the circumstances* or the benefits of the DIP Facility to the Debtors and to *all* of the Debtors' stakeholders. Instead, the Committee focuses solely on certain of the terms in the DIP Credit Agreement negotiated to incentivize Salus to lend to the Debtors and to "offset the apparent risks of lending money to an entity in bankruptcy." *Id*. at 888. The Debtors' performance has faltered over the last few months, including significant budget misses since the Petition Date on sales receipts and revenues, which will not be recaptured. Despite these facts, which the Committee ignores, Salus is willing to continue to provide the Debtors with the DIP Facility, but only with the protections that have been agreed to by the Debtors. Moreover, an orderly sale process supported by the DIP Facility provides obvious benefits to multiple parties in interest and not just Salus. Certainly, the alternative would result in a process that would not maximize the value of the Debtors' assets and that would result in chaos for the Debtors' employees, customers and creditors. When considered in total, the terms in the DIP Credit Agreement are fair and reasonable.

III. **The Debtors are not Prohibited from Granting Liens in the Unencumbered Assets**

9.  Bankruptcy Code §364 clearly permits a debtor in possession to obtain financing "secured by a lien on property of the estate." 11 U.S.C. §364(c),(d). Notwithstanding the explicit

authority in Bankruptcy Code §364, the Committee objects to the grant of superpriority claims and liens in certain of the Debtors' assets. The Debtors' decision to grant liens and superpriorty claims is appropriate because, as discussed above, it is supported by the Debtors' business judgment and it is necessary to induce Salus to lend under the DIP Credit Agreement.

10. The Committee argues that the Court should prohibit the Debtors from granting liens in any avoidance actions under chapter 5 of the Bankruptcy Code. On this point, the Committee argues: "It is well established that causes of action brought under chapter 5 of the Bankruptcy Code should be preserved for the benefit of unsecured creditors." Committee DIP Objection, 9. The Committee's argument with respect to liens on avoidance actions is flawed for several reasons.

11. First, the Committee stretches the Third Circuit's decision in *Cybergenics* to encompass issues that the Third Circuit clearly never intended to address. In *Cybergenics*, the Third Circuit held that a debtor's right to bring state law fraudulent transfer claims on behalf of its creditors pursuant to Bankruptcy Code §544(b) was not an asset of the debtor that could be sold pursuant to Bankruptcy Code §363. *See Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re Cybergenics Corp.)*, 226 F.3d 237, 243-45 (3d Cir. 2000). The Third Circuit did not find that *all* chapter 5 avoidance actions are not a debtor's assets and did not consider Bankruptcy Code §364 or hold that a debtor cannot grant a lien on avoidance actions in order to obtain postpetition secured financing.

12. Although liens on avoidance actions are often the subject of negotiations between postpetition lenders and committees, there is no prohibition on a debtor's ability to grant liens on avoidance actions or their proceeds and the Bankruptcy Code certainly contemplates that the superpriority claims afforded to postpetition lenders under Bankruptcy Code §364 should have

recourse to the proceeds of such actions. Accordingly, here, the Debtors should be authorized to grant liens in all chapter 5 avoidance actions. *See, e.g., In re Metaldyne Corp.*, 2009 WL 2883045 (Bankr. S.D.N.Y. 2009) (authorizing grant of lien on avoidance action).

13. Similarly, the Bankruptcy Code specifically contemplates that a postpetition lender may be granted liens on any unencumbered assets to secure postpetition financing and so there is no reason that Salus should not have a lien on the Commercial Tort Claims, Lease Proceeds and Augmented Goods. The Debtors have not simply bargained for the use of Cash Collateral or a roll-up of Salus' prepetition debt. Rather, Salus has agreed to lend substantial, new funds to the Debtors, and Salus is simply requiring a lien on all assets to secure the DIP loans.

14. Second, once again, the Committee ignores the Debtors' alternatives as well as the arms' length negotiations that led to the DIP Credit Agreement. If an alternate lender was willing to lend to the Debtors without requiring a lien on avoidance actions or other unencumbered assets, then the Debtors could have selected such alternate financing. If the Committee is able to produce such a lender, they should do so. However, Salus underwrote the DIP Facility based on the full collateral package provided in the DIP Credit Agreement. To the extent that the Debtors are not able to provide that full collateral package, the risk to Salus in lending the DIP Facility would increase, which would necessarily lead to decreased availability under an amended financing arrangement.

15. Third, even if the Court agrees with the Committee that the Debtors are not permitted to grant liens on avoidance actions, the Debtors are unquestionably permitted to grant liens on the other unencumbered assets and on the proceeds of avoidance actions. *See e.g. In re Atrium Corporation*, 2010 WL 2822131 at *15 (Bankr. D. Del. 2010); *In re True Temper Sports,*

*Inc.*, 2009 WL 7226692 at *15 (Bankr. D. Del. 2009); *In re Comfort Co., Inc.*, 2008 WL 8191314 at *10 (Bankr. D. Del. 2008). Finally, by operation of Bankruptcy Code §364, given that the Debtors were unable to obtain credit on any other basis, they are permitted to grant to Salus the DIP Superpriority Claim which has priority over all other administrative claims and is payable from the proceeds of Avoidance Actions and other unencumbered collateral.

**III.    The Proposed Bankruptcy Code §506(c) and §552(b) Waivers are Appropriate**

16.    Salus is "funding these cases, and should not be surcharged for the privilege of doing so." *In re Metaldyne Corp.*, 2009 WL 2883045, *5 (Bankr. S.D.N.Y. 2009) (approving postpetition financing arrangement that included § 506(c) and §552(b) waivers). Not only does the Budget include the Debtors' projections of all amounts that could be surcharged under §506(c) and provides for the payment of those amounts, Salus has agreed to subordinate its liens and superpriority claims to the Carve-Out, which is sufficient basis alone for §506(c) and §552(b) waivers. *See In re General Growth Properties, Inc.*, 412 B.R. 122 (Bankr. S.D.N.Y. 2009) ("In light of the Lenders' agreement to subordinate their liens and superpriority claims to the Carve–Out, the Lenders are entitled to a waiver of (i) the provisions of section 506(c) of the Bankruptcy Code and (ii) any 'equities of the case' claims under section 552(b) of the Bankruptcy Code, in each case, in respect of the DIP Documents."). Thus, denying Salus a §506(c) waiver could result in Salus funding these cases twice—once under the Budget and Carve-Out and a second time under §506(c). As set forth above, the DIP Facility will facilitate an orderly sale process and, as such, will benefit all of the Debtors' stakeholders, including employees, landlords and other creditors, and not just secured creditors.

17.    The Committee also objects to the size of its professional fee budget *relative to* the Debtors' professional fee budget. Salus has agreed to an overall Carve-Out of well over $1

million for the Debtors' counsel and Committee professionals and respectfully submits that the Carve-Out is adequate given the size and tenor of these Chapter 11 Cases. Moreover, Salus is neither willing nor required to increase that number.

### IV. The Sale Milestones are Appropriate and Should be Approved

18. The Debtors and their advisors have determined that conducting a sale in accordance with the sale milestones set forth in the DIP Credit Agreement will maximize the purchase price for the Debtors' assets. This decision is based on a balancing of a number of factors, including the Debtors' performance and liquidity situation, the costs associated with extending the sale process and the projected benefits of a longer process.

19. The Committee's argument that the sale milestones should be extended is based on rank speculation that extending the dates will result in a higher purchase price. While the Committee has absolutely no evidence to support that argument, the Debtors' evidence will prove that extending the sale milestones would decrease the net proceeds to the Debtors' estates as administrative expenses continue to accrue at a pace faster than the Debtors' overall asset values. In short, the sale timeline is not being dictated by the subjective desires of Salus. Rather, the timeline is necessitated by the Debtors' circumstances and actual performance. The Committee's request for more time ignores the reality of this situation and, if granted, would end up hurting all parties in interest.

**[REMAINDER OF PAGE INTENTIONALLY OMITTED]**

## **CONCLUSION**

20. For the foregoing reasons, Salus respectfully requests that the Court grant the DIP Motion on a final basis and grant the Sale Procedures Motion.

Dated: New York, New York  
       February 17, 2014

Respectfully submitted,

**MORGAN, LEWIS & BOCKIUS LLP**

 s/ Rachel Jaffe Mauceri  
Wendy S. Walker (admitted *pro hac vice*)  
Rachel Jaffe Mauceri  
Patrick D. Fleming (admitted *pro hac vice*)  
101 Park Avenue  
New York, New York 10178-0600  
Telephone: (212) 309-6000  
Facsimile: (212) 309-6001

-and-

**MORGAN, LEWIS & BOCKIUS LLP**  
Sandra J. Vrejan (admitted *pro hac vice*)  
225 Franklin Street, 16th Floor  
Boston, Massachusetts 02110  
Telephone: (617) 341-7700  
Facsimile: (617) 341-7701

*Counsel to Salus Capital Partners, LLC*