UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

```
x- - - - - - - - - - - - - - - x
IN THE MATTER OF:              . Case No. 14-11016 (DHS)
                              . Newark, New Jersey
      DOTS, LLC,              .
                              . January 22, 2014
          Debtor,            .
- - - - - - - - - - - - - - - -.
```

TRANSCRIPT OF TELEPHONE CONFERENCE
BEFORE THE HONORABLE DONALD H. STECKROTH
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtor:                LOWENSTEIN SANDLER
                              By:  KENNETH ROSEN, ESQ.
                                   SHIRLEY DAI, ESQ.
                                   WOJCIECH JUNG, ESQ.
                                   ANDREW BEHLMAN, ESQ.
                                   GERALD BENDER, ESQ.
                              65 Livingston Ave.
                              Roseland, NJ  07068

For Irving Capital Partners    OKIN HOLLANDER & DeLUCA
et al:                         By:  PAUL HOLLANDER, ESQ.
                                   GREG KINOIAN, ESQ.
                                   JAMES DeLUCA, ESQ.
                              400 Kelby St.
                              Fort Lee, NJ  07024

For Salus Capital:             MORGAN LEWIS & BOCKIUS
                              By:  WENDY WALKER, ESQ.
                                   KYLE SHONAK, ESQ.
                                   SONDRA VREJAN, ESQ.
                                   PATRICK FLEMING, ESQ.
                                   JONAS McCRAIGS, ESQ.
                              101 Park Avenue
                              New York, NY  10178

Proceedings recorded by electronic sound recording, transcript
                 produced by transcription service.

**TRACY GRIBBEN TRANSCRIPTION, LLC**
**27 Beach Road, Unit 4**
**Monmouth Beach, NJ  07750**
**800 603-6212**
**(732) 263-0044     Fax No. 732-865-7179**
www.tgribbentranscription.com

APPEARANCES CONTINUED:

For the Trustee:          OFFICE OF UNITED STATES TRUSTEE
                          By: DONALD MacMASTER, ESQ.
                          One Newark Center, Suite 2100
                          Newark, NJ 07102

For Key Bank:             MICHAEL AXEL, ESQ.
                          CARLO LANING, ESQ.

For various Landlords:    CLARK HILL
                          By:  DAVID BLAU, ESQ.
                               PAUL MAGY, ESQ.
                          151 S. Old Woodward, Suite 200
                          Birmingham, MI 48009

For various Landlords:    KELLY DRYE & WARREN
                          By:  ROBERT L. LeHANE, ESQ.
                          101 Park Avenue
                          New York, NY  10178


For various Landlords:    DAVID POLLACK, ESQ.

1                              **I N D E X**

2

3    ORAL ARGUMENT                              PAGE

4          BY MR. ROSEN                          4

5          BY MR. JUNG                           10

6          BY MR. AXEL                           15

7          BY MR. BENDER                         17

8          BY MR. HOLLANDER                      29

9

10   DECISIONS

11         Employee payroll, et al              12

12         Customer programs                    14

13         Cash management                      16

14         DIP financing                        33

15

16

17

18

19

20

21

22

23

24

25

Rosen/Argument                                          4

1              MR. ROSEN:  Your Honor, would you like me to report

2    on who is on the phone?

3              THE COURT:  Sure, that would be great.

4              MR. ROSEN:  Okay.  Some people, and after I call the

5    role, if I've missed anybody's name, please tell me at the end.

6    You have Lisa Rhodes, the Chief Executive Officer is on the

7    line.  You have Elaine Kapusta, the Chief Financial Officer on

8    the line.  Jim Waldron, the Clerk of the Court today.  We have

9    Michael Axel from Key Bank.  Carlo Laning from Key Bank.  I

10   apologize if I'm mispronouncing anybody's name.  David Blau

11   from Clark Hill.  Gerry Bender from Lowenstein, with others

12   from Lowenstein.

13             Tamar Chubinidze Skylar Group.  On behalf of the,

14   what I'll refer to as the junior secured lender, we have Paul

15   Hollander, Greg Kinoian, and Jim DeLuca.  For various

16   landlords, Robert LeHane from Kelly Drye.  Don MacMaster from

17   the U.S. Trustee.  Paul Magy for various landlords.  David

18   Pollack for various landlords.  Kyle Shonak and Jonas McCraigs

19   from Salus Capital.  And then you have from Morgan Lewis and

20   Bockius on behalf of Salus, Wendy Walker, Sandra Vrejan,

21   Patrick Fleming.

22             In the room with me today is Perry Mandarino, Perry

23   is with PriceWaterhouse Coopers.  Also with me is Andrew

24   Behlman, Shirley Dai, and Wojeich Jung.  Is there anybody's

25   name who I did not call?  Okay.  Your Honor, if it pleases the

Rosen/Argument                                    5

1    Court, my understanding, and I thought I should make this

2    announcement, is that Mr. Waldron has arranged for this

3    conference call to be recorded.  So everybody should be aware

4    of that.  I appreciate Mr. Waldron's helping us out in that

5    regard under the circumstances.

6          What we were going to do is take a few moments just

7    to sort of make a little bit of an introduction about the case,

8    with the understanding that we will be before Your Honor at one

9    o'clock tomorrow.  And that this teleconference hearing is sort

10   of in the nature of you know, it's really an accommodation

11   given you know, weather conditions, the courts are closed.

12   It's an accommodation to help us you know, sort of get a bridge

13   till tomorrow when Your Honor will have a much better

14   opportunity to have a complete hearing.

15         And speaking on behalf of the debtor we greatly

16   appreciate that.

17         THE COURT:  Let me just comment, so everybody is

18   aware, the cases were filed, I guess yesterday or perhaps the

19   evening before.  And I became aware of it yesterday morning.

20   And we were also aware of the impeding storm at the time, it

21   was about 10 o'clock.  The courthouse was preparing to close

22   around noon.  I called debtor's counsel because I had looked at

23   the first day application and asked, when do we really need

24   this hearing.  Absent the storm we would have had the hearing

25   in court today, if it was necessary, this afternoon, if not

1    tomorrow.  I was suggesting that we set it sometime on Thursday

2    because of the storm.  And the likelihood that the three

3    Federal courthouses in New Jersey would be closed today.

4         Mr. Rosen indicated that the real, the immediate

5    concern is a practical one, there was payroll due today.  So we

6    were dealing with a payroll application and order.  It was for

7    that reason that I suggested we try to have this call.  So

8    interim relief could be granted if you will, limited to the

9    payroll application, some basic orders, like complex case

10   status and joint administration.  There's also, as I understand

11   it, a concern because of what I would might want to call the

12   gift card motion for lack of a better term.   And then I guess

13   we have to deal a bit with the financing to authorize or make

14   sure that the folks  are allowed to be paid today under the

15   payroll order.

16        Everything else is scheduled for tomorrow as you

17   know, at I think one o'clock, when we'll be in court, be able

18   to make a full record.  Everyone will have an opportunity to

19   fully have their say.  But I wanted to indicate for the record

20   the genesis of today's emergent if you will, relief, and the

21   limited nature of what I believe this call should deal with.

22        Ken, why don't you tell us a little bit about the

23   underlying facts, the reasons for filing and where the debtor

24   intends to head in this case.

25        MR. ROSEN:  Certainly.  By way of some background,

Rosen/Argument                                    7

1    the target audience for Dots is women 25 to 35 years old.

2    Store count is at the end of 2013 was roughly 405 locations.

3    Sales, net sales for 2013 were about 300 million.  Net sales

4    for fiscal 2014, which ends in a couple of weeks, is about 250

5    million.

6            The 400 stores are spread out in a 28 State

7    footprint.  Typical target community is a population exceeding

8    75,000.  Median age of the customer is below the age of 40.

9    Company was founded in 1987 outside of Cleveland.  Starting in

10   2008 Dots began launching products under their own label.  And

11   then shortly thereafter upgraded its headquarters to about

12   190,000 square foot campus and distribution facility in

13   Glenwillow, Ohio.

14           In 2011 the company, Dots, was acquired by Irving

15   Place Capital, which is a leading middle market private equity

16   firm.   In terms of the real estate, the locations are high

17   traffic strip centers.  Target community is 75,000 people or

18   more.  Typical lease is five years with renewal options.

19           The key management team, two of whom I mentioned a

20   moment ago, is Lisa Rhodes who is the Chief Executive Officer.

21   Lisa joined the company in August of 2012.  Prior to that she

22   was a senior vice president of WalMarts U.S. Apparel

23   Merchandising Division.  And prior to that she was an executive

24   vice president, chief merchandising officer, of Maurice's,

25   which was another specialty retailer of women's clothing.

1          I mentioned Elaine Kapusta, Chief Financial Officer.

2    Elaine has been with Dots since 1994.  And before serving as

3    CFO, was a VP of finance and controller.  Prior to that she

4    spent a tenure with Ernst and Young, most recently as a senior

5    manager.

6          And then the third member of key management is Lisa

7    Sirella (phonetic), she joined Dots in September of 2012.

8    Prior to that she was the merchandising manager for a chain of

9    retail stores called Five Below.  And she also has experience

10   at WalMart.

11         In terms of our workforce, one of the reasons that

12   we're here this morning, Dots has about 3500 individuals in

13   their stores.  And the 3500 is roughly broken out, 1250 full

14   time employees, 2250 part time employees.

15         The strategy for the case is to bring about a sale of

16   the company as a going concern.  Perry Mandarino from

17   PriceWaterhouse Coopers is the engagement partner on the file.

18   His team is the group that led the project of negotiating DIP

19   financing terms with our secured creditors.  The cash flow

20   budget is the result of the PWC efforts, along with obviously

21   Lisa and Elaine.  And Perry is with us this morning.

22         Perry's office, I apologize for using first names,

23   Mr. Mandarino's office has prepared a teaser which went out to

24   about 200 potential suitors.  I learned this morning from Mr.

25   Mandarino that we have about 25 signed non disclosure

Jung/Argument                                                    9

1    agreements.  There's a confidential information memorandum that

2    PriceWaterhouse is working on for the people that, you know,

3    that get to the next level of due diligence.  And that process

4    also is underway.

5          You will see that we retained a claims processing

6    agent, or seeking to retain, I beg your pardon, a claims

7    processing agent which is Donlin Recano.  Prior to the

8    commencement of the bankruptcy case, we established a, I guess

9    you would call it a virtual due diligence room.  Donlin Recano

10   effectuated that.  And the PriceWaterhouse team then populated

11   the due diligence room with several hundred documents.  And

12   PriceWaterhouse has been overseeing the process of who gains

13   access to the due diligence room and followup questions.

14         The agenda for the case, as I mentioned, is to find a

15   buyer for the company, for the debtor as a going concern.  You

16   heard me mention that we have 3500 employees.  You heard me

17   mention that we have 400 locations.  It wouldn't come as a

18   surprise that we want to preserve as many jobs as possible,

19   preserve a customer for our creditors.  Also avoid as many

20   lease rejections and the damage claims that would result from

21   that as is possible.

22         So over the next, I'll say 30 days, the real energy

23   of this case will be led by, will be the efforts, you know, to

24   bring someone to the table as fast as possible.  I believe we

25   have a target date roughly in four weeks, to identify an

Jung/Argument                              10

1   appropriate purchaser.  And if I recall correctly, I don't have

2   the paper in front of me, we have a March 4th deadline for

3   accomplishing the sale of the debtor's business.

4          So we have a lot of to do.  But I think we're pretty

5   well poised for that.  Your Honor, that sort of concludes the,

6   my general introduction, if that's okay.

7          THE COURT:  All right.  Thank you.  Why don't we

8   just move on.  There's a couple of fairly routine matters.  The

9   complex case status order and the joint administration order,

10  I've reviewed those and they are routine.  I would suggest I

11  would enter those.  Does anyone have any objection to those

12  applications being granted?

13         MR. MacMASTER:  No objection from the U.S. Trustee,

14  Your Honor.

15         THE COURT:  All right.  So I'll enter the complex

16  case order and the joint administration order.  The third

17  application we should talk about is the authorization to pay

18  employee obligations.  Mr. Rosen, will you briefly introduce

19  that?

20         MR. ROSEN:  Yeah, Your Honor, Wojciech Jung, who's

21  sitting next to me, will be addressing that motion.  And it's

22  Wojciech, W O J C I E C H, Jung, J U N G.

23         MR. JUNG:  Thank you, Ken.  Your Honor, for the wage

24  motion which is docketed at docket number 5, the company seeks

25  the authority to pay its prepetition wages for its employees,

Jung/Argument                          11

1    salaries and related thereto obligations and taxes.  And

2    requesting that the bank be permitted to honor any checks

3    issued on account of those.

4          Your Honor, as Mr. Rosen mentioned, the company has

5    3500 employees.  Biweekly payroll, Your Honor, is appraisal

6    $2.55 million.  The company uses ADP to process payments to

7    their employees.  Your Honor, as part of the employment, the

8    company offers various benefits to its employees.  Including

9    but not limited to healthcare and welfare, workers

10   compensation, the discretionary 401k matching.  And the company

11   also reimburses employees for their business expenses incurred

12   on the company issued American Express credit card.

13         Your Honor, as is often happens, although the credit

14   cards is in the company's name, individual holders of those

15   credit cards are liable for those expenses as well.  Henceforth

16   our request that those expenses be paid, Your Honor, post

17   petition.

18         Your Honor, I'm more than happy to go through

19   individual numbers for the line items, if Your Honor wishes.

20         THE COURT:  No, let me just, I reviewed the

21   application.  There will be no payments beyond the statutory

22   exemption, correct?

23         MR. MacMASTER:  My understanding -- this is Don

24   MacMaster, U.S. Trustee.  It's my understanding they're seeking

25   to pay the CEO beyond the statutory limits.

1          MR. JUNG:  Yes, Your Honor, the CEO compensation is

2     the only compensation which we seek to honor in excess of the

3     limits.  Your Honor, by, just by the nature of the compensation

4     itself, and by the, and due to the heavy workload that will be,

5     or has been placed on the CEO already, Your Honor, we believe

6     that it is more reasonable to honor that compensation excess of

7     the -- and Your Honor, I should also mention that Ms. Rhodes is

8     not an equity holder of the debtor, she is the CEO.

9          THE COURT:  Anyone have any objection?

10         MR. MacMASTER:  Your Honor, it's Don MacMaster,

11    again, my only comment to that is, I think this is a

12    negotiation that should be had between the debtor and the

13    Committee, when the Committee is appointed.  This is day two or

14    three of the case, I don't see the harm in holding off for two

15    weeks on a ruling on whether she should be paid above and

16    beyond the statutory limits.

17         MR. JUNG:  Your Honor, and in response, this is

18    clearly an ordinary course payment and we don't want to be

19    faced with a situation where, you know, other employees see

20    that their top person is not getting paid, it may send the

21    wrong message, Your Honor, to the workers.

22         MR. MacMASTER:  With all respect, Mr. Jung, I think

23    when they all see that they're getting paid in full they're be

24    perfectly fine with it.

25         THE COURT:  Anybody else have a comment?  I'll

Jung/Argument                              13

1   authorize the payment of up to the statutory exemption,

2   including limiting that for the Chief Executive Officer.  We

3   can carry the motion to a further day after the Committee is

4   selected, as the U.S. Trustee suggested.  And I'll be happy to

5   revisit that again, if the Committee has no objection.

6             MR. MacMASTER:  Thank you, Your Honor.

7             MR. ROSEN:  Your Honor, next I think on the agenda is

8   the DIP financing.  If I could impose upon Your Honor, up to

9   the -- I beg your pardon, the customer program motion was next

10  on the agenda.  But if I could impose on Your Honor, there is

11  another motion that I would ask if the Court might consider

12  this morning.  And that's the cash management motion.  That is

13  important in terms of the debtor continuing to operate in the

14  ordinary course, including but not limited to issuing

15  paychecks.  So I apologize for the inconvenience, but if

16  perhaps the Court could entertain that this morning.

17            THE COURT:  I'm taking a look at it now.  I haven't

18  seen it.

19            MR. MacMASTER:  And to --

20            THE COURT:  I'll take a look at that right now, why

21  don't we move on to the gift card motion while I review that.

22            MR. JUNG:  Thank you very much.  Wojciech Jung for

23  the record, Your Honor.  Your Honor, to this motion which is

24  docketed at docket number 10, the debtor seek authority to

25  honor the prepetition obligation with respect to the customer

Colloquy                              14

1    program.  As Your Honor referenced early on, those obligations

2    include gift cards, store credit, refund policy, their

3    obligations under or related to the private label, credit cards

4    as well as honoring various vouchers issued in connection with

5    the company's marketing activities.

6              Your Honor, we don't believe we seek anything that

7    extraordinary in this relief.  All the obligations are below

8    the statutory cap and Section 507(a)(7).  And unless Your Honor

9    has any questions, we respectfully request that this motion be

10   granted.

11             THE COURT:  All right, any comment on that motion?

12             MR. MacMASTER:  No objection from the U.S. Trustee,

13   Your Honor.

14             THE COURT:  All right, I reviewed that motion, it's

15   relatively standard form, I'll be happy to sign that order.

16             MR. JUNG:  Thank you very much.

17             THE COURT:  Mr. Rosen, I've had an opportunity to

18   take a look at least at the proposed order that has been

19   provided on the cash management application.  I don't know if

20   Mr. MacMaster has seen it.  It seems to be --

21             MR. MacMASTER:  I'm just kind of looking through it

22   right now, Your Honor.  I mean, it's got the 60 day carve out

23   for the U.S. Trustee to object.

24             THE COURT:  Exactly.

25             MR. MacMASTER:  It says they're replenish their stock

Axel/Argument                    15

 1   with debtor in possession logo once they run out.  On the face

 2   of it, again, this is just a very cursory look at it, I don't

 3   have any objection to it.

 4              THE COURT:  All right, I'll grant that.  It looks

 5   like it's in the standard form, and it has the 60 day period

 6   for the U.S. Trustee's Office to further examine, which is

 7   their usual requirement.

 8              MR. AXEL:  Your Honor, excuse me, may I be heard?

 9              THE COURT:  Sure.

10              MR. AXEL:  Michael  Axel, I represent Key Bank

11   National Association, which is one of the cash management

12   depository banks.  Your Honor, I am not admitted before the

13   Court's bar and would request oral pro hac vice admission for

14   purposes of today's hearing.

15              THE COURT:  That's fine, go ahead, counsel.

16              MR. AXEL:  Thank you, Your Honor.  As I said, Key

17   Bank holds six of the debtor's depository accounts, including

18   gift card accounts, concentration accounts, store depository

19   accounts.  And there are various issues with respect to

20   depository banks of debtors in possession that arise in a

21   Chapter 11.  Such as daylight overdrafts, charge backs from

22   credit card processing that can come back and hit the accounts,

23   creating the potential overdraft situations.

24              I would ask therefore, and request, either that the

25   Court, if it decides to grant the motion today, make it in

Axel/Argument                              16

1    interim order, akin to the DIP financing and cash collateral

2    arrangement.  And set the matter for final hearing on a fairly

3    short notice, simply to give Key Bank a chance to discuss with

4    debtor's counsel and file any responses that are necessary and

5    appropriate.

6              MR. ROSEN:  Your Honor, this is Ken Rosen.  We don't

7    have a problem with that.  We're happy to talk to Key Bank's

8    counsel.  Perhaps we could schedule the next hearing date on

9    this motion for whenever we schedule the next hearing on the

10   DIP financing.

11             THE COURT:  That's fine, okay.

12             MR. AXEL:  That's fine, I appreciate that.  And if

13   the Court is willing to indulge just with the understanding

14   that Key Bank you know, reserves all of its rights with respect

15   to the cash management motion and order.

16             THE COURT:  All right, I'm going to enter the order

17   that was presented with the motion, I'll make it interim in

18   nature.  And the final hearing will be subject to the day we

19   set for final hearing on that financing.  And in the interim I

20   certainly would expect and assume that counsel for Key Bank and

21   any other depository would be in communication with debtor's

22   counsel and attempt to resolve any concerns that they have.

23             MR. ROSEN:  Yes, Your Honor.  Thank you.

24             THE COURT:  You're welcome.

25             MR. AXEL:  Thank you.

Bender/Argument                         17

1          MR. ROSEN:  If it pleases the Court, I would like to

2     ask Gerry Bender to present the motion on the DIP financing.

3          THE COURT:  Okay.  Fine.

4          MR. BENDER:  Good morning, Your Honor, Gerald Bender,

5     Lowenstein Sandler.  Your Honor, I too have, am not admitted in

6     New Jersey, but we had filed a pro hac motion with the Court,

7     and I just wanted to advise you and ask if I could present this

8     motion.

9          THE COURT:  Certainly.  Absolutely.  Please proceed.

10         MR. BENDER:  Thank you.  As Mr. Rosen said before, we

11    got on the phone with Perry Mandarino from PWC and also Lisa

12    Rhodes who is the debtor's CEO, and they're both available in

13    connection with this motion to provide information or even

14    testimony if it's required.  Although I suspect we'll get to

15    that at a later date.

16         Also on the phone are Wendy Walker from Morgan Lewis

17    on behalf of Salus, the DIP lender.  And Mr. Paul Hollander on

18    behalf of the junior prepetition secured creditor, IPC.  And I

19    wanted to invite them, if I misspeak or if they want to

20    supplement or say differently something I'm saying, I wanted to

21    invite them to feel free to interrupt and say what they'd like

22    to say.

23         As Your Honor can probably tell from the flurry of

24    filings in connection with this motion, it's been fairly

25    active, including probably till about two o'clock or later last

Bender/Argument                        18

1    night with some changes to the credit agreement and the

2    proposed interim DIP financing order.  So when I get to it,

3    I'll be happy to walk Your Honor through those changes or to

4    address the substance of those changes.

5               THE COURT:  Yes, let me ask this.  Is it necessary to

6    have this order entered today, as opposed to tomorrow?

7               MR. BENDER:  It is mostly in connection with the need

8    to fund the wages and to get the employees paid, Your Honor.

9    That's the impetus for having it heard today versus tomorrow.

10              THE COURT:  All right.  We can't enter some kind of

11   one day order till tomorrow?  Because no one has really had an

12   opportunity to take a look at the revised documents that you

13   filed at two o'clock in the morning or whenever.

14              MR. BENDER:  Well you know --

15              THE COURT:  I understand it's interim.  But --

16              MR. BENDER:  And the changes that were filed relate

17   to mostly professional fees and the interactions with the

18   junior secured creditor, who's on the phone and obviously is

19   fully aware of that.  We actually had incorporated a comment

20   from one of the attorneys for landlords late last night as

21   well.  So I don't think there's anything that was changed in

22   the order that would, that could affect anybody other than the

23   parties who are on the phone quite frankly.

24              THE COURT:  All right.  Proceed.

25              MR. BENDER:  Well, I'm not going to belabor the

Bender/Argument                                    19

1    debtor's need for financing or repeat what Mr. Rosen said

2    earlier in his introduction.  The financing is meant to enable

3    the debtors to, honestly operate in the ordinary course, meet

4    the ordinary course obligations, including payroll, funding

5    working capital, buy inventory and the like.  But also to get

6    us through a proposed sale process as contemplated by the

7    credit agreement and the DIP financing order.  The debtor

8    proposes to sell its assets pursuant to Section 362 of the

9    Bankruptcy Code.

10             And this financing will allow the company to operate

11   in the ordinary course, pending that sale process so that we

12   can maximize the value of that sale for the benefit of all the

13   debtor's stakeholders.

14             In connection with prepetition efforts regarding

15   proposed financing, debtor in possession financing, the debtors

16   and their advisors, particularly PWC who's the proposed

17   financial advisor and investment bank for the debtors, we

18   reached out to a number of other putative lenders to engage

19   with them perhaps to see if they'd be willing to provide

20   financing to the company.  And there are confidentiality

21   agreements entered into and various discussions had with a

22   number of parties, none of which resulted in an offer to

23   provide financing on terms that are better than what's been

24   proposed by the debtor's existing prepetition secured lender.

25             Which is not surprising, given the fact that any such

Bender/Argument                                20

1   financing would require either the paying off of the existing

2   prepetition financing or the priming of that lender, and given

3   that we're bridging to a sale on a fairly short time frame, it

4   probably is self evident that it makes sense for the existing

5   lender to fund that process.

6          Just to describe the prepetition capital structure,

7   we have senior secured debt provided by affiliates of Salus

8   Capital Partners.  There's a revolver with a maximum principal

9   amount of $35 million that's about 14 and a half million of a

10  prepetition balance with respect to that.  There's a $16

11  million term loan which has original principal amount of $16

12  million, and there's a little over $16 million of a balance

13  there, for a total of approximately $30.5 million of

14  outstanding debt to the Salus companies.

15         There's also, as was mentioned before, junior secured

16  debt through affiliates of Irving Capital, IPC, in the

17  aggregate amount of approximately $17 million, or actually $17

18  million outstanding.  The proposed DIP financing is a $46

19  million facility, a senior secured credit facility consisting

20  of a $20 million revolver and a $16 million term loan.

21         The bulk of those loans are proposed to rollout, the

22  revolving facility would rollout as it does, over time as

23  receipts come in.  Salus will fund the debtor, the debtor's

24  operation and as receipts come in they will, they'll be able to

25  pay down the prepetition revolver.  And new revolving funds

1   will be lent under the facility.  And it will probably take

2   about four to five weeks for the old revolving facility to roll

3   through.  Which propose that the prepetition term loan will be

4   rolled up through a borrowing at the time of the final hearing

5   and final approval of the DIP financing.  So that at that

6   point, all of the prepetition debt will be taken care of and

7   there will be DIP loans outstanding at that point.

8           Obviously the loan also contemplates the use of cash

9   collateral by the debtors on a cash collateral revolvency.

10  Cash collateral of both the prepetition senior secured and the

11  prepetition junior creditor.  So there's also the contemplated

12  provision of adequate protection for the use of that cash

13  collateral to both the senior lender and the junior secured

14  lender.

15          THE COURT:  Right.

16          MR. BENDER:  Which is set forth in the credit

17  agreement.  Obviously both the loans and the adequate

18  protection are subject to the carve out which is provided for

19  in the DIP financing order.  And there is, as is typical, the

20  ability to pay professionals in the ordinary course pending a

21  carve out trigger event in which case the carve out gets

22  triggered and there's recourse to that.

23          And some of the changes that I think has seen, that

24  I'll go through in a minute, with respect to the DIP financing

25  order, relate to the mechanisms for funding professional fees

1    and dealing with the carve out.

2         In addition, and this is probably the other area that

3    Your Honor will see that there's a change made to the DIP

4    financing order and the credit agreement, relate to the

5    provision of credit support provided by IPC to Salus, to the

6    DIP lender, and requested by Salus.  They indicated that they

7    would not be willing to provide the DIP financing without some

8    measure of credit support provided by the preexisting equity

9    sponsor here.  And IPC agreed to provide a million and a half

10   dollars of such credit support pursuant to an agreement that is

11   going to be entered into between IPC and Salus.  They were

12   able, have been working on that.  It's not yet complete.  But

13   it is reflected in the credit agreement and the DIP financing,

14   and there is a condition and a covenant agreement that will be

15   entered into by this Friday.  And if it's not entered into by

16   Friday, then it will be a default under the credit agreement.

17        So the parties are working hard to get that

18   participation done.  It's structured as a participation,

19   initially in a prepetition loan which would convert to a

20   participation, the DIP term loan, once the DIP term loan is

21   rolled up at the final hearing under a consent and modification

22   agreement.  And there is, and I would draw Your Honor's

23   attention to it.  In paragraph 44 of the proposed DIP order,

24   there is language requested by IPC with respect to that

25   proposed credit support in the nature of confirmatory language.

Bender/Argument                          23

1          They wanted to clarify that this new credit support

2    that they're providing isn't going to be made subject to the

3    existing creditor agreement between the senior and the junior

4    prepetition lenders.   And I also wanted it to be made clear

5    that subject to the challenge rights that are provided in the

6    DIP financing for the Creditors Committee and others to review

7    liens and challenge them, generally, they wanted it to be made

8    clear that this participation, once provided, couldn't be

9    challenged because it's new money being put up by IPC and it

10   doesn't relate to the prepetition and junior secured loan,

11   other than it's being put up by related entities.

12          So IPC wanted comfort that in providing this post

13   petition credit support they would not be opening themselves up

14   to an attack with respect to it.   And this doesn't prejudice

15   any, as I said before, the Creditors Committee or other

16   parties' rights with respect to the challenge period in the

17   prepetition loans.   So I wanted to draw Your Honor's attention

18   to that specifically.

19          To also address the additional provisions in the

20   financing that are required to be highlighted of the local

21   Bankruptcy Rule 4001-4.   I wondered if I could take the Court

22   through those quickly.   I mentioned the fact that they could

23   roll up involved in this financing, a revolver rolling up in

24   the ordinary course of the term loan being replaced, if you

25   will, at the time of the final hearing and the final order.

Bender/Argument                    24

1          There are proposed waivers and concessions with

2     respect to the validity of the prepetition debt as is typical

3     of a debtor stipulated to the amount, nature and extent of the

4     prepetition secured creditors lien and security interests.  And

5     of course there's the provision of a Committee challenge

6     period, or if there's no Committee, for other parties in

7     interest to challenge.  The Committee would have 60 days, other

8     parties in interest would have 75 days from the entry of the

9     final DIP order to challenge the prepetition party's liens and

10    security interests under the prepetition credit documents.

11          There is the provision for a 506(c) waiver in

12    connection with the financing.  There is the provision of, to a

13    DIP lender of liens on avoidance actions.  There are I think

14    fairly typical defaults and termination provisions, although I

15    did mention a default provision with respect to not getting

16    this participation agreement done.  And there are also default

17    provisions with respect to milestones which Mr. Rosen alluded

18    to before, that have to do with the timing and the process for

19    selling the debtor's assets.  There are, there's a schedule

20    6.23 of the credit agreement that deals with various milestones

21    relating to the admission of motion dealing with bidding

22    procedures.  And ultimately the conduct of a Section 363 sale

23    of the assets, and the timetable for that process, which the

24    debtors have committed to meet.  So I wanted to draw Your

25    Honor's attention to those matters as well.

Bender/Argument                        25

1        Otherwise the motion puts forth all of the various

2   terms of the proposed financing, which are set forth at length

3   in the motion, and if Your Honor would like I could go through

4   them.  But I think they're fairly typical and straightforward.

5   But if Your Honor has any specific questions about the terms

6   I'm happy to address them.

7        I've now talked a little bit, I'm happy to answer

8   questions, I'm happy to defer to Mr. Hollander or Ms. Walker if

9   they want to supplement anything I've said.  I think I

10  mentioned this, -- before I do that.  I think I mentioned that

11  we had made one change which I think is not reflected in the

12  markups that we sent to Your Honor with respect to requests for

13  some slightly changed language in one of the provisions dealing

14  with the lender's rights to exercise remedies and enter

15  premises.  There was language requested by an attorney for some

16  of the landlords to just clean up that language and change that

17  language a little bit.  And we made that change.

18       And with that Your Honor, I could take you through

19  that or I can take you through a black line of the changes to

20  the DIP financing, or answer questions.  Whatever the Court

21  would prefer.

22       THE COURT:  You know, I'm always concerned on these

23  applications when no one's had, in all candor, just because of

24  the weather, you know, a reasonable time to review these.  And

25  we don't have a Committee in place.  So has the U.S. Trustee

Colloquy                              26

1    has an opportunity to review these?

2         MR. MacMASTER:  I've reviewed the original order that

3    was filed. I don't know that I've seen in detail, reviewed the

4    most recent version.  I don't know what all the markups are.

5    But you know, I've got some questions as to you know, could

6    they explain what paragraph 29 is intended to mean on page 40

7    of the version I'm looking at, use of the DIP facility.

8         THE COURT:  You're talking about the order?

9         MR. MacMASTER:  Yeah, yes, Your Honor.

10        THE COURT:  What paragraph?

11        MR. MacMASTER:  It's paragraph 29, prohibited use of

12   the DIP facility.  I understand that the Committee's allowed to

13   investigate the liens.  I'm not sure what paragraph 29 means.

14   Are they going to be allowed to investigate them, but they

15   can't file anything adverse to the liens?  I'm trying to --

16        MR. BENDER:  That's right, I think it's a fairly

17   typical provision that allows the Committee to investigate

18   liens, but not to use the lender's money to finance an action

19   against the lender to avoid those liens.  So if the Committee

20   wants to pursue an action, they'll have to either get

21   permission from the lender to use their funds, or fund it

22   themselves.

23        MR. MacMASTER:  So they can take discovery, they

24   could take depositions, they could serve 2004s or whatever?

25        MR. BENDER:  Yeah, I'm happy to cede to Ms. Walker if

Colloquy                          27

1   she wants to address the extent of the provision.

2           MR. MacMASTER:  I mean I know that 50,000 is going to

3   go a long way for the Committee, the carve out.

4           MS. WALKER:  Your Honor, this is Wendy Walker at

5   Morgan Lewis for Salus, the proposed DIP lender.  Your Honor,

6   the paragraph, the $50,000 that Mr. MacMaster just referred to,

7   is what used to be known as the burial expenses, if the case is

8   converted.  There is a carve out up to $50,000 to pay for the

9   Trustee's expenses.

10          Paragraph 29, as Mr. Bender said, is designed to

11  protect the DIP lender from having the proceeds of his loan

12  used to sue it, or bring an action against it.  And I certainly

13  acknowledge that it is usual to have an investigation budget

14  for a Committee.  We don't have that provided for here.  But

15  I'm happy to add it.

16          THE COURT:  All right.  Well, you know, in all

17  candor, these are the type of things that are troubling.  And

18  this is why I want a quick hearing on the final order that's

19  got to -- Mr. MacMaster, do you have any idea when you'll be

20  able to schedule the Committee meeting?

21          MR. MacMASTER:  Your Honor, I mean, we've been

22  basically closed just like the Court has, since yesterday.

23  Obviously I'd want to have it within the next 15 days.  I mean

24  I haven't even looked at the top 30 list to see where people

25  would be coming in from.

Colloquy                        28

1          THE COURT:  Okay.

2          MR. MacMASTER:  So, but certainly within the next two

3    weeks would be my goal.  Preferably within the next ten days.

4    But I just haven't been able to work that out yet.

5          THE COURT:  Right.  That's the type of provision in

6    all candor, that as soon as the Committee takes a look at it

7    we're either going to have objections at the final hearing, and

8    they're going to sit down with the lender, the DIP lender and

9    the debtor's counsel, and work out a resolution.  There's other

10   things in here that are going to change and I'd be shocked if

11   that doesn't happen.  So does anyone else have an objection to

12   the order entering and an early hearing date on a final

13   hearing?

14          MR. LeHANE:  Your Honor, this is Robert LeHane.

15          THE COURT:  Yes.

16          MR. LeHANE:  Your Honor, first of all I wanted to

17   thank Ms. Walker on behalf of several of our landlords, I

18   actually did reach out to her last night about paragraph 24,

19   and had some cleanup language they quickly responded to that.

20          THE COURT:  Good.

21          MR. LeHANE:  We did have some questions though.

22   Maybe I missed it, we've only had a little bit of time with the

23   papers.  But we didn't see any statement anywhere in the papers

24   of an estimated asset value, total asset value for the debtor.

25   So that's just a question I had.

Hollander/Argument                          29

1          But one other issue, and it sounds like it may have

2     been put in a revised agreement, was with respect to the credit

3     support and the post petition lending pursuant to an agreement

4     that hasn't yet been executed.  It sounded to me like there

5     would be a right for the Creditors Committee to challenge that

6     later on, but not other parties.  And that's I guess another

7     provision I would request that any parties have a right to

8     challenge that since it sounds like an agreement that hasn't

9     yet been executed.

10         And my clients may want to be on that Committee, but

11    I don't know who's going to be on that Committee.  And I don't

12    know what position I'll take with respect to that.  And I think

13    under the circumstances it would appropriate to have a complete

14    reservation of any party's rights to object to sponsorship

15    participation post petition being essentially approved in no

16    parties except for the Committee having a right to challenge

17    that at this early stage of the case.

18         MR. HOLLANDER:  Your Honor, this is Paul Hollander on

19    behalf of the prepetition junior secured parties.  As Mr.

20    Bender explained that the DIP lender, Salus, has conditioned

21    its willingness to make a DIP loan on the prepetition junior

22    secured lender's providing basically a backstop which has taken

23    the form of a participation interest in the $16 million term

24    loan.  And that request really has been evolving and is still

25    being, it's been approved in principle by my client, that

Hollander/Argument                          30

1   they're prepared to purchase a $1.5 million participation in a

2   term loan, and we're in the process of trying to document the

3   specific terms and conditions and provisions of a participation

4   agreement.

5          And the provision in the DIP loan order, I think it

6   was paragraph 44 that Mr. Bender made reference to, and maybe,

7   I think he clarified it, but perhaps maybe I'll try again.  As

8   the proposed participant in the term loan, we recognize that

9   whatever rights the statutory Committee might have to challenge

10  the term loan, they have those rights.  And we're buying a

11  participation in the term loan subject to whatever rights a

12  Committee has to challenge the term loan generally as to

13  whoever -- basically challenge the term loan generally.

14         What we are trying to protect in the language in

15  paragraph 44 is simply that because the junior, prepetition

16  junior secured parties are purchasing this participation

17  interest, we don't want anybody to challenge our participation

18  interest, which is between us and Salus, or the entity that the

19  Salus entity that will be selling us the participation.  So

20  that in other words we don't want to invest a million and a

21  half dollars to provide support for the DIP loan in that

22  fashion.  So that the DIP loan can be made and the company can

23  pursue its efforts to reorganization through this sale process,

24  and then find out that somebody is going to attack our

25  participation or try to treat us as a participant in the term

Hollander/Argument                         31

1   loan differently than the rest of the holders of the term loan.

2           We're accepting that we're going to be treated just

3   like the rest of the holders of the term loan, and if the

4   Committee has a problem with the term loan in its entirety,

5   those rights are reserved and I believe that the language in

6   paragraph 44 certainly reflects the best efforts of the debtor,

7   myself and the Morgan Lewis quarter to make it clear that that

8   was preserved.

9           But again, we don't want anyone taking a shot at us

10  for the million and a half dollars that we're investing in a

11  participation by trying to attack a participation agreement

12  itself.

13          THE COURT:  All right.

14          MR. HOLLANDER:  That's all that we're trying to -- I

15  don't know the gentleman who represents the landlords, whether

16  that in any way clarifies what we're looking to accomplish, or

17  whether he has any other questions about that.

18          MR. ROSEN:  This is Ken Rosen, just to make sure

19  we're clear on this.  And this is for Mr. LeHane's benefit.

20  The one and a half million as Mr. Hollander explained, is new

21  money coming in, you know, hereafter.  The rights of whatever

22  appropriate party to examine, to challenge, to review the

23  prepetition secured claims of what I'll call the IPC

24  affiliates, are not, Mr. Hollander is not asking that any of

25  those rights be limited.

1            MR. HOLLANDER:  This is Mr. Hollander speaking.  I

2      agree with what Mr. Rosen just said.  There was nothing in this

3      order that was intended, or by its language tries to insulate

4      the prepetition junior secured parties or their claims on

5      account of their prepetition loans.

6            THE COURT:  All right.

7            MR. HOLLANDER:  At this time the million five in new

8      money that we're being asked to advance by a deadline of

9      Friday, assuming we can get all the documentation in place.

10           MR. MacMASTER:  Mr. Hollander, this is Don MacMaster,

11     I take it this new money is going to the debtor?

12           MR. HOLLANDER:  It is going to the DIP lender in

13     order to provide credits for, so that they'll make the DIP

14     loan, Mr. MacMaster.  In other words, they were not willing to

15     make the DIP loan in the form that it presently exists, without

16     the prepetition junior secured creditors providing some credit

17     support.  And after negotiations which really began last

18     Thursday, that credit support is taking the form of the

19     purchase of a participation interest in the prepetition term

20     loan.  So it's new money as far as our clients are concerned.

21     But we're buying a portion of the prepetition term loan.  And

22     it's the only way, I believe, and the Salus people are

23     certainly capable of speaking for themselves, the only way on

24     which they were willing to make the DIP loan on the terms that

25     are in front of the Court and which will allow for this orderly

Colloquy                                    33

1   sale process.

2           THE COURT:  Does anybody else have any comments?

3           MS. WALKER:  Just one more, Your Honor.  And in the

4   nature of administrative, this is Wendy Walker from Morgan

5   Lewis for Salus.  I understand that Lowenstein is going to file

6   a revised form of interim DIP order reflecting the change to

7   paragraph 24 that we made at Mr. LeHane's request last night.

8   The DIP credit agreement is going to close this afternoon, or

9   people are going to try and have a close this afternoon so that

10  the employee wages can be paid, among other things.  There will

11  be some clarifying changes to the DIP credit agreement to deal

12  with things like the fact that the cash management order is

13  entered on an interim basis today, with a final hearing to

14  follow.  What I would propose, if it's acceptable to everybody

15  else is that when the revised DIP order is filed, the revised

16  credit agreement can also be filed with the clarifying changes.

17          THE COURT:  That's fine, when can you do that?

18  You're trying to get this done today, right?  Do you need an

19  order entered today?

20          MS. WALKER:  We do need an order entered today.

21          MR. BENDER:  Yes, Your Honor.

22          THE COURT:  And when is that order going to come in?

23  You understand the courthouse is closed.

24          MR. BENDER:  I believe that accommodations have been

25  made with the Court to allow for the order to get -- submitted

Colloquy                            34

1    and entered, Your Honor.

2            THE COURT:  Well, that depends on when it's

3    submitted.

4            MR. BENDER:  We can submit an order as soon as we get

5    off the phone.

6            THE COURT:  All right.

7            MR. POLLACK:  Your Honor, this is David Pollack for

8    certain of the landlords.  I did not see, perhaps I missed it,

9    a budget attached that is referenced in the order.

10           THE COURT:  Anybody want to address that?

11           MR. BENDER:  Yes, Your Honor, there is a budget.  I

12   believe it was attached, but I'll double check, and if not

13   we'll have it submitted as well.

14           MR. JUNG:  Your Honor, if I may, that budget is

15   attached as an exhibit to the order that has been filed on the

16   docket.

17           MR. MacMASTER:  That's Exhibit B, correct, Mr. Jung?

18           MR. JUNG:  I believe so.

19           THE COURT:  All right.

20           MR. BENDER:  And whoever asked the question, if you'd

21   like me to send a copy of the budget to you, I'm happy to do

22   that as well.

23           THE COURT:  Let's talk about a final hearing date

24   because your form of order requires that also.  Mr. MacMaster,

25   you think two weeks to get a --

Colloquy                                    35

1          MR. MacMASTER:  I think I'm probably going to need

2    two weeks to get a Committee in place.  I assume that we'll get

3    the notices out either today or tomorrow.   Probably tomorrow.

4          THE COURT:  Right probably.  All right, I'm going to,

5    let's, counsel send the revised order in.  But set the final

6    hearing subject to Committee requesting additional time if

7    that's necessary.  I want to get this looked at as quickly as

8    possible.  February 11th at one o'clock.

9          MR. BENDER:  Very good, Your Honor.

10          THE COURT:  If there's objections, we don't have --

11    an objection deadline of February 10th at 1 p.m.  And that's

12    not going to give any Committee much time, so it's with the

13    understanding that Committee counsel and the debtor, in the

14    midst of their negotiations can ask for additional time if they

15    think it's necessary.

16          MR. MacMASTER:  Okay.

17          THE COURT:  But I want someone to take a look at that

18    as quickly as possible.   All right?

19          MR. MacMASTER:  All right, thank you, Your Honor.

20          THE COURT:  Thank you.

21          MR. BENDER:  Your Honor, thank you, on behalf of the

22    debtor we greatly appreciate Your Honor accommodating us under

23    the circumstances today.

24          THE COURT:  Mr. Waldron's in court now and he and I

25    are going to talk.  We'll get these orders entered.  We all

Colloquy                                36

1    appreciate what the Clerk's Office is doing to accommodate

2    this.  It's a little more difficult.

3            ATTORNEY:  And the debtor seconds that appreciation.

4            THE COURT:  They're going above and beyond a little

5    bit. But that's fine.  We're happy to serve.  All right, I'll

6    see everybody tomorrow then at one o'clock, correct?

7            MR. ROSEN:  Thank you.

8            THE COURT:  And we'll look forward to that order

9    coming in.  Thank you.

10                      * * * * *

11              C E R T I F I C A T I O N

12       I, Patricia Poole, court approved transcriber, certify

13   that the foregoing is a correct transcript from the official

14   digital audio recording of the proceedings in the above-

15   entitled matter.

16

17

18

19   _____

20   /S/PATRICIA POOLE

21

22   TRACY GRIBBEN TRANSCRIPTION, LLC   February 11, 2014

23                                      DATE

24

25