> **THIS MOTION SEEKS, AMONG OTHER RELIEF, APPROVAL OF PROCEDURES TO ASSUME AND ASSIGN MULTIPLE UNEXPIRED LEASES OF NONRESIDENTIAL REAL PROPERTY.  PARTIES RECEIVING THIS MOTION SHOULD LOCATE THEIR LEASES ON EXHIBIT D ANNEXED HERETO.**
>
> **THE DEBTORS HAVE REQUESTED A HEARING TO CONSIDER THE SALE PROCEDURES PORTION OF THIS MOTION ON MARCH 11, 2014 AT 2:00 P.M. (ET).**

**LOWENSTEIN SANDLER LLP**
Kenneth A. Rosen, Esq.
John K. Sherwood, Esq.
Andrew Behlmann, Esq.
65 Livingston Avenue
Roseland, New Jersey 07068
(973) 597-2500 (Telephone)
(973) 597-2400 (Facsimile)

*Counsel to the Debtors and
Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| **Dots, LLC, *et al.*,** [1] | Case No. 14-11016 (DHS) |
| Debtors. | (Jointly Administered) |

**DEBTORS' MOTION FOR ENTRY OF ORDERS (I) (A) APPROVING PROCEDURES FOR THE SALE OF UNEXPIRED LEASES OF REAL PROPERTY AND (B) SCHEDULING LEASE SALE APPROVAL HEARINGS, AND (II) (A) AUTHORIZING SALE OF LEASES FREE AND CLEAR OF ALL INTERESTS, (B) APPROVING ASSUMPTION AND ASSIGNMENT OF LEASES, AND (C) WAIVING STAY PROVISIONS PURSUANT TO BANKRUPTCY RULES 6004(h) AND 6006(d)**

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), by and through their counsel, submit this motion (the "Motion"), pursuant to sections 105, 363, and 365 of title 11 of the United States Code (the "Bankruptcy Code"), rules 2002, 6004, and 6006 of

---

[1] The Debtors in these chapter 11 cases are Dots, LLC, IPC/Dots LLC, and Dots Gift LLC.  The last four digits of Dots, LLC's and IPC/Dots LLC's tax identification numbers are (3957) and (8282), respectively.

the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rule 6004-1 of the

Local Bankruptcy Rules for the District of New Jersey (the "Local Rules"), for entry of the

Lease Sale Procedures Order and the Sale Approval Orders (each as defined below).  In support

of this Motion, the Debtors respectfully state as follows:

## JURISDICTION

1.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334.  This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2).  Venue is proper in this

Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.     The predicates for the relief requested herein are sections 105, 363, and 365 of the

Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 6006, and Local Rule 6004-1.

## BACKGROUND

3.     On January 20, 2013 (the "Petition Date"), the Debtors commenced these chapter

11 bankruptcy cases  (the "Chapter 11 Cases") by filing voluntary petitions for relief under

chapter 11 of the Bankruptcy Code.  The Debtors continue to manage their properties and

operate their businesses as debtors-in-possession under sections 1107 and 1108 of the

Bankruptcy Code.

4.     No trustee or examiner has been appointed in these Chapter 11 Cases.  On

February 6, 2014, the United States Trustee for the District of New Jersey appointed an official

committee of unsecured creditors (the "Committee") pursuant to Section 1102(a)(1) of the

Bankruptcy Code.

5.     General background information about the Debtors and the Chapter 11 Cases is

set forth in the *Declaration of Lisa Rhodes, Chief Executive Officer of Dots, LLC, in Support of*

*Chapter 11 Petitions and First Day Pleadings* filed on the Petition Date [D.I. 19].

6.      On January 31, 2014, the Debtors filed a motion seeking, among other relief, approval of procedures for the auction and sale of their assets and approval of the sale of their assets to the winning bidder free and clear of liens, claims, encumbrances, and other interests (the "Sale Motion") [D.I. 132].   Pursuant to the Asset Sale Motion, the Debtors filed supplemental briefs on February 16 and 21, 2014 [D.I. 219, 260, 272] seeking approval of certain stalking-horse bid protections and authority to conduct store-closing liquidation sales (the "GOB Sales") at all of their store locations.

7.      On February 27, 2014, the Court entered an order granting the Sale Motion and authorizing the Debtors, through Gordon Brothers Retail Partners LLC ("GBRP") as agent, to conduct GOB Sales [D.I. 322].   The GOB Sales commenced on February 28, 2014, and are scheduled to end on or before May 31, 2014 unless extended.   GBRP has advised the Debtors that the GOB Sales will end prior to May 31, 2014 at certain locations.   The GOB Sales at approximately 40 stores are expected to conclude before the end of March 2014.

## RELIEF REQUESTED

8.      By this Motion, the Debtors seek entry of (a) an order (the "Lease Sale Procedures Order") approving procedures for the assumption, assignment, and sale of certain of the Debtors unexpired leases of nonresidential real estate ("Lease(s)") in three lots through a competitive bidding process and, if at least two competing qualified bids are received for any Leases, two auctions (the "Auctions"), and (b) following the Approval Hearings (as defined below), orders approving the assumption, assignment, and sale of certain Leases to the parties the Debtors determine have submitted the highest and best bids (the "Approval Orders").

9.    The Debtors have requested that the Court schedule a hearing to consider approval of the Sale Procedures (as defined below) on **March 11, 2014 at 2:00 p.m. (Eastern)**. The key dates in connection with the proposed sale of the Leases are as follows:

| Lot 1 Leases<br>Lot 2 Leases | |
|---|---|
| **Qualified Bids Due** | March 21, 2014 at 5:00 p.m. (Eastern) |
| **Lot 1 Auction**<br>**Lot 2 Auction** | March 24, 2014 at 9:00 a.m. (Eastern) |
| **Approval Hearing** | March 25, 2014 at 2:00 p.m. (Eastern) |
| | |
| **Lot 3 Leases** | |
| **Qualified Bids Due** | April 18, 2014 at 5:00 p.m. (Eastern) |
| **Lot 3 Auction** | April 21, 2014 at 9:00 a.m. (Eastern) |
| **Approval Hearing** | April 22, 2014 at 10:00 a.m. (Eastern) |

The Debtors respectfully request approval of the following procedures for the assumption, assignment, and sale of the Leases (the "Sale Procedures"):

**Sale of the Lot 1 Leases**

10.    The Debtors have entered into a stalking-horse Lease Purchase Agreement for certain of their Leases (the "Stalking Horse Agreement"), annexed hereto as **Exhibit A**, with Rainbow Southeast Leasing, Inc. (the "Stalking Horse Bidder"). Pursuant to the Stalking Horse Agreement, the Stalking Horse Bidder will purchase up to 201 Leases (the "Lot 1 Leases") for a purchase price of $2,100,000 and will assume responsibility for paying certain cure amounts due in connection with the assumption and assignment of the Lot 1 Leases (excluding occupancy charges for periods on or after February 1, 2014 and before the effective date of assignment). The Stalking Horse Bidder has the ability to remove Leases from the schedule of Lot 1 Leases, but cannot reduce the number of Lot 1 Leases to fewer than one hundred.

11.    The Stalking Horse Agreement is subject to higher and better bids. Accordingly, the Debtors are soliciting competing offers for the Lot 1 Leases though **5:00 p.m. (Eastern) on March 21, 2014** (the "Lot 1 Bid Deadline"). If any qualified competing bids are received by the

Lot 1 Bid Deadline, the Debtors will conduct an auction for the Lot 1 Leases (the "Lot 1 Auction") commencing at **9:00 a.m. (Eastern) on March 24, 2014** at the offices of the Debtors' counsel, Lowenstein Sandler LLP, at 65 Livingston Avenue, Roseland, New Jersey 07068.  If no qualified bids are received before the Lot 1 Bid Deadline, the Debtors will cancel the Lot 1 Auction and seek approval to sell the Lot 1 Leases to the Stalking Horse Bidder at a hearing to be held on **March 25, 2014 at 2:00 p.m. (Eastern)** (the "Lot 1 and 2 Approval Hearing").  As compensation for the willingness of the Stalking Horse Bidder to submit a bid that will serve as a floor for the Lot 1 Auction, the Debtors have agreed, subject to Court approval, to reimburse the Stalking Horse Bidder up to $100,000 of its documented, reasonable fees and expenses incurred in connection with the evaluation, negotiation, and preparation of the Stalking Horse Agreement (the "Expense Reimbursement"), payable upon the closing of an alternative transaction if the Stalking Horse Bidder does not submit the highest and best bid at the Lot 1 Auction.

12.     Subject to approval by the Court at the Lot 1 and 2 Approval Hearing, the Debtors will tender the Lot 1 Leases to the Stalking Horse Bidder or such other bidder that places the highest and best bid at the Auction (the "Lot 1 Winning Bidder") on seven days' notice of the completion of the GOB Sales at each of the applicable locations (the "Lot 1 Locations").  The Debtors anticipate that approximately forty (40) Lot 1 Leases will be assumed and assigned to the Lot 1 Winning Bidder on April 1, 2014, and the remainder of the Lot 1 Leases purchased by the Lot 1 Winning Bidder will be assumed and assigned on or before June 1, 2014, subject to the conclusion of the GOB Sales.  The Debtors will seek approval at the Lot 1 and 2 Approval Hearing to assume all of the Lot 1 Leases and assign them to the Lot 1 Winning Bidder, effective, with respect to each Lot 1 Lease, as of the date set forth in (a) the Approval Order authorizing the assumption and assignment of the Lot 1 Leases or (b) a *Notice of Assumption and*

*Assignment* in the form annexed hereto as **Exhibit B**, which the Debtors will file on the docket and serve upon the applicable landlords at least seven (7) days before delivery of the leased premises to the Lot 1 Winning Bidder.

**Sale of the Lot 2 Leases**

13.    The Debtors anticipate that the GOB Sales will be completed at certain of their retail stores other than the Lot 1 Locations before April 1, 2014 (the "Lot 2 Locations" and the applicable Leases, the "Lot 2 Leases").  Accordingly, the Debtors are soliciting bids for the Lot 2 Leases though **5:00 p.m. (Eastern) on March 21, 2014** (the "Lot 2 Bid Deadline").  If two or more qualified bids for the Lot 2 Leases or any subset thereof are received by the Lot 2 Bid Deadline, the Debtors will conduct an auction for such Lot 2 Leases (the "Lot 2 Auction") commencing at **9:00 a.m. (Eastern) on March 24, 2014** at the offices of the Debtors' counsel, Lowenstein Sandler LLP, at 65 Livingston Avenue, Roseland, New Jersey 07068.  If the Debtors do not receive two or more qualified bids for any of the Lot 2 Leases before the Lot 2 Bid Deadline, the Debtors will cancel the Lot 2 Auction.  If only one qualified bid is received for any Lot 2 Leases, and if the Debtors determine to accept such bid, the Debtors will seek approval to sell such Lot 2 Leases to the parties submitting qualified bids at the Lot 1 and 2 Approval Hearing on **March 25, 2014 at 2:00 p.m. (Eastern)**.

**Sale of the Lot 3 Leases**

14.    The Debtors anticipate that the GOB Sales will be completed at certain of their retail stores other than the Lot 1 Locations and Lot 2 Locations on or after April 1, 2014 (the "Lot 3 Locations" and the applicable Leases, the "Lot 3 Leases").  Accordingly, the Debtors are soliciting bids for the Lot 3 Leases though **5:00 p.m. (Eastern) on April 18, 2014** (the "Lot 3 Bid Deadline" and collectively with the Lot 1 Bid Deadline and Lot 2 Bid Deadline, the "Bid

Deadline(s)").  If two or more qualified bids for the Lot 3 Leases or any subset thereof are received by the Lot 3 Bid Deadline, the Debtors will conduct an auction for such Lot 3 Leases (the "Lot 3 Auction") commencing at **9:00 a.m. (Eastern) on April 21, 2014** at the offices of the Debtors' counsel, Lowenstein Sandler LLP, at 65 Livingston Avenue, Roseland, New Jersey 07068.  If the Debtors do not receive two or more qualified bids for any of the Lot 3 Leases before the Lot 3 Bid Deadline, the Debtors will cancel the Lot 3 Auction.  If only one qualified bid is received for any Lot 3 Leases, and if the Debtors determine to accept such bid, the Debtors will seek approval to sell such Lot 3 Leases to the parties submitting qualified bids at a hearing to be held on **April 22, 2014 at 2:00 p.m. (Eastern)** (the "Lot 3 Approval Hearing" and collectively with the Lot 1 and 2 Approval Hearing, the "Approval Hearings").

**Selection of Qualified Bids and Qualified Bidders[2]**

15.     The Debtors, in consultation with their prepetition and postpetition secured lenders (the "Lenders") and the Committee, will use the following criteria in determining whether any bid is a qualified bid ("Qualified Bid(s)" and the parties submitting Qualified Bids, "Qualified Bidder(s)"):

(a)     **Form of Bid**.  Each bid must be presented in substantially the form of Lease Purchase Agreement annexed hereto as **Exhibit C** (the "Model LPA").  Any bidder that modifies the Model LPA must submit both clean and marked copies of its agreement as part of its bid.

(b)     **Leases**.  Each bid must identify with particularity the Lease or Leases sought to be assumed and assigned.

(c)     **Cash Bids Only**.  Each bid must be for an all-cash purchase price, denominated in United States Dollars, with no contingencies to closing other than Bankruptcy Court approval.

---

[2] The Debtors reserve the right to declare any bid that does not conform to these guidelines as Qualified Bids, in consultation with the Lenders and the Committee.

(d)     **Cure Amounts**.  Each bid must provide for the bidder to pay all cure amounts required to be paid in connection with the assumption with the applicable Leases other than actual rent and other periodic charges due under such Leases for the occupancy period beginning on February 1, 2014 and ending on the effective date of the assignment of such Leases.

(e)     **As-Is, Where-Is**. Each bid shall be on an as-is, where-is basis, without warranty or representation of any kind by the Debtor, except as set forth in the Model LPA.

(f)     **Adequate Assurance Information**.   All competing bids must be accompanied by information sufficient to enable the Debtors to ascertain the bidder's ability to close the proposed transaction and to demonstrate adequate assurance of future performance.   The Debtors will use commercially reasonable efforts to obtain from each party submitting a Qualified Bid the following information: (i) the intended use of the premises with proposed trade name, (ii) the prior year's balance sheet and income statement, (iii) federal income tax returns for the most recent two years, (iv) pro forma capitalization of debt and equity at closing and for the two-year period after the closing date, and (v) a brief discussion of such Qualified Bidder's business plan, including experience operating a business similar in nature to the Debtors' business, if applicable (collectively, the "Adequate Assurance Information").   To the extent a bidder's ability to consummate the proposed assumption and assignment, including the ability to provide adequate assurance of future performance, will rely upon the financial wherewithal of any parties other than the bidder entity itself, its bid shall include Adequate Assurance Information with respect to such parties.   Upon receipt of a bid determined to be a Qualified Bid, the Debtors shall provide a copy of such Qualified Bid and the accompanying Adequate Assurance Information to the applicable landlords who have (x) requested copies of Adequate Assurance Information and (y) confirmed in writing to the Debtors' counsel (e-mail is acceptable) their agreement to keep such Adequate Assurance Information strictly confidential and use it solely for the purpose of evaluating whether a Qualified Bidder has provided adequate assurance of future performance under the applicable Leases.

(g)     **Good Faith Deposit**.  Bids must be accompanied by  (i) a certified check or wire transfer of immediately available funds, payable to "Lowenstein Sandler LLP Attorney Trust Account", in the amount of twenty percent (20%) of the cash consideration of the bid, which funds will be deposited into a non-interest-bearing account (a "Good Faith Deposit").  The Good Faith Deposit will be retained by the Debtors until the closing of an alternate transaction.   The Debtors shall retain indefinitely any Good Faith Deposit submitted by the winning bidders at each of the Auctions, which will be entitled to a credit therefor against the

purchase price under their respective bids.

(h) **Confirmation of Good Faith**.  Each bidder must confirm in writing that it has not engaged in any collusion in the bidding process and that its bid represents a bona fide offer that it intends to consummate if selected as a winning bidder.  All bids must disclose the identity of the actual bidder's organization, including confirmation that the bid is being made as principal for the bidder's own account, and if not, the basis upon which the bidder is acting and the identities of all other participants (if any).

16. The Debtors may reject any bid that does not conform with these guidelines.

## Auction Procedures

17. The Debtors propose the following procedures (the "Auction Procedures") for the conduct of any Auctions pursuant hereto:

(a) **Selection of Winning Bid**.  The bid or combination of bids that the Debtors determine, in consultation with the Lenders and the Committee, is the highest and best bid at the conclusion of each Auction shall be deemed the highest and best bid for the applicable Leases (each a "Winning Bid"), subject to Court approval, and the Winning Bidder shall be required to enter into a definitive Lease Purchase Agreement memorializing the Winning Bid before the Auction is adjourned.

(b) **Conclusion of Auction**.  Each Auction will conclude when no further proposals are presented by Qualified Bidders or at such other time as the Debtors, in consultation with the Lenders and the Committee, shall determine.

(c) **Backup Bidder**.  The bid received immediately prior to the Winning Bid at each Auction will remain open for a period of seven (7) days after the applicable Auction and will be deemed the Winning Bid if the Winning Bid declared at the Auction is unable to be consummated.

## Assumption and Assignment Procedures

18. In the event the GOB Sales at a particular location have not concluded prior to the applicable Hearing, (a) the Debtors will seek approval of the proposed assumption and assignment of such Lease and (b) the order approving such assumption and assignment will either (i) specify the date on which the Debtors will deliver possession of the applicable

premises, which date shall be the effective date of assignment of the applicable Lease, or (ii)
direct the Debtors to file on the docket and serve upon the affected landlords a *Notice of
Assumption and Assignment* in substantially the form annexed hereto as **Exhibit B** (an
"Assignment Notice") setting forth the effective date of assignment of the applicable Lease.

## BASIS FOR RELIEF REQUESTED

19.     The relief requested herein will enable the Debtors to assume, assign, and sell
their Leases as quickly and efficiently as possible.   Accordingly, such relief is in the best
interests of the Debtors' estates, creditors, and other parties-in-interest, represents an exercise of
the Debtors' sound business judgment, and, therefore, should be granted.

## I.      THE BIDDING PROCEDURES SHOULD BE APPROVED

20.     Bankruptcy Rule 6004(f)(1) permits sales of estate property outside the ordinary
course of business to be conducted by private sale or public auction.  Chapter 11 debtors selling
assets outside the ordinary course of business are obligated to attempt to maximize the value
received for their assets.  See, e.g., Official Comm. of Subordinated Bondholders v. Integrated
Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 659 (S.D.N.Y. 1992) ("'It is a well-
established principle of bankruptcy law that the . . . [debtors'] duty with respect to such sales is
to obtain the highest price or greatest overall benefit possible for the estate.'") (quoting Cello
Bag Co. Inc. v. Champion Int'l Corp. (In re Atlanta Packaging Prods., Inc.), 99 B.R. 124, 130
(Bankr. N.D. Ga. 1988)); see also Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn
Stores, Inc.), 107 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of
the Code [is] to enhance the value of the estate at hand").  Competitive auctions are favored as a
means of maximizing the value received by a chapter 11 debtor's estate.  See, e.g., Integrated
Res., 147 B.R. at 659 (competitive bidding procedures "encourage bidding and . . . maximize

the value of the debtor's assets").

21.     By providing for competitive auctions in the event multiple Qualified Bids are received for any of the Leases, the bidding procedures establish a value-maximizing mechanism, while preserving the Debtors' ability to sell Leases for which only a single Qualifying Bid is received.  The Debtors respectfully submit that the proposed bidding procedures set forth above are designed to obtain the highest price possible for as many of the Leases as possible and, therefore, should be approved.

## II.     THE FREE AND CLEAR SALES OF THE LEASES SHOULD BE APPROVED.

### A.     The sale of the Leases is an exercise of the Debtors' sound business judgment.

22.     A chapter 11 debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  A debtor seeking to sell estate property outside the ordinary course of business must demonstrate that a legitimate business justification exists for the proposed sale.  In re Lionel Corp., 722 F.3d 1063, 1071 (2d Cir. 1983).  Once a debtor seeking to sell assets "articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct."  In re Johns- Manville Corp., 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).  Where a valid business justification exists, the law vests a debtor's decision to sell property out of the ordinary course of business with a strong presumption that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."  Integrated Res., 147 B.R. at 656 (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del.1985)).

23.     The sale of the Leases, and the procedures by which the Debtors propose to

conduct such sale, are supported by a sound business purpose and represent a valid exercise of

the Debtors' business judgment.  As evidenced by the offer by the Stalking Horse Bidder to

purchase the Lot 1 Leases or a subset thereof for cash consideration of $2,100,000 (plus

payment of cure costs), the Leases are valuable assets.  However, upon conclusion of the GOB

Sales, the Leases will be of no value to, and will impose a significant administrative expense

burden upon, the Debtors' estates.  By selling the Leases, the Debtors will realize an influx of

cash while simultaneously eliminating future rental obligations and preventing the accrual of

rejection damage claims.  Accordingly, the sale of the Leases should be approved.

> **B.**      **Assignees of the Leases will be good-faith purchasers.**

24.     A debtor selling assets outside the ordinary course of business must also

demonstrate that the proposed purchaser acted in good faith.  In re Abbotts Dairies of Penn.,

Inc., 788 F.2d 143, 149 (3d Cir. 1986).  The Debtors, through their real estate consultants,

A&G Realty Partners ("A&G"), have extensively marketed the Leases.  A&G has reviewed

and analyzed the Leases, assisted the Debtors in negotiating the Stalking Horse Agreement,

and is continuing to actively market the Leases in order to find parties willing to submit bids.

The Debtors anticipate that due to the extensive marketing process for the Leases, and by

virtue of the requirement that any Qualified Bid be accompanied by an acknowledgment that

the bidder has acted in good faith and without collusion, any purchaser of any of the Leases

(including but not limited to the Stalking Horse Bidder) will be a purchaser in good faith.

> **C.**      **The sale of the Leases free and clear of liens, claims, encumbrances, and other interests should be approved.**

25.     A chapter 11 debtor may sell property free and clear of other parties' interests

therein if (a) applicable nonbankruptcy law permits such a "free and clear" sale, (b) the holder of

the interest consents, (c) the interest is a lien and the sale price of the property exceeds the value

of all liens on the property, (d) the interest is subject to a bona fide dispute, or (e) the holder of the interest could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest.  See 11 U.S.C. § 363(f).  Because section 363(f) is phrased in the disjunctive, a debtor need satisfy only one of the five requirements enumerated therein.  In Re Elliot, 94 B.R. 343 (Bankr. E.D. Pa. 1988).  Accordingly, if any of the five conditions set forth in section 363(f) are met, then a debtor may sell property free and clear.  Id.

26.     The sales of the Leases satisfy the requirements of section 363(f).  All relevant parties, including all known parties with an interest in the Leases, will have sufficient notice and the ability to object.  If a party with an interest in a Lease does not timely object to the transaction in accordance with the proposed procedures, the Debtors submit that such party has consented to the Sale pursuant to section 363(f)(2) of the Bankruptcy Code.  See Hargrave v. Township of Pemberton (In re Tabone, Inc.), 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (failure to object to sale free and clear of liens, claims and encumbrances satisfies section 363(f)(2)).

27.     Moreover, the Debtors believe that the only parties with an interest in the Leases or their proceeds are the Lenders, which hold liens on the Leases and their proceeds (except to the extent the terms of any Lease prohibits such a lien) pursuant to the Court's order approving the final order authorizing the Debtors to enter into a postpetition secured financing facility with the Lenders [D.I. 229].  The Debtors anticipate that at the conclusion of the Auctions, the Lenders will consent to the sale of the Leases.  Accordingly, the Debtors respectfully request that the Court approve the sales of the Leases free and clear of all liens, claims, encumbrances, and other interests.

**III.       ASSUMPTION AND ASSIGNMENT OF THE LEASES SHOULD BE APPROVED**

**A.     The Debtors have met the applicable standards for assumption and**

**assignment of the Leases.**

28.     A debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease[.]"   11 U.S.C. § 365(a).   A debtor may not assume an executory contract or unexpired lease under which there is an existing default unless the debtor

> (A)     cures, or provides adequate assurance that [it] will promptly cure, such default . . .;
>
> (B)     compensates, or provides adequate assurance that [it] will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>
> (C)     provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

29. A debtor may assign an executory contract or unexpired lease only if

> (A)     the [debtor] assumes such contract or lease in accordance with the provisions of this section; and
>
> (B)     adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).  To facilitate the assumption and assignment of any Assumed Contracts, the Debtors anticipate filing a separate motion seeking entry of an order fixing the pre-petition cure amounts due to each landlord.

30.     A debtor's decision to assume or reject an executory contract under section 365 is governed by the business judgment standard.  See Nostas Assocs. v. Costich (In re Klein Sleep Prods., Inc.), 78 F.3d 18, 25 (2d Cir. 1996); Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1099 (2d Cir. 1993).   Here, the assumption and assignment of the Leases is essential to maximizing the value the Debtors realize for their assets.

Moreover, the Debtors submit that there are no incurable defaults under any of the Leases.  The

Debtors do believe, however, that there may be certain amounts due under some of the Assumed

Contracts, and submit that any such payment defaults will be cured in connection with any

assumption and assignment of the Leases at or as soon as reasonably practicable after the closing

thereof.

> **B.**    **Counterparties to any assigned Leases will be provided adequate assurance
> of the assignees' future performance thereunder.**

31.    Moreover, the Debtors submit that all counterparties to Assumed Contracts will

be provided with adequate assurance of future performance.  The meaning of "adequate

assurance of future performance" depends on the facts and circumstances of each case, but

should be given "practical, pragmatic construction."  See Carlisle Homes, Inc. v. Azzari (In re

Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr D.N.J. 1988) (internal citations omitted); see

also In re Natco Indus., Inc., 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (holding that adequate

assurance of future performance does not mean absolute assurance of payment); In re Bon Ton

Rest. & Pastry Shop, Inc., 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("Although no single

solution will satisfy every case, the required assurance will fall considerably short of an absolute

guarantee of performance.").  Among other things, adequate assurance may be given by

demonstrating the assignee's financial health and experience in managing the type of enterprise

or property assigned.  See In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (chief

determinant of adequate assurance is whether rent will be paid).

32.    As set forth above, the Debtors will provide copies of each Qualified Bid and the

Adequate Assurance Information submitted therewith to the affected landlords who (a) request

copies of Adequate Assurance Information and (y) confirm in writing to the Debtors' counsel (e-

mail is acceptable) their agreement to keep such Adequate Assurance Information strictly

confidential and use it solely for the purpose of evaluating whether a Qualified Bidder has provided adequate assurance of future performance under the applicable Leases.  To the extent any landlord asserts that such Adequate Assurance Information does not establish adequate assurance of a Qualified Bidder's future performance under the applicable Leases, the Debtors will use commercially reasonable efforts to facilitate discussions between the Qualified Bidder and the affected landlord prior to the applicable Approval Hearing.  If the Debtors are unable to facilitate a consensual resolution of any adequate assurance dispute prior to the applicable Approval Hearing, and if the affected Qualified Bidder is the winning bidder at the applicable Auction, the Debtors will proffer testimony and/or present documentary evidence with respect thereto at the applicable Approval Hearing and request that the Court find that such Qualified Bidder has provided adequate assurance of its future performance under the relevant Leases.

**C.      The requirements of Bankruptcy Rule 6006(f) should be modified to permit the procedures set forth herein.**

33.      Bankruptcy Rule 6006(f) requires that

> [a] motion to assume or assign multiple . . . unexpired leases that are not between the same parties shall:
>
> (1)  state in a conspicuous place that parties receiving the omnibus motion should locate their names and their contracts or leases listed in the motion;
>
> (2)   list parties alphabetically and identify the corresponding contract or lease;
>
> (3)   specify the terms, including the curing of defaults, for each requested assumption or assignment;
>
> (4)   specify the terms, including the identity of each assignee and the adequate assurance of future performance by each assignee, for each requested assignment;
>
> (5)   be numbered consecutively with other omnibus motions to assume, assign, or reject executory contracts or unexpired leases;

and

(6)   be limited to no more than 100 executory contracts or unexpired leases.

34.     The Debtors submit that requirements (1)-(3) and (5) are satisfied by this Motion. First, the first page of this Motion clearly states that this is a motion to assume and assign multiple Leases, and directs parties to locate their names and Leases on **Exhibit D** annexed hereto.  Second, **Exhibit D** lists the Leases alphabetically by counterparty.  Third, the terms for the curing of defaults applicable to all Leases are set forth herein and in the Stalking Horse Agreement and Model LPA (as applicable).  To the extent any Qualified Bid contemplates any treatment of cure amounts other than as set forth in this Motion and the Stalking Horse Agreement or Model LPA (as applicable), the Debtors submit that the provision of all Qualified Bids to Lease counterparties upon request will provide all interested parties with information necessary to satisfy Bankruptcy Rule 6006(f)(3).  Fourth, this is the Debtors' only anticipated motion to assume and assign Leases, and thus is unnumbered.

35.     With respect to the requirement under Bankruptcy Rule 6006(f)(4) that the Debtors provide counterparties the identity and adequate assurance of future performance for each Assignee, it would be impossible to include such information in this Motion, except with respect to the Stalking Horse Bidder, because (a) the identities of potential assignees are not yet known and will not be known until the applicable Bid Deadlines have passed and (b) the identities of proposed assignees will not be known until the conclusion of the applicable Auctions.  However, the procedures set forth herein provide an efficient mechanism for the Debtors to disseminate such information to interested landlords as soon as possible after receipt from Qualified Bidders and, with respect to each Bid Deadline, several days in advance of the applicable Approval Hearing.

36.     The Debtors respectfully request that the Court waive the requirement under Bankruptcy Rule 6006(f)(6) that this Motion apply to only one hundred Leases.  As of the date hereof, the Debtors have 359 locations for which they seek to potentially assign Leases.  There is significant overlap among certain groups of the Debtors' landlords and their respective counsel. The cost of preparing four separate, nearly identical versions of this Motion, and the overlapping service that would likely result, would cause the Debtors' estates to incur undue administrative expense with no corresponding benefit whatsoever for any party.   Additionally, preparing multiple motions increases the workload on landlords and their counsel, who would have to review four separate, alphabetized schedules of Leases instead of the single schedule annexed hereto as **Exhibit D**.  Accordingly, in the interest of efficiency for the Court, all landlords, the Debtors, and all other interested parties, the Debtors respectfully request that the Court waive the requirements of Bankruptcy Rule 6006(f)(6).[3]

### D.     The Debtors should be relieved of future obligations under any assigned Leases.

37.     Section 365(k) of the Bankruptcy Code provides that "[a]ssignment . . . of a . . . lease assumed under this section relieves the [debtor] and the estate from any liability for any breach of such contract or lease occurring after such assignment."   The Debtors respectfully request that each order approving the sale of any Leases expressly decree that the Debtors are relieved from all future liability under the Leases assigned thereunder.

### E.     Anti-assignment provisions should be held unenforceable.

38.     To the extent the non-Debtor counterparties to any Leases do not consent to the

---

[3] Notwithstanding the use of "shall" in Bankruptcy Rule 6006(f), the Court has authority to modify or waive compliance with the requirements of the rule.   See Fed. R. Bankr. P. 6006, Advisory Comm. Notes, 2007 Amendments ("An omnibus motion to assume, assign, or reject multiple . . . unexpired leases . . . must comply with the procedural requirements set forth in subdivision (f) of the rule, *unless the court orders otherwise*.") (emphasis added).

assignment thereof, the Debtors request that the Court hold all anti-assignment provisions of such Leases to be unenforceable under section 365(f) of the Bankruptcy Code and authorize the Debtors to assign and sell such Leases upon assuming such Leases and providing adequate assurance of future performance by the applicable assignee.

## IV.    THE EXPENSE REIMBURSEMENT SHOULD BE APPROVED

39.    The Stalking Horse Bidder would not have entered into the Stalking Horse Agreement without the Debtors' agreement to provide the Expense Reimbursement.  The United States Court of Appeals for the Third Circuit established standards for determining the appropriateness of expense reimbursement in the bankruptcy context in Calpine Corp. v. O'Brien Envtl Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527 (3d Cir. 1999); see also In re Reliant Energy Channelview LP, 594 F.3d 200 (3d Cir. 2010).  In O'Brien, the Third Circuit identified at least two instances in which expense reimbursement may benefit the estate.  First, expense reimbursement may be necessary to preserve the value of the estate if such assurance "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited."  O'Brien, 181 F.3d at 537. Second, if the availability of expense reimbursement were to induce a bidder to research the value of the debtor's assets and convert the value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor's assets are sold will reflect their true worth.  See id.  The Third Circuit held that although payment of expense reimbursement is measured against a business judgment standard in non-bankruptcy transactions, the administrative expense provisions in section 503(b) of the Bankruptcy Code govern in the bankruptcy context.  Id.  Therefore, to be approved, the debtor must demonstrate that the expenses to be reimbursed provide a benefit to its estate.  Id. at

533.

40.     The Debtors submit that approval of the Expense Reimbursement is appropriate under the circumstances of these cases.  First, the Expense Reimbursement served as an inducement for the Stalking Horse Bidder to make its bid in the first instance.  <u>See</u> Stalking Horse Agreement, § 9.  Second, the Bid Protections induced the Stalking Horse Bidder to expend significant time, effort, and money researching the value of the Lot 1 Leases.  The benefit to the estate from the efforts of the Stalking Horse Bidder is substantial.  As a result of the Stalking Horse Bidder's significant efforts to research and value the Lot 1 Leases, the Stalking Horse Agreement provides for cash consideration of $2,100,000 for the assignment of the Lot 1 Leases plus the payment of cure costs, establishing a meaningful bidding floor.  Thus, if the Expense Reimbursement is approved, the Stalking Horse Agreement will serve as the basis for a Lot 1 Auction that will provide greater value to the estate than an Auction conducted without the Stalking Horse Bid.

41.     In sum, the Debtors' ability to offer the Expense Reimbursement enables them to ensure the sale of the Lot 1 Leases to a contractually committed bidder at a price they believe to be fair, while at the same time providing the Debtors with the potential of even greater benefit to their estates.  The Debtors submit that the Expense Reimbursement is justified by a sound business purpose, is fair, reasonable, and appropriate under the circumstances, and satisfies the standard used by courts in this district in approving similar protections.  Thus, the Expense Reimbursement should be approved.

## <u>REQUEST FOR IMMEDIATE RELIEF</u>

42.     Unless the Court orders otherwise, an order authorizing a debtor to assume and assign and sell a lease "is stayed until the expiration of 14 days after the entry of the order . . . ."

Fed. R. Bankr. P. 6004(h), 6006(d).  The Debtor respectfully requests that the orders granting the relief sought in this Motion be effective immediately, and provide that the fourteen-day stay set forth in Bankruptcy Rules 6004(h) and 6006(d) shall not apply, so that the Debtors can promptly consummate the assumption and assignment of the Leases without incurring further administrative expenses thereunder.

### **NOTICE, WAIVER OF MEMORANDUM OF LAW, NO PRIOR REQUEST**

43.    Notice of this Motion will be given to (i) the Office of the United States Trustee for the District of New Jersey, (ii) counsel for the Lenders, (iii) counsel for the Committee, (iv) the non-Debtor counterparties to the Leases, (v) counsel for the Stalking Horse Bidder, and (vi) all parties who have filed notice of appearance in the Debtors' chapter 11 cases.  The Debtors respectfully submit that no other notice is necessary.

44.    Because the legal points and authorities upon which this Motion relies are incorporated herein and do not raise any novel issues of law, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law pursuant to Local Rule 9013-2 be deemed waived.

45.    No prior request for the relief sought herein has been made to this or any other Court.

**WHEREFORE**, the Debtors respectfully request that the Court (a) enter the Lease Sale

Procedures Order and (b) after the Approval Hearings, enter the Approval Orders.

Dated: March 7, 2014

**LOWENSTEIN SANDLER LLP**

*/s/ Kenneth A. Rosen*
Kenneth A. Rosen, Esq.
John K. Sherwood, Esq.
Andrew Behlmann, Esq.
65 Livingston Avenue
Roseland, New Jersey 07068
(973) 597-2500 (Telephone)
(973) 597-2400 (Facsimile)

*Counsel to the Debtors and*
*Debtors-in-Possession*