```
                    UNITED STATES BANKRUPTCY COURT
                        DISTRICT OF NEW JERSEY

x- - - - - - - - - - - - - - - x
IN THE MATTER OF:                 . Case No. 14-11016 (DHS)
                                  . Newark, New Jersey
        DOTS, LLC,               .
                                  . March 5, 2014
            Debtor,              .
- - - - - - - - - - - - - - - - -.


                      TRANSCRIPT OF HEARING
           BEFORE THE HONORABLE DONALD H. STECKROTH
                UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtor:              LOWENSTEIN SANDLER
                             By: WOJCIECH JUNG, ESQ.,
                                 KENNETH ROSEN, ESQ.,
                             65 Livingston Ave.
                             Roseland, NJ  07068


For Irving Capital Partners  OKIN HOLLANDER & DeLUCA
et al:                       By:  PAUL HOLLANDER, ESQ.
                             400 Kelby St.
                             Fort Lee, NJ  07024



For Salus Capital:           MORGAN LEWIS & BOCKIUS
                             By:  WENDY WALKER, ESQ.
                             101 Park Avenue
                             New York, NY   10178



Electronic Court Reporter            Edith Valentin


Proceedings recorded by electronic sound recording, transcript
              produced by transcription service.
```

**TRACY GRIBBEN TRANSCRIPTION, LLC**
**27 Beach Road, Unit 4**
**Monmouth Beach, NJ  07750**
**800 603-6212**
**(732) 263-0044   Fax No. 732-865-7179**
www.tgribbentranscription.com

APPEARANCES CONTINUED:


For the Trustee:              OFFICE OF UNITED STATES TRUSTEE
                              By: DONALD MacMASTER, ESQ.
                              One Newark Center, Suite 2100
                              Newark, NJ 07102

3

1                           I N D E X

2

3     WITNESS                              PAGE

4     PERRY MANDARINO

5     Direct Examination by Mr. Jung          7

6     Cross Examination by Mr. MacMaster      26

7

8     SUMMATIONS                           PAGE

9        BY MR. MACMASTER                     44

10       BY MR. JUNG                          47

11       BY MR. POSNER                        50

12

13    DECISION                               51

14

15

16

17

18

19

20

21

22

23

24

25

Colloquy                                          4

1          COURT CLERK:  All rise.  The Honorable Donald

2   Steckroth presiding for the U.S. Bankruptcy Court for the State

3   of New Jersey.

4          THE COURT: Be seated please.  All right, we're here

5   on the DOTS, LLC matter.  There's a couple of matters on the

6   calendar.  I think the only thing going forward is the

7   application shortening time, requesting a key employee

8   incentive plan.  Can we have appearances please?

9          MR. JUNG: Good afternoon Your Honor, Wojciech Jung

10  and Ken Rosen from Lowenstein Sandler on behalf of the debtors.

11         THE COURT: Thank you.

12         MR. JUNG: Your Honor also in Court with us is Lisa

13  Sorella (phonetic) the co-president of the company and Perry

14  Mandarino, a partner of PWC.

15         THE COURT: Okay.  Terrific.  Anybody else want to

16  enter an appearance?

17         MR. HOLLANDER: Paul Hollander, Okin Hollander &

18  DeLuca on behalf of the IPC entities.

19         THE COURT: Thank you.

20         MS. WALKER: Wendy Walker, Morgan Lewis for Salus

21  Capital.

22         THE COURT: Thank you Ms. Walker.

23         MR. POSNER: Good afternoon Your Honor, David Posner,

24  Otterbourg, proposed counsel for the official committee of

25  unsecured creditors and my colleague Gianfranco Finizio.

Colloquy                                    5

1            THE COURT: Great, thanks.

2            MR. MacMASTER: Donald MacMaster, Office of the United

3    States Trustee.  Good afternoon Your Honor.

4            THE COURT: Good afternoon.

5            MR. JUNG: Your Honor first thank you for scheduling

6    this motion on a shortened time.  We and the company do

7    appreciate it.  As Your Honor mentioned, the only matter on the

8    agenda for today is the debtor's motion to approve a key

9    employee incentive plan.

10           Your Honor before I go into the details, we have made

11   a number of changes to the proposed order which goes into the

12   substance of the plan.  So perhaps I could start with that and

13   present Your Honor with the red lined changes.

14           THE COURT:  That's fine, good.  Thank you.

15           MR. JUNG:  Your Honor to address first the changes,

16   I've set forth in the motion, when we filed the motion, the

17   company reserved the right to alter or change the participants

18   in the KEIP and indeed some of the participants have changed

19   after we filed the motion.

20           To summarize Your Honor, we have removed two

21   individuals from tier 1 and we have removed three individuals

22   from tier 2.  In addition, we have switched a number of or

23   replaced a number of people in tier 2.  All of those changes

24   have been made Your Honor.  The total compensation has not

25   changed.  So the minimum, assuming the threshold is met is

Colloquy                                    6

1    still 345,000 and the maximum is still 1,376,000.

2              Your Honor the other change that has been made is

3    reflected in paragraph 1 of the revised order.  Your Honor that

4    change relates to the fact that the company is in the process

5    of a GOB sell (phonetic), no longer a going concern.

6              So the changes are meant to reflect the fact that

7    participants are eligible to receive a KEIP first if the

8    threshold is met and second if they stay with the company until

9    such time as they are needed, as opposed to a defined closing

10   date which we would otherwise have in a going concern

11   transaction.

12             In paragraph 2 Your Honor is language that we have

13   agreed to it with the DIP lender which says that the KEIP is

14   not senior to the DIP financing, but pursuant to the settlement

15   agreement which I will discuss later.  KEIP gets paid only if

16   the DIP financing is repaid.

17             THE COURT: Okay.

18             MR. JUNG:  Your Honor I'm happy to give an opening

19   statement or we can go directly to testimony.

20             THE COURT:  Has there been a resolution of the

21   objection by the U.S. Trustee?

22             MR. MacMASTER:  We've had some conversations Your

23   Honor.  I think it's a fact based analysis that has to be done

24   here.  I think they need to put their witness on.

25             THE COURT:  Okay, all right.  Why don't you call your

1    witness.

2              MR. JUNG:  Your Honor we would like to call Mr.

3    Mandarino to the stand.

4              THE COURT: Okay, thank you.

5                    WITNESS, PERRY MANDARINO, SWORN

6              THE COURT: Thank you Mr. Mandarino.  Could you please

7    be seated.  Try to respond into the microphone and give us your

8    name, spell your last name for the record please.

9              THE WITNESS: Perry Mandarino M A N D A R I N O.

10             THE COURT: Thank you.  Counsel.

11   DIRECT EXAMINATION BY MR. JUNG:

12   Q    Mr. Mandarino can you tell us who you're employed by?

13   A    Price Waterhouse Coopers.

14   Q    And what is PWC's involvement with the company?

15   A    We're the financial advisor to the debtors.

16   Q    Are you familiar with the key employee incentive plan that

17   has been filed with the Court?

18   A    Yes.

19   Q    What was your and PWC's involvement in the formulation of

20   the plan?

21   A    We assisted the Board in formulating the plan.

22   Q    Did the Board instruct you to develop a KEIP plan for the

23   company?

24   A    Yes.

25   Q    Can you tell us why you were instructed to develop a KEIP

Mandarino-Direct                                    8

1   plan?

2   A    Given the uncertainty of the bankruptcy, it was critical

3   to have a core group of employees in order to execute a

4   transaction.  And given the uncertainty of a Chapter 11 and the

5   whole retail environment, the Board thought it was necessary

6   that a plan be developed to properly incent employees based on,

7   based on, again -- not just retention, but if something

8   happened then funds would be made available.  And this was led

9   by the independent director of the Board, Ed Bond.

10  Q    So the KEIP was approved by the entire board including

11  dependent and independent directors?

12  A    Yes.

13  Q    When was the KEIP developed?  In what time frame?

14  A    It started pre-petition and then finalized post petition.

15  Q    And how, can you tell the Court how you came up with the

16  terms of the KEIP?

17  A    Sure, we used a market based test and we looked at other

18  KEIPs with similar size companies, of retailers as well.  And

19  looked at the market to see what would be a fair, a fair

20  proposal for the employees.

21  Q    Mr. Mandarino I will hand you an exhibit which is a copy

22  of the KEIP plan.

23          MR. JUNG:  Your Honor may I approach?

24          THE COURT:  Certainly.

25  Q    Are you familiar with the exhibit?

Mandarino-Direct                               9

1   A     Yes.

2   Q     You just -- oh, I'm sorry.

3             MR. MacMASTER:  Is this the same exhibit that was

4   sent to me today?

5             MR. JUNG:  It's the same one.

6   Q     You testified that you looked up a number of retail cases

7   in coming up with the benchmark or threshold for the KEIP.  Can

8   you describe what those cases were and why those cases are

9   relevant to the case at hand?

10  A     Sure, and it's on page 8 of the debtor's motion for an

11  order to approve the KEIP.  We looked at again not only retail

12  cases but cases with a similar size of value, of an enterprise

13  value.  And we looked at those KEIPs which were approved.

14  Looked at the aggregate amount, looked at the award per

15  employee.  And then tried to fit that into the needs of DOTS in

16  particular.

17        A market based analysis is generally a good way.  And I

18  know it's been, under the case law, I guess under Dana

19  (phonetic) is a standard that it is a market based analysis.

20        So we developed a plan using a number of different

21  factors.  The employees that were needed given the situation at

22  the time.  And that's why changed as you've described in your

23  opening remarks.  And we looked at what could be a fair level

24  and again a proper incentive.

25  Q     Thank you.  Do you recall the inventory levels that the

Mandarino-Direct                              10

1  company had on the petition date in terms of historic,

2  historical numbers?  Would they be low or above -- when the

3  company filed for bankruptcy did they have sufficient inventory

4  on hand to continue going forward?  You may recall there was

5  critical vendors payments early on.

6  A    Well, sure.  I mean the company had something like $26,

7  $27 million of inventory cost.  However, they needed to buy the

8  inventory to continue.  The inventory and the footprint of the

9  company and its brand were what we were attempting to sell as a

10 going concern at the time.

11 Q    Can you please take a look at the exhibit that I handed up

12 to you and describe the participants in what we call tier 1?

13 A    Sure.  The tier 1 participants are five people; the two

14 co-presidents, the VP of planning and allocation, the CFO and

15 the chief human resources officer.

16     These are the people that internally are managing the

17 company, were managing the company and are managing the company

18 now.

19 Q    And how are these people critical to a successful sale

20 process?

21 A    Well they all have different roles.  So for example the

22 chief stores officer and one of the co-presidents is critical

23 in assisting the liquidator in the liquidation of the stores.

24 There are 359 stores that were operating at the sale date.

25 Gordon Brothers is running what's called a collapsing store

Mandarino-Direct                          11

1   liquidation whereby they are going to go from like 359 stores

2   to 300 to 250.  So Mr. Minicks (phonetic) is critical in

3   insuring that that happens on an efficient basis.  And some of

4   the people in tier 2 that are assisting Mr. Minicks.

5       The next two people are critical from the point of getting

6   the merchandise in along with their colleagues in tier 2.  One

7   of the components of the Gordon Brothers sale is that there's a

8   sharing for more inventory that gets brought in.  And in fact

9   the ability to bring in the extra inventory is why during the

10  bidding the bidding went from 40 percent of retail to 48

11  percent of retail, which is worth, you know, with inventory say

12  at $28 million roughly, that was the eight points on $27

13  million is a material number, as well as the inventory that

14  continues to come in.

15      And without those four individuals, inventory in my view

16  would come to a grinding halt.  Because the relationships with

17  the vendors.  And it's not just calling up the vendors to get

18  it, but it's the right size, the right assortment, the right

19  labeling.  And it is a very complex process.

20      And then allocating those, that inventory that comes into

21  the D.C., to the stores and what stores it goes into.  In all

22  retail, and especially when you're dealing with high volume,

23  low priced goods, without those four people it would be

24  virtually impossible.  And, you know, it was very important to

25  Gordon Brothers and Hillco the other bidder who bid on the

Mandarino-Direct                                    12

1   inventory that those people be there.  Without those people

2   they would not have paid what they paid for the inventory.

3   Then we have the --

4            THE COURT:  Why don't they pay them?

5            THE WITNESS:  Excuse me?

6            THE COURT:  Why aren't they going to pay them then?

7            THE WITNESS:  Well they are paying their salaries.

8   They're reimbursing the company for their salaries.

9            THE COURT:  They're reimbursing the company for the

10  key employment?

11           THE WITNESS:  Well they're not reimbursing per se.

12  The key employment payments would come out through the water

13  fall as been in the settlement agreement, which are really

14  ultimately from the proceeds of sale.  So if you will Your

15  Honor, they built that into the price that they're willing to

16  pay and they went up quite a bit.

17      And then the last person, the last two people are the CFO

18  who's critical in terms of the books and records and the

19  reporting.  And then the chief human resources officer is

20  dealing with the transition of the 1,600 field people and also

21  dealing with all the benefits and all the medical that is left

22  over from the liquidation and keeping the staff together.

23      And in tier 2 we have people who are supporting the people

24  that I just described.  And I would almost put it in three

25  areas.  The first is the store operations.  The second is

Mandarino-Direct                    13

1    financial.  I'm sorry, four areas.  The second is financial.

2    Stores operations, number one.  Financial, number two.

3    Merchandising, number three and then IT number four.  So

4    keeping the POS system working and the IT and the reports is

5    critical.

6        And you know these are, most of the, all but four of these

7    people are located in Cleveland.  The other four are located in

8    New York.  Cleveland is actually a pretty good job market.  And

9    it would be --

10            THE COURT: In retail, in the retail world?

11            THE WITNESS: In Cleveland generally is a good job

12   market.  So if you have an IT person Your Honor it's not

13   necessarily, or finance is not limited to retail.  And treasury

14   and so on.  They're in payroll, it's not limited just to

15   retail.  And so it's really critical to keep these people

16   through the end of -- it was my board's opinion, my opinion

17   that it's critical to keep these people employed throughout.

18            THE COURT: Well what are they going to do that they

19   ordinarily wouldn't do?

20            THE WITNESS: Well what they would ordinarily have,

21   well there's a couple of things.  There are some different

22   things related to a liquidation.  There's some more reporting.

23   There is, there are different aspects of complying with monthly

24   trustee reports and so on, the MLRs.

25            However, in the normal case, these people do have,

Mandarino-Direct                          14

1   would have a bonus.  The company normally had a bonus pool and

2   these people would be eligible for a bonus.  So as part of

3   their overall compensation, you know, they are getting a small

4   fraction of the bonus that they would earn, that they would

5   have earned during the year.  So when you look at compensation

6   Your Honor --

7          THE COURT: The company was giving bonuses when it

8   was, it wasn't profitable?

9          THE WITNESS: They did not give bonuses last year.

10         THE COURT: That's my point.  Okay, so they weren't

11   going to get a bonus.  And they wouldn't get one this year if

12   they were still there.

13         THE WITNESS: But in a normal, in a normal --

14         THE COURT: But this isn't, this isn't normal.

15         THE WITNESS: But in a normal job situation they would

16   be eligible for a bonus.  And we're asking them to stay in

17   order for the company to achieve the, not only the sale of the

18   inventory which happened, but the continued bringing in of the

19   inventory, number one.

20         THE COURT: Has anyone given notice that they're going

21   to leave?

22         THE WITNESS: Of the people on this list, one person

23   has so that --

24         THE COURT: Who's that?

25         THE WITNESS: The CFO, so that person will be removed.

Mandarino-Direct                          15

 1    But these people would have the ability to -- we're asking

 2    them, we're looking to give them an incentive to stay to help

 3    us maximize the value of the estate.

 4              Because in addition to the inventory and the

 5    inventory that has to come in, there's the other assets which

 6    need to be sold.  You know, again, subject to consumer rights,

 7    things like the customer list which has 2 million people on it.

 8    Things like the furniture, fixtures and equipment.  There's a

 9    lot of -- the distribution center and the assets in the

10    distribution center.  There's a lot of complexities that also

11    normally wouldn't happen, not part of their day job if you will

12    in order to get this done.

13              THE COURT:  Okay.  What is the, refresh my

14    recollection, what is the payment to the secured parties that

15    has to be paid first?

16              THE WITNESS:  The secured lenders at the sale date

17    Your Honor were owed about $30 million.

18              THE COURT:  Okay.

19              THE WITNESS:  31 million.

20              THE COURT:  So in essence --

21              THE WITNESS:  And I'm sorry, that is the, that is

22    just the, that is just the DIP.  That is the Salus DIP.  In

23    addition, the IPC creditors are owed $17 million below the

24    Salus DIP.  However, pursuant to the settlement agreement --

25              THE COURT:  That's being forgiven.

Mandarino-Direct                          16

1            THE WITNESS:  That is, yes, they are letting all of

2      these expenses come ahead of them.

3            THE COURT:  Right.  But at least 31 million has to be

4      collected in proceeds before we start talking about whether we

5      have an insolvent estate here, right?

6            THE WITNESS:  Yes.

7            THE COURT:  Are any of these folks insiders?

8            THE WITNESS:  None of the, to my knowledge, none of

9      the people here own any equity in the company.

10           THE COURT:  Are any of them related to the owner, do

11     you know?

12           THE WITNESS: No.  No, they are not related.

13           THE COURT: How did you come up the figure, the

14     threshold is, I mean is 30 million, right?

15           THE WITNESS: Yes, the threshold is 30 million.

16           THE COURT: Which isn't really, barely covers the

17     secured debt.

18           THE WITNESS: Correct.

19           THE COURT: And if they reach that, they're going to

20     get a bonus?

21           THE WITNESS: Well they would get a bonus --

22           THE COURT: For lack of a better term, we'll call it a

23     bonus.

24           THE WITNESS: For lack of, well, an incentive payment.

25           THE COURT: I guess what I'm worrying about is, what's

Mandarino-Direct                        17

1    the incentive?  Are they leaving?  They're not going to leave.

2    No one's going to leave.

3            THE WITNESS: Well --

4            THE COURT: In this industry, at this time?  They're

5    lucky they have a job.

6            THE WITNESS:  The company's actually had about a

7    dozen people that have left since the beginning of the

8    bankruptcy in Cleveland and New York.  Mostly in Cleveland.

9            THE COURT: Well there will be lots of people that

10   will take the job if they do leave, from what I understand

11   about the industry.

12           THE WITNESS: Correct.  I would point out --

13           THE COURT:  What I'm concerned with, you know, just

14   to be, you know, like the U.S. Trustee told me, from day one

15   I've told you I'm concerned with this, a solvent estate.

16   That's what I want, okay.  It's what we're going to get.  And

17   this is eating into it.  That's my concern.

18           THE WITNESS: If I may Your Honor.  So part of the

19   benefit that these people have already given, when I think it

20   was put on record at the sale hearing and was included with the

21   settlement agreement was that we weren't sure if there would be

22   a solvent estate, but we're working towards it.  We clearly

23   have a path towards there.

24           Well I'll give you an example of what some of these

25   people have done already to get to that path.  The

Mandarino-Direct                          18

1    merchandising team and the store team was able to bring in

2    about $1.5 million of inventory at cost on the day of the

3    auction and the sale date which Gordon Brothers didn't realize

4    that was going to be there.  They didn't think that inventory

5    was going to get in.

6            That, when you gross that up to a retail cost, to the

7    retail basis, it resulted in about, gross $2 million more of

8    proceeds that Gordon Brothers had to pay the estate.

9            So they already through their efforts in staying, and

10   staying from the petition date when they were, you know, the

11   employees were told that a KEIP plan was going to get filed.

12   Again, they were not guaranteed because of the --

13           THE COURT: Well they're getting paid, right?

14           THE WITNESS: They're getting paid.

15           THE COURT: They're all getting paid their salary to

16   do a job.

17           THE WITNESS: Right.

18           THE COURT:  And that's what they've been doing.  Now

19   I hear they're doing their job so we should give them a bonus

20   plan or a severance plan which is really what this is.

21           THE WITNESS:  Well I view it a little bit differently

22   Your Honor then a pure retention plan.  Because a pure

23   retention plan would --

24           THE COURT:  And I'm only really concerned because of

25   the state of the case.

Mandarino-Direct                            19

1           THE WITNESS:  So where we are Your Honor on that, to

2     finish my other thought, is that because of those efforts, and

3     they were incented to get this inventory in.  I mean these are

4     frankly, especially the merchandising people are talented

5     people that I believe would be in high demand.  They stayed and

6     they helped the estate get the inventory in.  And the same will

7     need to happen in a, during the liquidation.

8           Now what will happen if they leave, it will just

9     result in increased professional fees frankly.  And when I

10    think the Board looked at it, they looked at spreading $300,000

11    over 20 people is a lot cheaper than paying folks from

12    Lowenstein and PWC to do the same type of work.  So there's a

13    cost benefit analysis as well.

14          THE COURT: All right.  Anything else?

15          MR. JUNG: Yes.

16    BY MR. JUNG:

17    Q    Mr. Mandarino as part of the Gordon Brothers sales

18    transaction, it the company purchasing new inventory?

19    A    Yes, as I described there's still inventory that's coming

20    in and that's the merchandising and the allocation people are

21    working on.

22    Q    And any augmentational inventory that comes in that

23    results in additional proceeds to the estate?

24    A    Yes, there's a sharing formula per the agency agreement.

25    Q    Do you recall how many employees the company had as of the

Mandarino-Direct                          20

1   petition date?

2   A    As of the petition date I believe there was close to 2,000

3   including the store employees.

4   Q    And do you know what the current count of the employees

5   is?

6   A    Well, again, apples to apples, between New York and

7   Cleveland, the corporate buying offices says there were I

8   believe close to 260 employees.  Now there are about 101.

9   Q    So the number of employees in that category dropped.

10   A    It's gone down by about 150.

11   Q    Okay.  Let's talk briefly about the work load of the key

12   participants.  Are you aware of the work load?  Has the work

13   load increased or decreased in recent weeks?

14   A    Yes, as I described a few minutes ago, there are, you

15   know, non-traditional parts of the job that still has to happen

16   such as working on the sale of the other assets that these

17   people will be involved in.  Different reporting to, with

18   respect to the sale and the bankruptcy reporting.

19   Q    Is it fair to say that the employees are working more

20   hours, the key participants are working more hours a day that

21   they worked in the past?

22   A    Well I think, you know, since the restructuring started,

23   they've been working more hours than they had in the past and,

24   you know, with different demands and being pulled in a couple

25   different directions from different stake holders.

Mandarino-Direct                          21

1    Q    The United States, the Office of the U.S. Trustee, one of

2    its objections is that the thresholds may not be true

3    incentives but more of -- Can you talk about that, why the

4    thresholds are indeed incentivizing?

5    A    Well when this agreement was, when this motion was put

6    forward we didn't have a bid from a liquidator.  The bid would

7    not, was clearly not a slam dunk.  And it was through the

8    efforts again as I explained mostly from the buying team with

9    respect to getting the inventory in and really working with my

10   team and with the buying team and the store team in getting the

11   liquidators comfortable that allowed them to bid up to the 48

12   cents of retail, 48 ½ cents of retail.

13   Q    Do you believe that in order to reach the first threshold

14   the debtor needs to have a successful sale of both leases and

15   FF&E?  Or is the threshold satisfied by Gordon Brothers'

16   transaction?

17   A    Right now it's projected that it's not satisfied just by

18   the inventory.  However through the augmentation it may be.

19   But it will, it will exceed the threshold if the, based on the

20   sale of the other assets.

21   Q    What is your current understanding from the debtor's

22   ability to reach the second threshold for the KEIP?

23   A    It would, there would have to be one of two extraordinary

24   things to happen.  The first would be the, an extraordinary

25   amount of inventory would have to come in and Gordon Brothers

1    would have to extend the GOB sales from the end of May through

2    the end of June, which they have not expressed an willingness

3    to.

4         And or secondly, you know, a potential buyer will think

5    that the brand name or that Dots.com is worth an, more than we

6    think now.  Or the leases would be worth more than our

7    projected by the debtor's lease advisors, A & G Realty.

8    Q    So is it more likely or less likely that the second

9    threshold would be met?

10   A    Less likely.

11   Q    Based on current projections.

12   A    Less likely.

13   Q    Mr. Mandarino the Court asked you about the administrative

14   solvency of the case.  It is your, is it your current

15   understanding that the estate is or will be administratively

16   solvent?

17   A    Well it's my opinion that the estate, you know, may be,

18   there's a path to administrative solvency and it is not a path

19   that is a ton of heavy lifting.  There are some assumptions,

20   the continued execution of the going out of business sales, the

21   sale of the leases and the distribution center and other

22   assets.

23        But and then the collection of the preferences if

24   necessary.  But there is a clear path to an administrative

25   solvency for the estate.

Mandarino-Direct                          23

1   Q    Is it your opinion that the KEIP is justified by the

2   present circumstances and facts of this Chapter 11 case?

3   A    Yes.

4            MR. JUNG: Your Honor no other questions.

5            THE COURT: Thank you.  Thank you very much.

6            MR. HOLLANDER: Judge.

7            THE COURT: You have a question or two?

8            MR. HOLLANDER: Well I actually want to try to clarify

9   something but, while Mr. Mandarino is on the stand.  So maybe

10  if Your Honor has any questions which is that, I got the sense

11  from one of Your Honor's question that the Court thinks that

12  the first $30 or $31 million that's coming in is going right

13  out the door to the pre-petition lenders.  That's,

14  unfortunately that's not what's going on here.

15           And we're getting a little bit ahead of ourselves

16  because there is a hearing on the settlement agreement which

17  sort of will lay it all out.  But in order to get from now

18  until what is called week 20 which is June 7th.

19           THE COURT: Right.

20           MR. HOLLANDER: The Salus and the IPC entities are

21  letting I think conservatively $6 million or $7 million or more

22  of the money that's coming in to be used by the debtors to pay

23  all of the expenses while this liquidation is going on, okay.

24           So it's not that we're in the, would be the fortunate

25  or enviable position of just being able to grab all the first

Mandarino-Direct                    24

1    dollars.  I think from the initial payment from Gordon

2    Brothers, the Salus revolver was paid off.  But there's a $16

3    million term loan that other than one small payment later this

4    month, basically doesn't get paid off until week 20.

5           So you know if somehow the Court got left with the

6    impression that we're sitting here lounging around, you know,

7    just waiting for the money to roll in, that's, you know, then I

8    think Mr. Mandarino could explain it maybe more succinctly with

9    more back up as to exactly how much money has to sort of be

10   reinvested.

11          And there clearly was excess money after the payoff

12   of the revolver from the proceeds of the initial payment by

13   Gordon Brothers.  But it just wasn't feasible to sweep that

14   money and apply it to the term loan because there would have

15   been no money to run the rest of the case.

16          So, you know, part of the whole budget assumes that

17   Mr. Mandarino and the people working with him will have at

18   least as much success selling the leases and the distribution

19   center and the furniture, fixtures and equipment.  And that if

20   he has that success, at the end of week 20 the shortfall has

21   been substantially reduced.

22          And I think when we get to the settlement agreement,

23   so long as that gets approved, Your Honor will see that there's

24   a huge back stop in the form of these preferences that if

25   there's any short fall, that we've, you'll see that we've built

Mandarino-Direct                              25

1   into this agreement a mechanism not only to pay the expenses

2   that are in the budget, but it goes so far to address line

3   items in the budget so that if there's a line item and the

4   amount turns out to be wrong, okay, it's not that those people

5   just don't get paid.  The line item gets adjusted.

6         And not that I really want to dwell on this.  Your

7   Honor said that the junior secured, the IPC people who I

8   represent are forgiving.  We're not really forgiving.  We're, I

9   believe I succeeded in getting ourselves into the eighth tier

10  of the water fall under the settlement agreement, you know.

11        And all of these expenses that everybody is very much

12  concerned about, fall, well the DIP loan is one.  But two

13  through seven with one exception is going to the budget.

14        So until we see how it all plays out, you're not

15  going to know with certainty.  But I think, you know, while Mr.

16  Mandarino is on the witness stand if you need any more -- I

17  mean there are budgets that back it up.  So this is hopefully

18  just not just a complete dream that we're, you know, going

19  through.

20        THE COURT: All right.

21        MR. MacMASTER: I was just wondering if there was

22  going to be a question in there somehow Your Honor.

23        MR. HOLLANDER: Well --

24        THE COURT: Not yet, not yet.

25        MR. HOLLANDER: I just brought that up because Your

Mandarino-Cross/MacMaster                          26

1    Honor in one of your comments --

2              THE COURT: I did.  No, that's true.

3              MR. HOLLANDER: That we just were sucking all the cash

4    out.  And, you know, that is really the furthest thing from the

5    truth.  But I'm sure Mr. MacMaster will acknowledge that once

6    he gets done with his remarks.

7    CROSS EXAMINATION BY MR. MacMASTER:

8    Q    Good afternoon Mr. Mandarino.

9    A    Good afternoon.

10   Q    Donald MacMaster, Office of the United States Trustee.

11   You said the, and correct me if I'm wrong, my understanding is

12   that the Board of directors instructed you to come up with an

13   incentive plan to keep the employees or to find out who the key

14   employees were and then to come up with a way to incentivize

15   them, is that correct?

16   A    Correct.

17   Q    Okay.  And when did the Board of directors tell you to do

18   this?

19   A    Pre-petition.

20   Q    Pre-petition.  And was this at a board meeting?

21   A    I believe so.

22   Q    Okay.  And can you tell me who the current members of the

23   Board of directors are?

24   A    The Board of directors are Matt Turner, Bernie Zieker

25   (phonetic), Ed Bond and I believe those are the three.

Mandarino-Cross/MacMaster                    27

1    Q    So there are three directors.

2    A    Yes.

3    Q    And those are the directors pre-petition?

4    A    No, only, well two of the three were pre-petition.  Mr.

5    Bond came on right, I think right before the, sometime in early

6    January or late December.

7    Q    Okay.  So none of the current people that are receiving

8    compensation here were members of the Board, is that correct?

9    A    That's right.  The former CEO was a member of the Board,

10   but she's not entitled to anything under this.

11   Q    Right.  And when did she leave?

12   A    She left a couple of weeks after the filing.

13   Q    Okay.  And it says, the tier 1, they're the current or key

14   management of the company, is that?

15   A    Yes, as I testified to before.

16   Q    Right.

17   A    With different roles between store operations,

18   merchandising, finance and HR.

19   Q    All right.  And David Minicks, he's the current co-

20   president?

21   A    Yes.

22   Q    Okay.  So he'd be an officer of the company at this stage?

23   A    Yes.

24   Q    And how long has he been co-president?

25   A    Since Ms. Rhodes' resignation.  So I believe she resigned

Mandarino-Cross/MacMaster                               28

1   in, the second week in February.

2   Q    Okay.  And what was he before that?

3   A    He was the chief stores officer.

4   Q    Okay, so was he an officer of the company before he became

5   a co-president?

6   A    Yeah, I believe all the people in tier 1 with a deference

7   to counsel, I believe they're all officers.

8   Q    All officers of the company.

9   A    Yes.

10  Q    Okay.  And what about tier 2?

11  A    None of the folks here are to my knowledge are officers.

12  Q    They're more the, you said kind of the guts of the

13  corporation working out of Cleveland, with four exceptions, is

14  that correct?

15  A    Yes, well in tier 2 everyone is in Cleveland except the

16  first two people who are the merchandising folks.

17  Q    The first two people, okay.  So those are the workers that

18  are kind of responsible for keeping the operation going?

19  A    Yes.

20  Q    All right.  As far as the compensation that's paid, you

21  list the base compensation for all of these employees.  For

22  example, Mr. Minicks gets $355,000 a year, is that correct?

23            MR. JUNG:  Your Honor just for the record I would

24  like for us not to use numbers, because those things are

25  confidential.

Mandarino-Cross/MacMaster                          29

1        MR. MacMASTER:  There's no motion to seal.  I mean I

2   don't know how --

3        THE COURT:  No, he can use numbers.

4   A   That's correct.

5   Q   And you said he didn't receive a bonus in 2012, correct?

6   A   2013.

7   Q   2013, okay.  Did he receive one in 2012?

8   A   I believe so.

9   Q   Okay.  Do you know what his bonus was in 2012?

10  A   No, I don't.

11  Q   Okay.

12  A   But in, I believe the bonus incentive has not changed in

13  terms of the percentage of salary.  So I would think around the

14  same area.

15  Q   Same area?

16  A   As is listed on the chart.

17  Q   As a potential bonus incentive?

18  A   Yeah, the full, the 100 percent.  That's right.

19  Q   Okay.  So that would be their annual bonus?

20  A   Yes.

21  Q   On a good year.

22  A   Yes, based on whatever targets were set by the Board at

23  that time.

24  Q   Okay.  Now Lisa Sorella, it says GMM.  What does that

25  stand for?

1   A    General merchandising manager.

2   Q    Okay.  And that was her role before she became co-

3   president?

4   A    Yes.

5   Q    And she became co-president at the same time Mr. Minicks

6   became co-president?

7   A    Yes.

8   Q    Do you know how long Mr. Minicks has been with the

9   company?

10  A    I don't.  I think at least four years.

11  Q    Okay, how about Ms. Sorella?

12  A    About two years.

13  Q    Theresa Deena (phonetic) she's vice president of planning

14  and allocation.

15  A    Correct.

16  Q    How long has she been there?

17  A    A couple of years as well.

18  Q    Elaine Capusta (phonetic)?

19  A    I believe she's been at the company for 17 or 18 years.

20  Q    And Jody Taylor?

21  A    I'm not sure.  I just don't recall how long she's been

22  there.  I think maybe three years.

23  Q    Okay.  And is it your understanding that each one of these

24  employees would have been entitled to the types of bonuses that

25  are listed here?

1   A     Yes.

2   Q     Under ordinary circumstances?

3   A     Yes.

4   Q     How about the tier 2?

5          THE COURT: Well when you say bonuses listed here,

6   you're talking about the first tier or are you talking about

7   the potential?

8          MR. MacMASTER: Bonus incentive.

9          THE COURT: Incentive.

10          THE WITNESS: The potential bonus incentive.

11          THE COURT: Total.

12          THE WITNESS: Total.

13          THE COURT: Okay.

14   Q     So that would be an annual bonus for each one.

15   A     Yes.

16   Q     So the bonus incentive would be the annual bonus for each

17   one of these people.

18   A     Correct.

19   Q     In an ordinary year.

20   A     Yes.

21   Q     How about for the tier 2 employees?  Are they all entitled

22   to bonuses under ordinary circumstances?

23   A     Yes.

24   Q     And did you analyze their potential bonus incentives

25   against what they would ordinarily be entitled to?

Mandarino-Cross/MacMaster                              32

1   A    This again, it was all done consistent with what they

2   normally.  One of the thresholds we looked at, what would they

3   have normally been entitled to.  So, yes.

4   Q    And it's your testimony that none of these are officers of

5   the company, correct?

6   A    That, to the best of my knowledge, yes, other than as

7   described.

8   Q    Now are all of the people listed there, they're currently

9   employed, correct?

10  A    Yes.

11  Q    As we sit here today or stand here today.  And they all

12  receive the salaries that are listed as their base amounts?

13  A    Correct.

14  Q    And that was the expectation, they would do their job and

15  get their salary, correct?

16  A    Yes.

17  Q    Have any of the employees, you mentioned Elaine Capusta

18  has left the company or is leaving the company?

19  A    I confirmed as of last night with the head of HR that Ms.

20  Capusta was the only one that tendered a resignation.

21  Q    Okay.  So how about the tier 2 employees?

22  A    The same thing, with everyone on this list.

23  Q    Okay.  So they're all still employed.  Have any of them

24  threatened to leave if they didn't receive these incentive

25  plans?

Mandarino-Cross/MacMaster                               33

1    A     To me personally.

2    Q     Yes.

3    A     No.  But to, in my discussions with Ms. Taylor, the head

4    of HR, is that she's concerned that without, she doesn't know,

5    but she's concerned they could leave.  I don't know if anyone

6    has threatened to.

7    Q    But she's generally concerned that they could leave if

8    they don't get these bonuses?

9    A     Yes.

10   Q    To the best of your knowledge has she told you of any of

11   these people threatening to leave if they didn't get their

12   bonuses?

13   A     No.

14   Q    Do you know if any of these people have received other job

15   offers?

16   A     I don't.

17   Q    All right.  Now you stated that a couple of the tier 1

18   employees were responsible for bringing in additional inventory

19   at the, right at the, from the date of the sale hearing.

20   A     Yes.

21   Q     And which employees were those?

22   A     There's four; Ms. Sorella, Ms. Deena, Ms. Zicarco

23   (phonetic) and Ms. Overmann (phonetic).

24   Q     But weren't they just doing their job?  Isn't that what

25   they're supposed to do?

Mandarino-Cross/MacMaster                                34

1   A      I'm sorry, were they?

2   Q      Weren't they just doing their job?

3   A      Bringing inventory in is part of their job.  They, yes.

4          THE COURT: The question is, how do you distinguish

5   what's their ordinary, what their job is and what's being asked

6   that's special and what are they producing that's special.

7          THE WITNESS: Well I think Your Honor, maybe the

8   analogy I would give is a going concern, right.  You do your

9   job because you know your job is going to be there.  It's going

10  to be there in a year, you know, unless you screw up, unless

11  something happens, they're going to be there.

12         This incentive is to help an entity where there is no

13  future for them, to achieve results that benefit the creditors,

14  that benefit the estate.  And that's the difference.  So yes

15  are they doing their jobs, of course they are.  Do the people

16  have integrity, they have a ton of integrity.  But there's an

17  incentive Because there is no going concern.  There is no

18  perpetuity or road to do that.

19  Q      But they're highly compensated, some of them, correct?

20  You got salaries 355,000, $400,000 per year.

21  A      Yeah, those are the numbers that are paid.  That is well

22  above the normal U.S. average for a salary.

23  Q      Like an attorney for the U.S. Trustee's Office for

24  example?

25  A      I'm not privy to that Mr. MacMaster, but I'll take your

Mandarino-Cross/MacMaster                          35

1  representation.

2  Q    The point is they're pretty well compensated.

3  A    They have, the ranges of salaries here are $39,000 a year

4  up to 400,000.

5  Q    All right.  So now explain to me, I know Mr. Hollander was

6  testifying there for a while and so maybe you can just walk me

7  through, how do these bonuses get paid?

8  A    So the bonuses will get paid pursuant, if it's approved to

9  the settlement agreement, that the secured lender --

10 Q    This is the settlement agreement that's already been

11 approved by the Court?

12 A    No, that's pending.  I think it's March 25th is the

13 hearing date.

14 Q    Okay.

15 A    So --

16 Q    Settlement agreement by and among whom?

17 A    By and among the debtor, the Salus, the IPC entities and

18 the official committee of unsecured creditors.

19 Q    Okay.  And explain that.  How does it work?

20 A    So, I don't have the settlement agreement in front of me

21 nor that's on today, right.  But generally is that there is a

22 waterfall that the secured lenders were paid down the revolver

23 debt.  They've left a pool to pay the administrative expenses

24 of the case in order for the case to run for the liquidation to

25 occur, in order for the assets to get sold.

Mandarino-Cross/MacMaster                                36

1    A     And the KEIP is a payment which will get paid in a certain

2    order pursuant to the waterfall.

3    Q     Okay, so Salus gets paid first.

4    A     Well Salus and Mr. Hollander's client that has a piece of

5    it, they've been paid down, some of their debt.  But they have

6    set aside I believe it's $7,250,000 to fund the administration

7    of the estate.  So in effect they're letting use their cash

8    collateral maybe is a good analogy.

9    Q     Right.

10   A     To do that.  Then gives the estate the opportunity to

11   liquidate the other assets in order to pay all the other claims

12   in full.

13              THE COURT: And pay them back their --

14              THE WITNESS: And pay them back their full --

15              THE COURT: 7,250,000.

16              THE WITNESS: Yeah, whatever their remaining amount

17   due, yes.

18   Q     Is it contemplated under the settlement agreement that

19   Salus is going to get paid in full out of the sale?

20   A     Well I think the settlement agreement, the settlement

21   agreement lays out the path for Salus to get paid in full, yes.

22   Q     Okay.  What about IPC?

23   A     With respect to their participation, yes.

24   Q     Okay, in full.

25   A     Only with respect to their participation.

Mandarino-Cross/MacMaster                          37

1    Q    Okay.  What about the unsecured creditors?  When do they

2    get paid?

3    A    The unsecured creditors, there's a carve out for the

4    unsecured creditors as well as, that's what their, the benefit

5    to the unsecured creditors is, a carve out that is being funded

6    up to $525,000 as well as then a sharing formula of any amounts

7    over after the administrative claims are paid.

8    Q    So the unsecureds are guaranteed a carve out of 525,000

9    under this?

10   A    Yes, under this proposed settlement.  Yeah and again the,

11   a secured creditor has, you know, is $17 million, as you said

12   Your Honor forgiving their claim.  But it's really, they're

13   allowing themselves to get primed for all these expenses.

14   Q    You're talking about who?

15   A    The IPC creditors.

16   Q    IPC creditors, right.

17   A    And then they are, they would give part of their proceeds

18   above the administrative claims to the unsecured creditors.

19   Q    So they're effectively carving out admin and some small

20   dividend to unsecureds.

21   A    Right.

22        THE COURT: This, where would that fall in the

23   waterfall?

24        THE WITNESS: If I recall correctly, the third tier.

25   So it's Salus, I believe Salus is the first -- the second tier,

Mandarino-Cross/MacMaster                    38

1   I'm sorry.  Salus is the first tier then this is the second

2   tier.

3                THE COURT: This specifically or this is part?

4                THE WITNESS: This is part of the second tier.

5                THE COURT: Part of the second tier.

6                THE WITNESS: Yes.

7   Q    And the unsecureds, what tier is that?

8   A    Well their carve out I believe is part of the second tier

9   as well or the third -- I don't have it in front of Mr.

10  MacMaster and I didn't read it so I apologize.

11  Q    What about all, is all admin part of the second tier?

12  A    All admin that has been accounted for in the budget is

13  part of the third tier.

14  Q    So the bonuses are part of the second tier?  So they get

15  paid before other admin?

16  A    I would need to see the settlement agreement Mr.

17  MacMaster.  I just don't have it memorized.

18  Q    Okay, is that your understanding though?  I mean you talk

19  about second tiers, third tiers.

20  A    It's, there's different categories in the different tiers

21  so I'd need to have the settlement agreement in front of me.

22  Q    All right.

23                MR. JUNG: Your Honor rather than guess, we can hand

24  up the document.

25                THE COURT: Pardon me?

Mandarino-Cross/MacMaster                    39

1           MR. JUNG: Rather than guess what the tiers are under

2    the global settlement we can just hand up the document to Mr.

3    Mandarino.

4           THE COURT: Sure.

5           MR. MacMASTER: May I approach?

6           MR. HOLLANDER:  This is document 336, Exhibit A.

7    Q    All right, I'm looking at page 5.

8    A    Right.

9    Q    And it's got the priority of aggregate sale, net proceeds,

10   is that where this all?

11   A    Yes, so the first tier is the credit agreement.

12   Q    And that would be --

13   A    Except for the exit fee that Salus would charge.

14   Q    Okay.

15          THE COURT: Excuse me, what docket number is it?

16          MR. HOLLANDER: 336, Exhibit A.

17          THE COURT: Thank you.  All right, thank you.

18   A    Okay, so second on a pari passu

19   Q    Those are the KEIP payments, right?

20   A    Well subject to the approval of the Court, is the KEIP

21   payment.  And the payment of the amount included in the budget

22   for rent which is the stub rent for landlords.

23   Q    And then after that would be the other --

24   A    No, no, hold on, and vendors holding allowed claims in the

25   budget for the post petition merchandise payments.  So

1    basically any post petition debt to creditors is paid alongside

2    with the KEIP.

3    Q    All right.

4    A    And third is all other expenses in the budget including

5    professional fees and other expenses of the estate.

6    Q    And then it goes on from there.

7    A    Yes.

8    Q    Okay.

9         MR. HOLLANDER:  Your Honor just for the record the

10   budget is Exhibit A.  It's Exhibit A to Exhibit A, although

11   it's very hard to read --

12        THE COURT:  Proposed settlement to KEIP payments

13   share in pari passu basis with the leasors rent.

14        THE WITNESS:  The stub period rent.

15        THE COURT:  The stub period --

16        THE WITNESS:  Which is about a million dollars.  And

17   the post petition vendor payments which is about another 2.4

18   million.  So there, just say 300,000 of 3.7 million.

19   Q    So the bottom line is they're at a higher priority than

20   other general administrative expenses of the estate.

21   A    Like professional fees.

22   Q    Like professional fees, correct.  All right.

23        THE COURT: Well there's a carve out for professional

24   fees already though.

25        THE WITNESS:  There has been some that's been funded

Mandarino-Cross/MacMaster                    41

1    but for the work that we're doing from now on which is not

2    insubstantial.

3              THE COURT:  All right.

4    Q    There are 101 employees left at the company right now?

5    A    Correct.

6    Q    And how come Gordon Brothers isn't paying for it?  How

7    come they aren't paying any salaries to these people?

8    A    Well they are.  The estate is being reimbursed $20,000 a

9    week for certain employee expenses.  Not everything that the

10   employees are doing benefit just Gordon Brothers, they also

11   benefit the estate.

12        So the folks that are working on selling the other assets

13   does not benefit Gordon Brothers.  The financial reporting

14   that's required by the Court, the tax returns that have to get

15   filed, that doesn't benefit Gordon Brothers.

16        And, you know, we believe that the Gordon Brothers

17   reimbursement is a fair reimbursement of the expenses for what

18   they're using.

19   Q    But Gordon Brothers gets a percentage of the sale

20   proceeds, correct?  Is that how --

21   A    Well Gordon Brothers owns the inventory and they're

22   selling it.

23   Q    Right.  But then it's a sharing of the sale proceeds.  So

24   the more revenues that are generated the better Gordon Brothers

25   does, correct?

Mandarino-Cross/MacMaster                          42

1   A    Yes, but also Gordon Brothers is also, to be clear, Gordon

2   Brothers is paying all the store level expenses.  So from the

3   four walls of the stores and everyone in the stores and the

4   managers and so on, Gordon Brothers is paying those expenses.

5   Q    Okay, but these KEIP employees you said are instrumental

6   in maximizing the sale proceeds, correct?

7   A    Which maximizes, maximizes the sale proceeds to the estate

8   based on the sharing formula.

9   Q    And --

10  A    So if Gordon Brothers does better, then estate does

11  better.

12  Q    Okay.  But Gordon Brothers does better too, right?

13  A    Well Gordon Brothers is also taking the risk and has paid

14  the estate a substantial amount of money for that privilege.

15  Q    The point being is it's the estate that's paying these

16  bonuses though.

17  A    Yes, it is.  That's correct.

18  Q    Now you said that the employees have to do some non-

19  traditional work as a result of this bankruptcy, some reporting

20  requirements and what not, correct?

21  A    Yes.

22  Q    Okay.  How many more hours are they working than they were

23  before the bankruptcy case was filed?

24  A    Well again the company's been, even pre-petition, it's

25  been since the restructuring started, it's been long hours.

Mandarino-Cross/MacMaster                                    43

1  And again it's not just the mere fact of the longer hours, it

2  is the longer hours.  It is as I mentioned a few minutes ago,

3  that there's no going concern part of --

4  Q    I understand.  There is an end day for these people.

5  A    Yes.

6            THE COURT: And under the revised order no one's paid

7  if they leave until their employment is terminated, correct?

8            THE WITNESS: Correct, they're required to stay till

9  the end date.

10  Q    I thought the revised order is, they're required to stay

11  until they're no longer needed.

12  A    Well the end date as -- I'm sorry.  I define end date as

13  the date that the debtors determine they're no longer needed.

14  Q    Because the original order had a set defined end date,

15  correct?

16  A    I believe so.

17  Q    And now it's just until they're needed.

18  A    Which is, which is not their decision, it's the debtor's

19  decision.

20  Q    I understand that.  It's debtor's decision if they meet

21  the thresholds before they're asked to leave, they're entitled

22  to compensation.

23  A    Correct.

24            MR. MacMASTER: I have no further questions Your

25  Honor.

MacMaster/Summation                              44

1              THE COURT: Okay.  Does the committee have any

2      questions?

3              MR. POSNER: Your Honor we have no questions for Mr.

4      Mandarino.

5              THE COURT: All right, thank you.  Mr. Mandarino you

6      can step down.

7              THE WITNESS: Thank you Your Honor.

8              THE COURT: You're welcome.  Thank you.  Is there

9      anything else?

10             MR. JUNG: Your Honor that is all in terms of

11     testimony.

12             THE COURT: Okay.

13             MR. JUNG: Would Your Honor like some oral argument on

14     the matter?

15             THE COURT: Please.

16             MR. JUNG: Your Honor --

17             THE COURT: Let me have the Trustee's arguments first

18     so you can address those and then we'll talk about it.

19             MR. MacMASTER: In 2005 obviously the Bankruptcy Code

20     was revised and 503(c ) was enacted.  And that was frankly, you

21     know, as a result of a lot of the abuses that were going on as

22     far as retention bonuses, severance bonuses.

23             THE COURT: Right.

24             MR. MacMASTER: Key incentive employee plan bonuses,

25     however you want to structure them.  503 (c ) was enacted to

MacMaster/Summation                                45

1   eradicate the notion that executives were entitled to bonuses

2   simply for staying with the company through the bankruptcy

3   process.

4              Well, you know, here you've got officers.  There's no

5   and that's what Mr. Mandarino's testimony is.  And tier 1

6   employees are all officers of the company.  Basically they're

7   staying Because they need them till the end of the case.  So

8   they're being retained, they're being paid to stay, they're

9   retention bonuses.  They can dress them up any way they want.

10  Sure they're tied to some certain benchmarks, you know.

11             The secured creditors $30 million, first benchmark is

12  $30 million.  I would submit that, I don't know how much of a

13  stretch it is for the debtor to really make that benchmark.

14             THE COURT: Right.

15             MR. MacMASTER: And they're going to get paid

16  significant bonuses.  I've seen worse.

17             THE COURT: Let's assume that threshold is raised.

18  I'm having trouble with the thresholds, so let's assume that

19  the threshold is raised.  I think it's too easy.

20             MR. MacMASTER: I don't know, I mean you still have to

21  look, you've got 503( c)(1) and (c )(2).  You have obviously

22  are there retention bonuses.  And if they are retention bonuses

23  or severance payments, you stayed this long so you're going to

24  get this in severance.

25             You have to satisfy the conditions of (c )(1) and

1   (c )(2).  You know if you decide that their neither retention

2   bonuses or severance payments and they are in fact true

3   incentive payments, you know, there's obviously case law out

4   there that says you can't make pure incentive payments.

5           THE COURT: Yes, there are a lot of cases.

6           MR. MacMASTER: And --

7           THE COURT: But a lot of cases aren't on the edge like

8   this.  That's what troubles me.

9           MR. MacMASTER: Right.  And, you know, so if the

10  incentive --

11          THE COURT: At least they wind up on the edge.  But

12  when these applications come in, they don't look like they're

13  on the edge.

14          MR. MacMASTER: Right.  You know, these people and

15  let's be honest, a lot of these employees are pretty well paid

16  right now and they're getting paid to do their job.

17          You know, okay, it sticks the company's being

18  liquidated.  But they're being well compensated to do what

19  they're supposed to do.

20          THE COURT: It's not like they were truly successful.

21          MR. MacMASTER: Right, right.

22          THE COURT: I mean let's face it.

23          MR. MacMASTER: Right, so --

24          THE COURT: I mean that may be harsh, but that's the

25  reality in that industry today, you know.  They're lined up at

1    the door, those guys.

2             MR. MacMASTER: I'm frankly a little more sympathetic

3    to the lower level people than I am to the higher level people.

4    So with the threshold raised and that's not before me, but, or,

5    I don't know what they would raise it to.  But certainly based

6    on what we have here, you know and what the case law says if

7    it's really a fairly easy goal to reach, then is it really an

8    incentive.  And I don't know that we have that here today, so.

9             THE COURT: Okay.  All right, thank you.  Mr. Jung do

10   you have anything?

11            MR. JUNG: Your Honor to summarize the plan and from

12   Mr. Mandarino's testimony, what the debtors are seeking to pay

13   is a relatively modest amount of what the key participants are

14   used to or accustomed to getting prior to the petition date.

15            At the same time Your Honor they are working

16   extraordinary hard to make sure that everyone in the case and

17   or the constituents in the case receive the highest

18   distribution possible.

19            Your Honor, Mr. Mandarino testified based on the

20   settlement agreement itself, key participants are not on the

21   top in terms of payment.

22            First Your Honor we have to repay probably over $31

23   million of the DIP which is higher than the threshold amount on

24   the KEIP.  Second Your Honor, the KEIP payment is in quote,

25   unquote tier 2 under the settlement agreement and it shares

1   with approximately $3 million of other administrative claims.

2          Your Honor we are all hoping on a successful process.

3   Although the Gordon Brothers sale process is under way, a

4   significant amount of work remains to be done.

5          Your Honor the company has 359 leases remaining which

6   are being negotiated as we speak.  We have potential parties

7   interested in a good number of those leases.  Your Honor those

8   negotiations are underway and many of these participants are

9   intimately involved in those negotiations.

10          Your Honor since the bankruptcy filing it is no

11   surprise that many vendors expressed great concerns in terms of

12   making sure that they would be paid.  Your Honor the company is

13   getting hundreds and I'm not exaggerating, hundreds of calls

14   from vendors, from shippers and from other service providers

15   and negotiations are taking place every day.

16          Your Honor in terms of thresholds, we do not believe

17   that the first threshold of 30 million is low, although the

18   actual number is 31 and maybe even higher.  Especially because

19   as Mr. Mandarino testified, the plan was put together before we

20   had the buyer.  The Gordon Brothers transactions provides a

21   guarantee in sales proceeds which is I believe approximately

22   $27 million which is below the threshold.

23          Your Honor so in sum, the reaching of the first

24   threshold depends on a quote, unquote "successful sale

25   process".  Your Honor, Mr. Mandarino also testified that it is

Jung/Summation                                    49

1    probably unlikely that the subsequent thresholds will be met.

2    So Your Honor what we are truly talking about is a payment of

3    $345,000, a payment that is made pari passu with other

4    administrative claims.

5            And Your Honor given the circumstance and

6    extraordinary work that the folks are doing, we believe that

7    the plan is justified under the company's business judgment.

8    It is a similar plan pre-petition as well as under the facts

9    and circumstances of this case.

10           And Your Honor lastly to address Mr. MacMaster's

11   point, this is not a retention plan.  Your Honor if any of

12   these people are not doing the work or are doing less than

13   they're supposed to be doing, they will no longer be with the

14   company.  So Mr. MacMaster's reference that they are being paid

15   to stay, Your Honor that is simply not --

16           THE COURT: It's not a retention, it's more of an

17   incentive plan.

18           MR. JUNG: It absolutely is an incentive to achieve

19   the goals that have been set in the case.

20           THE COURT: Certain goals, okay.  All right.

21           MR. JUNG: Thank you Your Honor.

22           THE COURT: You're welcome.  I'm sorry.

23           MR. POSNER: Briefly Your Honor.

24           THE COURT: Sure, please.

25           MR. POSNER: A few points.

1          THE COURT: Sure.

2          MR. POSNER: David Posner from Otterbourg for the

3    committee.  The committee understands the needs for incentive

4    plans and why the debtor wants an incentive plan and so we

5    don't oppose the relief requested.

6          Mr. Mandarino testified a little bit about the

7    waterfall and the settlement agreement and he referred to

8    guaranteed payment of general unsecured creditors of 525,000.

9          My only point there Your Honor is the settlement

10   agreement is not on for today and the agreement speaks for

11   itself.  And we'll have our day in Court when we'll all talk

12   about the settlement agreement.

13         And so I think until he saw the document, he was

14   speaking from his memory and the document speaks for itself.

15         We are concerned Your Honor, he made a point and I

16   think it is a valid one, some of the employees especially in

17   tier 2 which are more operational, legal, HR, systems, treasury

18   functions, if those people did leave I think he made a valid

19   point Your Honor that that probably would be replaced by more

20   administrative expense.  Because I suspect Lowenstein and Mr.

21   Mandarino would have to make up those functions rather than

22   hire people.  And so I think that's a, I think that's a valid

23   point Your Honor that Your Honor should consider.

24         And then lastly Your Honor made a comment about, you

25   know, folks perhaps not doing a good job.  There have been some

Decision                                    51

1    articles, I don't know if Your Honor has seen them in the local

2    papers in Cleveland and in Crain's where employees have

3    commented that if anybody didn't do a good job it was Lisa

4    Rhodes and she's no longer with the company and she's not part

5    of the plan.

6            THE COURT: Yes, I don't pass judgment, I'm just, you

7    know, suggesting the company wasn't profitable, you know.

8            MR. POSNER: That's all Your Honor.

9            THE COURT: All right, before the Court is an

10   application by the debtor in possession seeking authority under

11   Section 105(a) and 363(b) approving the debtor's key employment

12   incentive plan.

13           Mr. Mandarino's giving testimony in support of the

14   application.  U.S. Trustee has objected, essentially arguing

15   that under Bankruptcy Code, particularly the amendments of '05,

16   these applications are to be scrutinized and the exception

17   rather than the rule.

18           I don't have difficulty with the concept of incentive

19   program.  And in most cases, I'm concerned as I've said from

20   day one in this case about the fear of an insolvent estate.

21   And we're not going to have an insolvent estate if we have to

22   have 500 preference complaints filed, we'll have them filed.

23           So, you know, I've said that enough so I hope the

24   message is clear.  We're not going to have an insolvent estate

25   here.

Decision                                                        52

1       But that does worry me.  I think it's appropriate

2   that the incentives be tied to sales goals and incentives,

3   particularly in the posture that the case holds now.  I accept

4   Mr. Mandarino's testimony that the workload's increased not

5   only with reporting requirements but we've all been in the

6   situation where if there's a filing, the phone never stops

7   ringing and it's hectic.  And it's beyond the norm and I accept

8   that.

9       I think it's also important to have key employees

10  retained to meet the necessary thresholds.  But I am troubled

11  not only by the testimony of what I understand will be the

12  settlement that's brought before the Court for approval with a

13  $30 million threshold.  I just think it's too low and too easy

14  to reach, okay.

15      So we're kind of kidding ourselves when we call it

16  incentives. I think it's, if that's not reachable, then what

17  are we doing?

18      I think an incentive program should be designed to

19  give or pledge extra payment for extra work and extra incentive

20  to bring in sales.  So I'll approve to make a long story short,

21  I'll approve the program and I'll approve the numbers.  I don't

22  think the incentive dollars are really significant in the total

23  picture and I'll approve it.  But I'll only approve it if the

24  threshold is raised to 35 million.  It can be 35 million

25  instead of the 39.  But I just think the original, the original

1   threshold is too low.

2           So if you want to make the change in the order, if

3   that's acceptable to the debtor.

4           MR. JUNG: Your Honor 35 is acceptable.

5           THE COURT: All right.  Do you want to submit a new

6   order?

7           MR. JUNG: Yes.

8           THE COURT: I'm not sure you really need to submit a

9   new order.  Except that schedule, Exhibit A has 30 as the

10  range.  I could just make that 35.  I don't think, I don't

11  think there's much else that has to be done to it, does it?

12          MR. JUNG: Your Honor that's acceptable as well.

13          THE COURT: Okay, I'll make that change and I'll sign

14  the order today.

15          MR. JUNG: Thank you Your Honor.

16          THE COURT: All right, thank you.  Thanks everybody.

17                        * * * * *

18                  C E R T I F I C A T I O N

19          I, Tracy Gribben, court approved transcriber, certify

20  that the foregoing is a correct transcript from the official

21  digital audio recording of the proceedings in the above-

22  entitled matter.

23  _____

24  /S/TRACY GRIBBEN

25  TRACY GRIBBEN TRANSCRIPTION, LLC      April 9, 2014